IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA


UNITED STATES OF AMERICA,            CRIMINAL ACTION

              vs.                    No. 21-10

KHALED MIAH,

        Defendant.


═══════════════════════════════


Transcript of VIDEO DETENTION HEARING
held on January 8, 2021
United States District Court, Pittsburgh, Pennsylvania
BEFORE:  HONORABLE RICHARD A. LANZILLO, DISTRICT MAGISTRATE


<u>APPEARANCES</u>:

For USA:                    Jessica Lieber Smolar, Esq.
                            Assistant U.S. Attorney
                            U.S. Attorney's Office
                            700 Grant Street
                            Pittsburgh, PA 15219


For the Defendant:          Adrian N. Roe, Esq.
                            428 Boulevard of the Allies,
                            Pittsburgh, PA 15219




Court Reporter:             Karen M. Earley, RDR-CRR
                            Joseph F. Weis, Jr.
                            U.S. Courthouse
                            6260 U.S. Courthouse
                            700 Grant Street
                            Pittsburgh, PA 15219
                            412-201-2660



Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

```
                        I N D E X

                         - - -

                  DIRECT   CROSS   REDIRECT   RECROSS
```

GOVERNMENT'S WITNESS:

Special Agent Morgan        6       71        80          --

DEFENSE WITNESS:

Limon Miah                 82       90        --          --



GOVERNMENT'S EXHIBITS:

No. 1 Screen shot of Twitter account

No. 2 Information obtained from defendant's ICloud

No. 3 Document from defendant's ICloud account

No. 4 Search warrant

No. 5 Video received from phone and ICloud account

No. 6 Photo

No. 7 Female ROTC student being filmed

No. 8 Selfie of defendant in tactical attire

No. 9 Defendant's Isis propaganda pose

No. 10 Defendant with long gun at Action Target

No. 11 Defendant at gun range with long gun with scope

No. 12 Screen shot for rental information

No. 13 Screen shot search results

No. 14 Screen shot black bag with mock IEDs

No. 15 Still of beheading video

No. 16 Islamist imagery black standard flag

No. 17 Photo of defendant next to Dzhokhar Tsarnaev

No. 18 Photo of news reporting of Boston marathon attack

No. 19 Photo

No. 20 Video

No. 21 Video

No. 22 Compilation of photos

No. 23 Search warrant Order signed by Judge Lenihan

No. 24 Search of Judge Lenihan

No. 25 Defendant's Twitter account tweet

No. 26 Defendant's Twitter account tweet

No. 27 Defendant's Twitter account tweet

No. 28 Defendant's Twitter account tweet

No. 29 Defendant's Twitter account tweet

1                    P R O C E E D I N G S

2      (January 8, 2021, 10:20 a.m.  In open court via

3      videoconferencing.)

4                    THE COURT:  Good morning.

5                    This is the time set for the preliminary

6      hearing and, if necessary, detention hearing in the

7      matter of United States versus Miah at Docket

8      No. 21-mj-10 on the Pittsburgh Division docket.

9                    Let me begin by taking the appearances of

10     counsel.

11                   Attorney Smolar, good morning.

12                   MS. SMOLAR:  Good morning, Your Honor.

13                   Jessica Smolar on behalf of the United States.

14                   THE COURT:  And good morning, Attorney Roe.

15                   MR. ROE:  Good morning, Your Honor.

16                   THE COURT:  Now before I proceed further --

17                   MR. ROE:  I'm sorry to interrupt, Your Honor.

18     I just cannot see -- there you are.  Sorry.  There are

19     so many people on the Zoom call, I couldn't see you.  I

20     would like to see whom I'm talking with.  Sure.

21                   THE COURT:  I'm the one in the robe.

22                   MR. ROE:  Got it.

23                   THE COURT:  We'll proceed further.

24                   Mr. Miah, I need to advise you that normally

25     you would be present here in the courtroom with us today

1   for this proceeding but due to health concerns arising

2   out of the Coronavirus pandemic, federal law now

3   authorizes me to conduct this and other proceedings by

4   videoconference so long as you consent after having had

5   an opportunity to consult with your attorney.

6           So let me ask you, Mr. Miah, do I have your

7   consent this morning to proceed by videoconference?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Thank you, sir.  Very good.

10          Now the purpose of the preliminary hearing,

11  Mr. Miah, is to determine if there is probable cause to

12  believe that you committed the offenses with which you

13  are charged and so with that, we will then turn to

14  attorney Smolar who may proceed.

15          MS. SMOLAR:  Thank you, Your Honor.

16          At this time the government would like to

17  proffer the complaint affidavit submitted in this matter

18  for purposes of a showing of probable cause.

19          In addition, the government does have a

20  witness, Special Agent Gary Morgan from the FBI, who I

21  would like to have testify on both the preliminary

22  hearing and the detention matters at one time, if that

23  is acceptable to the Court.

24          THE COURT:  It's acceptable to the Court.

25          Any objection to that approach, Attorney Roe?

1              MR. ROE:  I have no objection, Your Honor, to

2      the testimony as to both proceedings.

3              Thank you.

4              THE COURT:  All right.  I will receive the

5      criminal complaint and you may call Agent Morgan.

6              MS. SMOLAR:  Thank you, Your Honor.

7              At this time the government calls Special

8      Agent Gary Morgan, and if you could please unmute.

9              THE COURT:  Then I'll ask my courtroom deputy

10     to administer the oath to Agent Morgan.

11             THE DEPUTY CLERK:  Agent Morgan, can you

12     please stand and raise your right hand.

13             SPECIAL AGENT GARY MORGAN, a witness herein,

14     having been duly sworn, testified as follows:

15             THE DEPUTY CLERK:  You can be seated.

16             THE COURT:  Before we begin, Agent Morgan, can

17     you state and spell your full name for the record,

18     please.

19             THE WITNESS:  Yes, Your Honor.  Special Agent

20     Gary Morgan.  G-a-r-y, M-o-r-g-a-n.

21             THE COURT:  Thank you.

22             Attorney Smolar, you may proceed.

23                       DIRECT EXAMINATION

24     BY MS. SMOLAR:

25     Q.   Good morning, Special Agent Morgan.  Can you please

**Special Agent Morgan - Direct**

1  tell us how you are currently employed?

2  A.   I'm a special agent with the FBI assigned to the

3  Pittsburgh Field Division.

4  Q.   What section are you assigned to within the

5  Pittsburgh Field Division?

6  A.   I'm specifically assigned to the Joint Terrorism

7  Task Force.

8  Q.   How long have you been a special agent with the

9  FBI?

10  A.   Approximately 17 years.

11  Q.   And during the course of your 17 years with the

12  FBI, what areas have you been assigned to investigate?

13  A.   National security investigations, specifically

14  international terrorism.  I'm also a crisis negotiator.

15  I was previously an evidence response technician as well

16  and a whole host of areas.

17  Q.   Prior to joining the FBI 17 years ago, were you

18  also in law enforcement?

19  A.   Yes.  I was an intelligence analyst with the Drug

20  Enforcement Administration for six years.

21  Q.   What does a crisis negotiator do?

22  A.   The primary role of a crisis negotiator is to

23  engage with individuals in crisis.  Oftentimes we assist

24  our SWAT team or the HRT, the hostage rescue team, in

25  gaining the cooperation of individuals and ensuring

1   their safe exit of a residence or a structure to effect

2   an arrest or conduct a search.

3   Q.   Can you briefly explain your training and

4   experience in working with the joint terrorism task

5   force and international terrorism cases?

6   A.   I received basic training at Quantico for a number

7   of weeks.  I have since graduating Quantico 17 years

8   ago, I regularly participated in training, online

9   training, in-person training regarding international

10  terrorism, threat indicators, investigative techniques,

11  analysis of information and evidence, things of that

12  nature.

13  Q.   During the course of your training, have you also

14  had occasion to receive training and information from

15  FBI's Behavioral Analysis Unit?

16  A.   Yes.  I consulted with the Behavioral Analysis Unit

17  on a number of investigations to include this matter.

18  Q.   What is the Behavioral Analysis Unit?

19  A.   The Behavioral Analysis Unit is a cadre of highly

20  specialized special agents who assist agents in the

21  field in primarily assessing risks, developing interview

22  strategies, neutralization approaches, developing ways

23  to effectively resolve investigations when their

24  specific specialization is needed.

25  Q.   Have you reviewed the complaint affidavit in this

**Special Agent Morgan - Direct**

1   case?

2   A.   I have.

3   Q.   And you are familiar with the facts of the

4   investigation of the defendant Khaled Miah?

5   A.   Yes, and the charges.

6   Q.   Can you tell us generally what started the FBI

7   investigation into Mr. Miah?

8   A.   Approximately in January of 2019, the FBI became

9   aware of a YouTube handle, the handle was Blitz Kreig.

10   That YouTube handle was being used to convey threats to

11   another user and the user Blitz Kreig also intimated a

12   potential attack in the United States.  That handle was

13   determined to be resolved to Mr. Miah.

14   Q.   And did the FBI attempt to approach Mr. Miah about

15   these threats in April of 2019?

16   A.   Yes, to no avail.  That was the first time efforts

17   were made to approach Mr. Miah and multiple efforts from

18   me to contact him via phone, as well as going to his

19   residence.

20   Q.   The investigation into Mr. Miah's social media

21   posts continued, however, after April of 2019; correct?

22   A.   Yes, it did.

23   Q.   And the FBI tried again this past September of 2020

24   to interview Mr. Miah; correct?

25   A.   Yes, ma'am.  The first attempt occurred on

**Special Agent Morgan - Direct**

1   September 28 of 2020.

2   Q.   Tell us just briefly what happened there?  I'm

3   going to refer the Court as well to the complaint at

4   Paragraph 21.

5   A.   Okay.  A special agent, I believe a task force

6   officer went to Mr. Miah's residence.  They knocked on

7   the door, and they identified themselves.  I believe a

8   roommate of Mr. Miah answered the door.  Mr. Miah was I

9   believe upstairs at the time.  The roommate notified

10  Mr. Miah that law enforcement was there to speak with

11  him.

12          It's my understanding that Mr. Miah rather

13  than coming to the door to speak with the law

14  enforcement personnel proceeded to take a shower,

15  appeared to take a considerable amount of time in coming

16  down to the agents.

17          He was very uncooperative, engaged in erratic

18  and provocative ways.  He ultimately refused to provide

19  any substantive information in response to the

20  questions.

21  Q.   That interview was concluded then; correct?

22  A.   It was, yes.

23  Q.   Did there come a time on September 28 that

24  Mr. Miah --

25          (Cell phone starts to ring.)

**Special Agent Morgan - Direct**

1      MR. ROE:  Excuse me.  I'm sorry.  I apologize.

2      THE COURT:  You may continue.

3  Q.   Did there come a time on September 28 after that

4  interview was concluded that the FBI had occasion to

5  interact with Mr. Miah yet again?

6  A.   Yes.  Later that evening Mr. Miah presented himself

7  at the FBI Building over on the South Side of Pittsburgh

8  on East Carson Street.  He approached a guard at the

9  guard shack at the entrance gate.  He indicated his

10  desire to register a complaint against the FBI agents.

11  He was told to come back during the normal business

12  hours.

13  Q.   What happened after that?

14  A.   As he was departing, an agent, another agent was

15  leaving our building.  Our building is a secured

16  building.  It has a perimeter fence, all sorts of

17  structures to avoid impermissible entry.

18      As an agent was leaving the building, Mr. Miah

19  and his vehicle followed on behind that agent, driving

20  at a high rate of speed in an erratic manner.  I believe

21  at one point Mr. Miah pulled alongside of the driver.

22  It appeared as though Mr. Miah was attempting to take a

23  photograph of the agent.

24      Mr. Miah, he had his face covered, perhaps

25  because of Corona.  He had his face covered and was

1    wearing a ball cap.

2            The agent noticing these erratic behaviors was

3    able to follow behind Mr. Miah, noted Mr. Miah's

4    license plate, called our operation center, advised the

5    operation center of what was transpiring, provided that

6    license plate number to the operations center.  They

7    determined it was resolved to Mr. Miah and there was a

8    subsequent investigation and notified the agent

9    accordingly.

10   Q.   Did it appear based upon your communications with

11   that agent that Mr. Miah was attempting to take a

12   photograph of him?

13   A.   I did not speak directly with the agent who was

14   being followed but based on my conversations with agents

15   who spoke with that agent directly, yes, that is my

16   understanding.

17   Q.   Did the FBI then contact Mr. Miah the next day on

18   September 29th?

19   A.   Yes.  The next day, the supervisory special agent

20   contacted Mr. Miah via phone.  There was a brief

21   exchange over the phone and Mr. Miah at that point

22   agreed to return to the FBI Building to further discuss

23   the matter.

24   Q.   How did that go?

25   A.   It was not productive at all.  Mr. Miah gave some

1  basic biographical information.  He engaged in very

2  general light background discussion.  Again, he declined

3  to provide any substantive information.

4         At one point Mr. Miah was presented with

5  screen shots of the concerning YouTube posts.  Mr. Miah

6  responded in words to the effect he couldn't confirm or

7  deny at that moment.

8         There were several questions about specific

9  accounts that he gave similar responses.

10        Soon thereafter the interview concluded.

11 Mr. Miah was presented with a business card of the

12 agent.  That agent expressed his desire to resolve this

13 matter with Mr. Miah, asked Mr. Miah to please contact

14 the FBI, that agent directly at a future time, either

15 directly or through his counsel.

16 Q.   And that agent is Special Agent A as set forth in

17 the complaint affidavit?

18 A.   Yes.

19 Q.   The supervisory special agent that called Mr. Miah

20 is also referenced as Supervisory Special Agent A in the

21 complaint affidavit; correct?

22 A.   That is correct, yes.

23 Q.   Based on your experience as an agent for 17 years,

24 and even as a crisis negotiator, what is your

25 understanding of the intent of the agents in trying to

**Special Agent Morgan - Direct**

1    interview Mr. Miah two times -- well, actually, three

2    times if you go back to April of 2019 with regard to

3    this matter?

4    A.   The intent was simply to answer specific questions

5    that were attempted being posed to Mr. Miah to no avail,

6    gain that information, try to understand if he had an

7    explanation for the post and ideally, if he had logical

8    explanations, and absent further conflicting statements

9    or derogatory information, the matter would likely have

10   been closed at that time, the investigation would have

11   likely been closed.

12   Q.   That's not what happened, however, is it?

13   A.   That is not.

14   Q.   Instead, what ended up happening after the

15   September 29th attempted interview of Mr. Miah?

16   A.   Very soon thereafter Mr. Miah began escalating his

17   behavior, specifically surveilling the FBI, Special

18   Agent A as outlined in the complaint and also posting

19   threatening tweets and communications about various FBI

20   personnel task force officers, the FBI in general, as

21   well as Special Agent A's spouse.

22   Q.   All right.  You referred to tweets and I assume you

23   are referring to the use of Twitter; correct?

24   A.   Yes, ma'am.

25   Q.   Twitter is an interactive social media platform

**Special Agent Morgan - Direct**

1   located in San Francisco, California; correct?

2   A.   Correct.

3   Q.   At all times relevant to this complaint, Mr. Miah

4   was located here in the Western District of

5   Pennsylvania; correct?

6   A.   That is correct.

7   Q.   Did there come a time after the attempted

8   interviews of Mr. Miah that the FBI noted that he was

9   deleting accounts that were under investigation?

10  A.   Yes.  I believe it was on or about August 5th,

11  agents began revealing Mr. Miah's accounts and they

12  noticed material changes and deletions to those

13  accounts.

14          Specifically, Mr. Miah changed profile photos,

15  display names, locations to which his accounts resolved.

16  Additionally, Mr. Miah deleted numerous tweets.

17  Q.   And, in fact, he also deleted whole accounts;

18  correct?

19  A.   Yes, ma'am, he did.  I believe it was QassamSol was

20  the Twitter handle he deleted in total.

21  Q.   And that account specifically is one that the FBI

22  attempted to execute a search warrant on and could not

23  because it had been deleted and Twitter had failed to

24  preserve it; correct?

25  A.   That's correct.  As such, we are unable to recover

**Special Agent Morgan - Direct**

1    any data with respect to that account.

2    Q.   On or about October 8, the FBI discovered that

3    Mr. Miah had actually created a Twitter profile that

4    involved personal information about Special Agent A's

5    wife; correct?

6    A.   That is correct.

7              MS. SMOLAR:  Your Honor, if I could share my

8    screen at this time, I have some exhibits.

9              THE COURT:  Yes, you may proceed.

10             MS. SMOLAR:  Thank you.

11             Can everyone see what is marked as Government

12   Exhibit 1?

13             THE COURT:  It's visible on the Court's

14   screen.

15             Attorney Roe, are you able to review the

16   document?  You're muted, Attorney Roe.

17             MR. ROE:  Give me just a moment.  I would like

18   to make it bigger on my screen.

19             (Pause in the proceedings.)

20             MR. ROE:  I'm still working on it.  Bear with

21   me, Your Honor.

22             THE COURT:  Just let me know when you're

23   ready.

24             MR. ROE:  Thank you.

25             (Pause in the proceedings.)

**Special Agent Morgan - Direct**

1      MR. ROE:  Could you please increase the size

2 of this document a little bit?

3      MS. SMOLAR:  I'm not sure I can.  I don't

4 believe it can be increased.  It's a screen shot of a

5 Twitter --

6      MR. ROE:  Okay.  Thank you.  I'll work with

7 this.  Go ahead.

8      MS. SMOLAR:  I'll try to walk you through it.

9 BY MS. SMOLAR:

10 Q.   Special Agent Morgan, did the FBI prepare exhibits

11 for purposes of today's detention hearing?

12 A.   Yes, ma'am.

13 Q.   Is Exhibit 1 one of those exhibits?

14 A.   Yes, it is.

15 Q.   I will acknowledge we have redacted this document

16 for privacy purposes, but Special Agent Morgan, isn't it

17 correct that the actual document was not redacted;

18 correct?

19 A.   That's correct, yes.

20 Q.   Can you identify for the Court what this document

21 is?

22 A.   So this is a screen shot of a Twitter handle that

23 Mr. Miah was using.  The previous handle name was

24 Lugenpress which I believe translates to en Lionpress.

25 This is one of the handles Mr. Miah changed to reflect

1   the name of the first name of the spouse of Special

2   Agent A and then "press" following her name.  What is

3   redacted there is a photograph of that special agent's

4   spouse.

5   Q.   Okay.  There also were some alterations to her face

6   and a bubble above her head; correct?

7   A.   Yes.  It's a sexual comment, a rude sexual comment,

8   yes.

9   Q.   There were some international flags placed on her

10  face; correct?

11  A.   Yes, I believe beneath her eyes.

12  Q.   And above that picture, profile picture, there is a

13  picture of five what appear to be men.  Their heads are

14  not shown.  Can you tell me what that picture is from?

15  A.   Yes.  That is a wedding photograph of Special Agent

16  A's wedding to his wife who is depicted in the photo,

17  the profile photo.

18  Q.   In the body of this -- first of all, was this

19  Twitter publicly accessible?

20  A.   Yes.

21  Q.   So underneath the profile picture, what types of

22  information was placed on this Twitter?

23  A.   There's biographical information regarding the

24  spouse to include her place of employment, where she was

25  educated, her age, physical characteristics such as

**Special Agent Morgan - Direct**

1   color of her hair, religion and then, again, some rude

2   comments making reference to Special Agent A.

3   Q.   What types of comments -- we don't need to talk

4   about the sexual comments but what types of other

5   comments were placed on the Twitter about Special Agent

6   A?

7   A.   There's a tweet.  I believe it's the second tweet

8   that appears in the image -- would you like me to read

9   it?

10  Q.   Sure.

11  A.   White supremacy, European cultural supremacy is a

12  great evil.  Unfortunately, far too many adherents of

13  this hateful ideology have infiltrated government and

14  its agencies, which presume to be a reference to Special

15  Agent A.

16  Q.   Has the FBI determined prior to even the creation

17  of this account that that Lugenpresse account was

18  attributed to Mr. Miah; correct?

19  A.   Yes.  A phone number known to be utilized by

20  Mr. Miah was used to register that account.

21          MS. SMOLAR:  Your Honor, at this time I ask

22  Government Exhibit 1 be admitted.

23          THE COURT:  Any objection?

24          MR. ROE:  No objection.

25          THE COURT:  It will be admitted.

1   Q.   Mr. Morgan, the FBI executed a federal search

2   warrant at Mr. Miah's residence on October 9 of 2020;

3   correct?

4   A.   That's correct.

5   Q.   Were any electronic items seized during the course

6   of that search?

7   A.   Yes.  Seven electronic items were seized to include

8   an iPad, an iPhone, and a Samsung phone.

9   Q.   During the course of that search, was Mr. Miah

10  attempted to be interviewed again?

11  A.   Yes, attempts were made to interview Mr. Miah

12  again, but largely to no avail yet again.

13  Q.   However, did he make any admissions concerning

14  Government's Exhibit 1, the Twitter with Special Agent

15  A's wife's face on it?

16  A.   Yes.  Mr. Miah acknowledged that he did, in fact,

17  make those alterations.  He knew who these individuals

18  were and he intimated these actions were wrong.

19  Q.   Did the FBI also execute a federal search warrant

20  on Mr. Miah's ICloud account?

21  A.   Yes.

22  Q.   That's an Apple ICloud account?

23  A.   That's correct.

24  Q.   Was a forensic examination conducted by the FBI on

25  the devices seized during the October 9 search, as well

**Special Agent Morgan - Direct**

1   as the ICloud account?

2   A.   Yes.

3   Q.   Did you have occasion to review a number of the

4   items that were seized and what was on them?

5   A.   I did, yes.

6   Q.   Let's talk a little bit about what was found on his

7   devices.

8          Was there anything found on his devices

9   concerning the FBI agents who had been trying to

10  interview him?

11  A.   Yes, there was actually very concerning

12  information.  Over a period of time, I believe since the

13  first attempted contact -- well, the actual contact was

14  in September of 2020 -- September 28 of 2020 until the

15  time of the essentially the execution of the warrant,

16  Mr. Miah used multiple devices to conduct numerous open

17  source searches on essentially everyone that he had come

18  in contact with through the FBI Building to include task

19  force officers, special agents, the wife of a special

20  agent.  He also queried information pertaining to lying

21  to the FBI, as well as terrorism.

22  Q.   Did he also do searches concerning Special Agent

23  A's other family members?

24  A.   He did, yes.  He found photographs of Special Agent

25  A's extended family and was aware of the victim's

1  sister, as well as other members of the family, yes, the

2  extended family, yes.

3  Q.   So as you were reviewing his devices, did you also

4  find other photographs of Special Agent A and his wife

5  and family members and commentary about that?

6  A.   Yes.  We found a WhatsApp communication between

7  Mr. Miah and an associate.

8  Q.   What did that say?

9  A.   Well, it was -- Mr. Miah directed four photographs

10  to the associate.  The photos were of the special agent

11  and his spouse and then Mr. Miah accompanied those

12  photos by a text indicating that these were his, "his"

13  being the special agent, his wife, close friends.

14       Mr. Miah indicates it's all public

15  information, along with the agent's credentials, shield

16  number, I assume his badge number, the make of his

17  official FBI vehicle, I believe the license plate of

18  that vehicle as well, the license plate of the special

19  agent and presumably the spouse's personal vehicle and

20  indicates the residence as well, the residence where the

21  agent and this spouse reside.

22  Q.   So he says in that WhatsApp chat that he knows the

23  location of the personal residence of Special Agent A;

24  correct?

25  A.   That is correct.

**Special Agent Morgan - Direct**

1   Q.   I would like to show you what's been marked for

2   identification as Government Exhibit 2, and can you

3   identify for the Court what this exhibit is?  I will

4   acknowledge having highlighted some of the items on this

5   for ease of presentation today.

6   A.   This is a document prepared by the FBI and the data

7   in the document is information provided by Apple in

8   response to a search warrant.

9   Q.   Okay.  So where it says "Search Warrant Returns For

10  Apple" and then there is a number and

11  "Notable/Concerning Activities," those are comments by

12  the FBI; correct?

13  A.   Yes.  Those headings were -- those annotations were

14  made by the FBI that are bold and underlined.

15  Q.   However, the specific entries that are listed next

16  to numbers underneath the Notable/Concerning Activities,

17  those are directly the ICloud?

18  A.   That's correct.  That is essentially the raw data

19  from the ICloud.

20  Q.   Beginning with -- let's just start with the

21  highlighted items.  Could you just read for us what some

22  of those say and what they are.

23  A.   The first highlighted item is written personal

24  timeline from 2010 through 2014 and then parenthetically

25  in quotations, Osama death, followed by discovery of

**Special Agent Morgan - Direct**

1    jihad, followed by radicalization, followed by

2    seclusion, followed by deep radicalization, followed by

3    realization of purpose, followed by ISIS, et cetera, and

4    the "et cetera" is the entry that appears there.

5    Q.   The next one.

6    A.   The next one is a video pretending to shoot PBP,

7    which is Pittsburgh Bureau of police officer, while

8    passing by in vehicle.

9    Q.   The next one.

10   A.   Image Bing search results VBIEDs and car bombs

11   2017-1101.

12   Q.   The next one appears to been an audio file.  What

13   is that?

14   A.   This is me conducting surveillance on your house.

15   I'm coming for you, mother fucker.

16   Q.   The next one.

17   A.   Audio praising recent killing of Sufi Muslims in

18   Egypt.  In quotations, I'm very glad that that happened.

19   Should happen more often.  Only one version of Islam.

20   Salifism.  Death to you all.

21   Q.   What does the next one say?

22   A.   Fuck the police in English, followed by speech in

23   Arabic praising ISIS and Abu Bakr Al-Baghdadi.

24   Q.   And let's just do the last few.  The next one,

25   walking on Pitt's campus, can you tell us what that

1  says?

2  A.   Walking on Pitt's campus and talking on the phone.

3  Is that a chick?  I'm going to fucking rape that girl.

4         The next entry is following female ROTC

5  student on Pitt's campus.

6         Then replace SIM card for FBI surveillance.

7         Outstanding goals.

8         Photo of residence, search warrant with

9  handwritten markings.

10  Q.   Under outstanding goals, there is something in

11  parenthetical?

12  A.   Yes.  In quotations, toss SIM card and fake check.

13         MS. SMOLAR:  Your Honor, I would ask

14  Government Exhibit 2 be admitted into evidence.

15         MR. ROE:  Your Honor, I'm going to object to

16  that exhibit.  I'm concerned some of the documents that

17  are being summarized here may be -- the summary may be

18  misleading.  I don't mean to -- for example, there are

19  documents in this case where this person is taking

20  courses at the University of Pittsburgh.  I believe the

21  course is terrorism and is taught at Pitt and without

22  seeing more detail for the specific entry, I think the

23  summary is improper.

24         MS. SMOLAR:  Your Honor, I would object to

25  that assessment.  This is merely a summary of

**Special Agent Morgan - Direct**

1  specifically what was taken from his ICloud account

2  pursuant to a search warrant.

3          There is no editorializing in this document.

4  This is a detention hearing.  This is merely for

5  purposes of detention, and the Rules of Evidence do not

6  apply in this matter.

7          To the extent that we are talking about a

8  terrorism course at Pitt, I would be happy to provide

9  evidence that this was not used for a terrorism course

10  at Pitt.

11          THE COURT:  Yes.  I'm going to admit it.  I

12  understand the argument made by defense counsel but I

13  will consider it for what it's worth based upon the

14  content here before me.  It is simply a summary.  So it

15  is admitted.

16          MS. SMOLAR:  Thank you, Your Honor.

17          MR. ROE:  Thank you, Your Honor.

18  BY MS. SMOLAR:

19  Q.   Special Agent Morgan, I'm going to show you what

20  has been marked as Government Exhibit 3.  Can you

21  identify this for the Court, please?

22  A.   This was an item seized subsequent to the search of

23  the ICloud account.

24  Q.   So that actual document came from the search

25  warrant return of the ICloud?

**Special Agent Morgan - Direct**

1  A.   Yes, ma'am.

2  Q.   Can you tell us what it is?

3  A.   It appears to be a timeline of 2010 through 2024.

4  Q.   Based on your review of the ICloud return, is this

5  the same timeline that was referred to in Government

6  Exhibit 2?

7  A.   Yes.

8  Q.   Can you tell us some of the things that the FBI

9  noted from this timeline?

10 A.   Specifically following the entry for the year 2011,

11 the entries include Arab spring, Al-Islam, Osama's

12 death, discovery of Jihad, radicalization.  Those are

13 the entries for 2011.

14 Q.   Also, 2014, what are some of those entries?

15 A.   2014, those entries include realization of purpose,

16 glorious Ramadan, eat sheep slaughter, fired, I believe

17 it is, and job search.

18 Q.   Mr. Morgan, is it your understanding that -- so

19 this came from Mr. Miah's ICloud; correct?

20 A.   That is correct.

21 Q.   Is it your understanding that these dates 2010 to

22 2014 predate Mr. Miah's attendance at the University of

23 Pittsburgh?

24 A.   Yes, ma'am.

25 Q.   Thank you.

**Special Agent Morgan - Direct**

1          MS. SMOLAR:  Your Honor, I would ask
2    Government Exhibit 3 be admitted.
3          THE COURT:  Any objection?
4          MR. ROE:  Can I have clarification.  Is this
5    his handwriting?  Have we authenticated this
6    handwriting?
7          THE COURT:  This was procured via the search
8    warrant from an account controlled by the defendant is
9    my understanding.
10         MR. ROE:  Thank you.  I have no objection.
11         THE COURT:  All right.  It's admitted.
12   Q.   Special Agent Morgan, can you tell us what we are
13   seeing here in Government Exhibit 4?
14   A.   This is also from the search of the ICloud and this
15   is a Bing search return with respect to VBIEDs.
16   Q.   What are VBIEDs?
17   A.   Vehicle borne improvised explosive devices, car
18   bombs essentially, car bombs, truck bombs.
19         MS. SMOLAR:  I would ask Government Exhibit 4
20   be admitted.
21         MR. ROE:  No objection.
22         THE COURT:  That's admitted as well.
23   Q.   Special Agent, what are we seeing in Government
24   Exhibit 5 and it is a video which I can play after you
25   have identified it for us?

**Special Agent Morgan - Direct**

1   A.   Sure.   This is a video of a Pittsburgh police

2   officer entering his service vehicle.   Mr. Miah, as he

3   is driving by, he is motioning with his hand a gun, the

4   firing of a gun at the police officer.

5   Q.   Where was this video recovered from?

6   A.   This was from the iPhone, I believe.

7   Q.   And it was also identified in that summary on the

8   ICloud; correct?

9   A.   Yes.

10          (Whereupon, the video was played for the

11   Court.)

12          MS. SMOLAR:   I ask Government Exhibit 5 be

13   admitted.

14          THE COURT:   For the record, it will be

15   admitted.   For the record, the mimicking of gunfire, was

16   that the sound that I heard on the video?

17   Q.   Special Agent Morgan, you can answer that.

18   A.   Yes.   Yes.

19          THE COURT:   All right.   I did not see the

20   hand.   Can you replay that, please.

21          (Whereupon, the video was replayed for the

22   Court.)

23          THE COURT:   That's admitted.   You may proceed,

24   Attorney Smolar.

25   Q.   So, Special Agent Morgan, maybe there's some

**Special Agent Morgan - Direct**

1   confusion as far as a hand gesture.  I'm showing you

2   what is now marked as Government Exhibit 6.  Was this

3   item also retrieved by the FBI pursuant to forensic

4   examination of his electronic devices?

5   A.   Yes.

6   Q.   What are we seeing there?

7   A.   Yes.  This is actually the video where the hand

8   motion of the gun appears and as Mr. Miah is driving by

9   an individual, he is making that gesture.

10           MS. SMOLAR:  I ask Government Exhibit 6 be

11  admitted.

12           MR. ROE:  No objection.

13           THE COURT:  It's admitted.  I was confusing

14  these two exhibits.

15           MS. SMOLAR:  As was I, Your Honor.  I

16  apologize.

17  Q.   I'm going to show you now what's been marked for

18  identification as Government Exhibit 7.  I believe we

19  noted in the previous exhibit concerning the ICloud

20  there was something about following an ROTC student.

21           Can you identify this exhibit for us and

22  explain what we were seeing.

23  A.   Yes.  This exhibit was taken from the iPhone.  It's

24  an ROTC female student on the University of Pittsburgh

25  campus who is being covertly surveilled or filmed by

**Special Agent Morgan - Direct**

1   Mr. Miah.

2   Q.   Did you also find videos of Mr. Miah following this

3   particular ROTC student?

4   A.   Yes.

5   Q.   And what is in the green box on the right of this

6   slide?

7   A.   That's an exchange that Mr. Miah had with an

8   associate.  Specifically in the red highlighted portion,

9   the text, response for Baghdadi.  I have been following

10  her for ten minutes.

11  Q.   I think it says revenge.

12  A.   Revenge for Baghdadi.  I'm sorry.  Revenge for

13  Baghdadi.

14  Q.   And that came from a social media comment to an

15  associate?

16  A.   Yes.  That was via WhatsApp.

17          MS. SMOLAR:  I would ask that Government

18  Exhibit 7 be admitted.

19          THE COURT:  It's admitted.

20  Q.   During the course of your investigation concerning

21  Mr. Miah, did you become aware of his interest in going

22  to a shooting range and also his interest in guns?

23  A.   Yes, we did.

24  Q.   I'm going to direct the Court to the complaint at

25  Paragraphs 43 and 44 that discuss the shooting range.

**Special Agent Morgan - Direct**

 1          Can you briefly summarize for us where

 2    Mr. Miah was found to be going and how often and also

 3    the interest in guns.

 4    A.    Specifically with respect to the range, Mr. Miah

 5    was going to Keystone Shooting Center which is located

 6    in Mars, Pennsylvania.  He visited that range

 7    approximately nine times, the last time being the final

 8    weeks of September.  I believe he went once in the third

 9    week of September and then again in the final week of

10    September.

11          Also, at the gun range he was able to rent

12    both handguns and long guns on at least six occasions

13    and discharge those weapons.  Mr. Miah also would peruse

14    and review different firearms for sale at the shop

15    portion of the gun center of the Keystone Shooting

16    Center.

17    Q.    During the last visit, was he seen perusing

18    specific items at the Keystone Shooting Center?

19    A.    Yes, he was.  He was looking at various firearms.

20    I believe he was also looking at some air soft items as

21    well.

22    Q.    Was he looking at scopes?

23    A.    Yes, he was looking at scopes for long guns.

24    Q.    Now, to be clear, Mr. Miah is not prohibited from

25    owning a gun at this time; correct?

1    A.    He is not a prohibited person.  So he is able to

2    legally possess, handle, and discharge firearms.

3    Q.    So if he wanted to go buy a gun tomorrow, he could?

4    A.    Yes, ma'am.

5    Q.    During your review of Mr. Miah's devices and going

6    back to that, we took seven devices from his residence

7    as well as the ICloud, did you find numerous pictures of

8    Mr. Miah with guns?

9    A.    Yes, we did.

10   Q.    Were most of these selfies --

11   A.    Yes.

12   Q.    -- as the kids use that term?

13   A.    I believe they are all selfies, yes.

14   Q.    When we refer to selfies, how would you understand

15   that term?

16   A.    That is Mr. Miah taking a photograph of himself

17   utilizing one of his electronic devices.

18   Q.    I'm showing you what has been marked as Government

19   Exhibit 8 I believe.  Can you identify this for us,

20   please?

21   A.    This is Mr. Miah attired in a hat, mirrored

22   sunglasses, a face covering and a tactical vest, what

23   appears to be potentially a ballistic vest or what is

24   commonly referred to as a bulletproof vest.

25   Q.    This was found on Mr. Miah's own devices; correct?

**Special Agent Morgan - Direct**

1    A.   That's correct.

2              MS. SMOLAR:  I ask Government Exhibit 8 be

3    admitted.

4              THE COURT:  It's admitted.

5    Q.   I'm showing you now what has been marked as

6    Government Exhibit 9.  Can you identify that for us,

7    please?

8    A.   Yes.  That is also a photo taken from Mr. Miah's

9    devices.  That photo is the common area of Mr. Miah's

10   residence, the parquet floor, those doors, the grading

11   on the floor.

12              The photograph is of an individual attired in

13   black with his face covered, a camouflage jacket and

14   what appears to be a backpack across his chest with his

15   arms across the backpack.

16   Q.   Based on your experience as an FBI agent for 17

17   years, does the pose in this photograph mean anything to

18   you?

19   A.   Yes, ma'am.  That's a common pose or stance you see

20   in Isis propaganda.

21              MS. SMOLAR:  Ask Government Exhibit 9 be

22   admitted.

23              THE COURT:  It's admitted.

24   Q.   Can you identify Government Exhibit 10, please,

25   Special Agent Morgan?

**Special Agent Morgan - Direct**

1   A.   Yes.  This is Mr. Miah at what appears to be a

2   range.  It's a bit difficult to make out but the writing

3   above his head on the back there says action targets.

4   Again, he is wearing ear protection, sunglasses, I

5   suppose that's his eye protection, mouth covered, and he

6   is handling a long gun.

7   Q.   Was this photograph taken -- seen from the forensic

8   review of Mr. Miah's electronic devices?

9   A.   Yes, it was.

10           MS. SMOLAR:  I would ask Government Exhibit 10

11  be admitted.

12           THE COURT:  It will be admitted.

13  Q.   Likewise, Government Exhibit 11, can you identify

14  that for us, please?

15  A.   Yes, ma'am.  That is Mr. Miah again attired in a

16  similar manner.  This time he has a long gun or a

17  carving slung across his chest, what appears to be slung

18  across his chest.

19  Q.   Is that also a photograph taken from Mr. Miah's own

20  electronic devices?

21  A.   Yes.  It appears to be in a gun range and there is

22  also a scope on that weapon as well.

23  Q.   For those of us that are not familiar with guns,

24  what does a scope do?

25  A.   It provides a better field of view.  It magnifies

**Special Agent Morgan - Direct**

1   the intended target to ensure more accurate aiming.

2           MS. SMOLAR:  The government moves for

3   admission of Government Exhibit 11.

4           THE COURT:  It's admitted.

5   Q.   During your review of Mr. Miah's devices and

6   ICloud, did you also find other selfies with guns that

7   are not shown here today?

8   A.   Numerous, yes.  Numerous selfies with guns and

9   tactical attire, yes.

10  Q.   Did you also find research on those devices

11  concerning the purchase or rental of weapons?

12  A.   Yes.  Mr. Miah conducted research with respect to

13  the rental prices for specific firearms, as well as

14  accessories for firearms, specifically scopes.

15  Q.   I'm showing you now what has been marked as

16  Government Exhibit 12.  Can you identify that for us,

17  please?

18  A.   Yes.  As you can see in the top there this is a

19  screen shot.  The website address at top is

20  keystoneshootingcenter.com.  It appears to be the rental

21  information for Sig Sauer MPX SBR, which is a suppressed

22  weapon.

23  Q.   And Keystone Shooting Center, is that the range

24  where you previously identified Mr. Miah going to shoot?

25  A.   Yes, ma'am.  He frequented that range on multiple

**Special Agent Morgan - Direct**

1  occasions.

2  Q.   And what's the relevance of the term "suppressed"

3  on this particular weapon?

4  A.   It's to suppress the fire, sort of the flash of the

5  discharging of the weapon is my understanding.

6  Q.   This was taken from his devices as well; correct?

7  A.   Yes, this was taken from his device.

8       MS. SMOLAR:  I ask Government Exhibit 12 be

9  admitted.

10       THE COURT:  Exhibit 12 will be admitted.

11       While we are on that, if counsel has no

12  objection, I just want to make sure I understand.  The

13  rental of these firearms, are these for use at a

14  particular range or can they be removed from the

15  premises, if you know, Agent?

16       THE WITNESS:  My understanding, Your Honor,

17  these items have to remain at that facility.  They

18  cannot be taken from that facility.  That is my

19  understanding.

20       THE COURT:  All right.  Thank you.  You may

21  proceed.

22  BY MS. SMOLAR:

23  Q.   Special Agent, I'm now showing you Government

24  Exhibit 13.  Can you identify this and tell us where

25  this came from.

**Special Agent Morgan - Direct**

1   A.   Yes.  This was taken from Mr. Miah's devices, as

2   well as a result of the search warrant, and these are

3   search results with respect to an M16 with a scope, as

4   the scope was discussed before.

5            MS. SMOLAR:  I'll just ask Government Exhibit

6   13 be admitted.

7            THE COURT:  Any objection?

8            MR. ROE:  Bear with me, Your Honor.

9            (Pause in the proceedings.)

10           MR. ROE:  No objection.

11           THE COURT:  All right.  It's admitted.

12  Q.   Special Agent Morgan, in addition to the two

13  exhibits that we have just seen involving research about

14  specific guns, did you find other evidence on these

15  devices of research concerning firearms and other

16  weapons?

17  A.   Yes, there was evidence of a search and the

18  construction of apparent IEDs.

19  Q.   In the ICloud specifically did you find evidence of

20  construction of homemade IEDs?

21  A.   Yes.  We located images of what appeared to be

22  IEDs, yes.

23  Q.   I would direct the Court at this time to Paragraph

24  49 of the complaint.  There are photographs attached to

25  the complaint affidavit at Paragraph 49.

**Special Agent Morgan - Direct**

1           Special Agent Morgan, can you tell us if those

2    are the IEDs you are referring to?

3    A.   Yes, ma'am, they are.

4    Q.   Was there also research -- if you look at Paragraph

5    49 -- concerning specific long guns?

6    A.   Yes.

7    Q.   With regard to these homemade devices, did the FBI

8    take any steps prior to searching Mr. Miah's residence,

9    most recently this week, with regard to their concern

10   about these type of devices?

11   A.   Yes, ma'am.  I brought these photos to the

12   attention of a special agent bomb technician for review.

13   Subsequent to his review, the determination was made

14   that two bomb technicians would enter Mr. Miah's

15   residence and clear that residence of potential

16   explosive devices prior to commencing any search

17   activities.

18   Q.   I'm now showing you what has been marked as

19   Government Exhibit I believe 14.  Was this also found on

20   the ICloud with the pictures of the homemade devices?

21   A.   Yes, ma'am, it was.

22   Q.   Can you explain to us -- first of all, there is

23   some writing on the top, black bag packed with mock IED

24   and other cans.  Created 10/2/17 iPhone.  Who wrote

25   that?

1  A.   That was the FBI.

2  Q.   This particular photograph was a photograph taken

3  from Mr. Miah's ICloud; correct?

4  A.   Yes, ma'am.

5  Q.   Can you explain the relevance of this particular

6  photograph?

7  A.   So, in this photograph if you can draw your

8  attention to those cans to the right -- I don't know if

9  you are able to hover your cursor over that, if you

10  compare and contrast those cans with the cans depicted

11  on Page 23 of the complaint, you can see there is tape

12  or an adhering mechanism around those cans identical to

13  the manner of the device depicted on Page 23, Paragraph

14  49 of the complaint.

15       So those cans are Monster Energy drink cans.

16  Those cans, the presumed IED, are placed in a duffel bag

17  and commingled with other what appear to be innocuous,

18  inert cans, Monster Energy cans and Arizona Ice Tea

19  cans, I believe.

20  Q.   What's the relevance of putting all those cans

21  together to you as a special agent with experience for

22  17 years with the FBI, what relevance does that have to

23  you?

24  A.   The relevance is bags of any nature but in

25  particular, backpacks, duffel bags, and the like have

**Special Agent Morgan - Direct**

1  been used as a method of both conveyance and concealment

2  for improvised explosive devices.

3          MS. SMOLAR:  I would ask Government Exhibit 14

4  be admitted.

5          MR. ROE:  No objection.

6          Your Honor, can I have a moment?

7          THE COURT:  Yes.

8          MR. ROE:  I'll be back to the line in one

9  minute.  Excuse me.

10          THE COURT:  All right.

11          (Pause in the proceedings.)

12          MR. ROE:  Thank you, Your Honor.

13          THE COURT:  We left off, Exhibit 14 is

14  admitted.

15          Ms. Smolar, you may proceed.

16          MS. SMOLAR:  Thank you, Your Honor.

17  BY MS. SMOLAR:

18  Q.  Special Agent Morgan, during the forensic review by

19  the FBI of Mr. Miah's iPhone and iPad seized in the

20  search of his residence on October 9, did the FBI find

21  extremis content that advocated for glorified, gruesome

22  violence?

23  A.  Yes.  A number of videos, specifically Isis

24  propaganda videos, documents were located, as well as

25  extensive research regarding the Tsarnaev brothers, as

Special Agent Morgan - Direct

1  well as Omar Mateen and other terrorists.

2  Q.   Specifically were there violent videos and images

3  found on Mr. Miah's devices?

4  A.   Yes, ma'am.  Across the devices there were dozens

5  of beheading videos, dozens of videos of individuals

6  being thrown from buildings, as well as dozens of videos

7  of individuals being chained to the ground and set

8  afire.

9  Q.   I'm showing you now what's been marked as

10  Government Exhibit 15.  Is this an example of one of the

11  images from Mr. Miah's devices?

12  A.   Yes, ma'am.

13  Q.   Can you identify it for us, please?

14  A.   This is a still of what is about to be a beheading

15  video.

16  Q.   Did you review those videos specifically?

17  A.   I did review not all of the videos but I reviewed

18  beheading videos, individuals being set on fire, yes.

19  Q.   Is that actually what was represented in those

20  videos?

21  A.   Yes, it is.

22          MS. SMOLAR:  I ask Government Exhibit 15 be

23  admitted.

24          MR. ROE:  No objection.

25          THE COURT:  It's admitted.

Special Agent Morgan - Direct

1  Q.   I'm showing you now Government Exhibit 16.  Can you

2  tell us where this was taken from and what it

3  represents?

4  A.   This was taken from Mr. Miah's devices as well.

5  There were many photos of this nature, it's Islamist

6  imagery.  There are individuals holding what is commonly

7  referred to as the black standard, the flag that's

8  adopted by extremist organizations.

9       MS. SMOLAR:  I ask that Government Exhibit 16

10  be admitted.

11       THE COURT:  It's admitted.

12  Q.   You stated earlier that you noted from the forensic

13  review of Mr. Miah's devices that he had an interest in

14  the Boston bombers, the Tsarnaev brothers; correct?

15  A.   Yes, ma'am.

16  Q.   I'm now showing you what has been marked as

17  Government Exhibit 17.  Can you tell us what this image

18  is and where it was located in the devices?

19  A.   This was an image as well taken from Mr. Miah's

20  devices.  It's a photo that was created presumably by

21  Mr. Miah, not the FBI.  This is a photograph depicting

22  Dzhokhar Tsarnaev juxtaposed next to a photograph of

23  Mr. Miah.

24  Q.   So it was found on Mr. Miah's devices in exactly

25  this way; correct?

Special Agent Morgan - Direct

1    A.   Yes, ma'am, it was.

2    Q.   And that is Mr. Miah on the right based upon your

3    interactions with him?

4    A.   Yes, that is Mr. Miah on the right and on the left

5    is Dzhokhar Tsarnaev, one of the bombers of the Boston

6    Marathon attack, the surviving bomber, actually.

7    Q.   That attack occurred in 2013; correct?

8    A.   Yes, ma'am, April of 2013.

9          MS. SMOLAR:  I ask that Government Exhibit 17

10   be admitted.

11         THE COURT:  It's admitted.

12   Q.   In addition to this particular photo, did you find

13   other photographs of the Tsarnaev brothers in Mr. Miah's

14   devices?

15   A.   Yes, we did.  We found additional photographs of

16   the Tsarnaev brothers.

17   Q.   Did it come to your attention at some point in the

18   investigation that Mr. Miah had actually traveled to

19   Boston to the location of some of the locations involved

20   in the Boston Marathon bombing?

21   A.   Yes.  As a result of the results of the fruits of

22   the search of the ICloud, it was determined that

23   Mr. Miah traveled to Boston.

24   Q.   What is your understanding as to what some of the

25   things he did were and where he went?

**Special Agent Morgan - Direct**

1   A.   It was this summer.  He went in the summer.  While

2   he was there, he went to a number of the locations that

3   were associated with the Tsarnaev brothers to include a

4   gym they frequented, the location where Tamerlan

5   Tsarnaev died.

6   Q.   I'm showing you what's been --

7   A.   I believe also the location -- there was an MIT

8   police officer who was killed by the Tsarnaev brothers

9   when he attempted to intervene.  I believe Mr. Miah was

10  in close proximity of that location as well.

11  Q.   I'm showing you what has been marked as Government

12  Exhibit 18.  Was this also taken from Mr. Miah's

13  devices?

14  A.   It was and that red circle was not placed there by

15  the FBI.

16  Q.   So that was on the actual picture at the time it

17  was recovered from the devices?

18  A.   Yes.  The individual in the white T-shirt is

19  Tamerlan Tsarnaev.

20  Q.   And what does it say on this document?

21  A.   Tsarnaevs at boxing gym three days before bombing.

22          MS. SMOLAR:  I ask Government Exhibit 18 be

23  admitted.

24          THE COURT:  It will be admitted.

25  Q.   Special Agent Morgan, I'm now showing you

**Special Agent Morgan - Direct**

1    Government Exhibit 19.  Can you identify that for us and

2    tell us where that was taken from?

3    A.    So this was taken from Mr. Miah's phone.  It's a

4    photograph of the news reporting of the shootout

5    following the attacks in April of 2013 at the Boston

6    Marathon.

7    Q.    And that red circle, was that on the photograph as

8    it was recovered by the FBI?

9    A.    Yes, it was.

10   Q.    So it was not placed on the photograph by the FBI?

11   A.    That's correct.

12          MS. SMOLAR:  I ask that Government Exhibit 19

13   be admitted.

14          THE COURT:  It's admitted.

15   Q.    You mentioned a trip to Boston this past summer

16   that Mr. Miah took.

17          Has it come to your attention during the

18   course of the investigation that he traveled to other

19   cities where terror attacks had previously occurred?

20   A.    Yes.  Over the summer, Mr. Miah also traveled to

21   New York, Washington, D.C., as well as Shanksville,

22   Pennsylvania.

23   Q.    What is your understanding as to where he visited

24   during that trip?

25   A.    The locations were associated with terrorist

**Special Agent Morgan - Direct**

1  attacks.  Specifically, with respect to New York, he

2  went to the World Trade Center area.  Shanksville is the

3  location of the Flight 93 Memorial.  And Washington,

4  D.C., he drove through the Capitol region in proximity

5  to the Pentagon, the Capitol, the White House, mall

6  area.

7  Q.   All of this travel was done by car?

8  A.   Yes.

9  Q.   Did he go by himself?

10  A.   Yes, he did go by himself.

11  Q.   Now, since the threats concerning Special Agent A

12  and his wife, has the FBI had surveillance on Mr. Miah?

13  A.   The FBI has had extensive surveillance on Mr. Miah,

14  yes.

15  Q.   And why is that?

16  A.   Given the nature of the threats, as well as the

17  threats and communications directed at Special Agent A

18  and others, other law enforcement personnel, as well as

19  Mr. Miah surveilling Special Agent A's residence, as

20  well as the FBI Building in Pittsburgh.

21  Q.   So let's talk about that for a minute.  The

22  surveillance noted on multiple occasions that Mr. Miah

23  was in the vicinity of Special Agent A's residence;

24  correct?

25  A.   That's correct.

**Special Agent Morgan - Direct**

1   Q.   More than one occasion; correct?

2   A.   Yes, on multiple occasions.  At least two that I'm

3   aware of.

4   Q.   Even on one particular date, and I believe it's

5   referenced in the complaint, he drove to Special Agent

6   A's residence location, then drove to Washington, D.C.,

7   and then returned back to Special Agent A's residence

8   location; correct?

9   A.   Yes.  I believe that was November 6 of 2020.

10  Q.   And did surveillance also identify Mr. Miah in the

11  vicinity of Special Agent A's residence parked for a

12  period of time?

13  A.   Yes.

14  Q.   Did the surveillance also note that Mr. Miah was

15  traveling to the airport on a number of occasions?

16  A.   Yes.  Mr. Miah went to the airport on a number of

17  occasions for no discernible reason.

18  Q.   Mr. Miah used to work for Uber; correct?

19  A.   That is correct.

20  Q.   He no longer works for Uber?

21  A.   Correct.  It's my understanding he was terminated.

22  Q.   What's your understanding as to why he was

23  terminated?

24  A.   My understanding is there were complaints from

25  users regarding Mr. Miah, specifically pertaining to the

**Special Agent Morgan - Direct**

1   nature of his driving, which I believe was characterized

2   as erratic, as well as making passengers feel

3   uncomfortable.

4   Q.   Finally, let's discuss the surveillance indicators

5   concerning Mr. Miah's presence outside of the FBI

6   Building on at least 11 occasions as detailed in the

7   affidavit.  Can you tell us when those trips tended to

8   occur?

9   A.   Odd hours, after hours, not during business hours,

10  late in the evening, early in the morning, after

11  midnight, just very odd hours, very off hours.

12  Q.   Even as recently as the day of his arrest, which

13  was this past Wednesday, was it determined that Mr. Miah

14  was actually found outside the vicinity of the FBI for

15  at least 20 minutes?

16  A.   It was.  We came to that realization today.  The

17  morning of the arrest, he was in proximity to the FBI

18  from approximately 12:40 a.m. to maybe ten after

19  one a.m. the day of the arrest, the morning of the

20  arrest.

21  Q.   So as we talked about in October of 2020, Mr. Miah

22  created the Twitter which we saw in Exhibit 1 concerning

23  Special Agent A's wife.

24         He also created other Twitter accounts in

25  November after the attempted interviews and search of

**Special Agent Morgan - Direct**

1    his residence; correct?

2    A.    That's correct.

3    Q.    Two of those accounts are shown on Page 26,

4    Paragraph 50 of the complaint.

5          MS. SMOLAR:   I direct your attention, Your

6    Honor, to those pictures.

7    Q.    The first one, Special Agent Morgan, can you tell

8    us what @54marienstrasse, which is the name of that

9    account, what relevance that has to you?

10   A.    54marienstrasse is the street address where a

11   number of the 911 hijackers were located for a period of

12   time.

13   Q.    In Germany?

14   A.    In Germany, yes.

15   Q.    Can you read to us what is written in the complaint

16   affidavit underneath the profile picture?

17   A.    Yes.  Hey guys, am I interesting?  Enjoying the

18   selfies and he references 18 U.S.C. 2261A, which is

19   cyber stalking, was never broken.  Requires a pattern of

20   two or more acts, not one troll post.  I never lied but

21   you did.

22   Q.    It also says pitt.edu underneath?

23   A.    It does, yes, pitt.edu.

24   Q.    And was it determined by the FBI that these two

25   accounts depicted on Page 26 were opened by Mr. Miah?

**Special Agent Morgan - Direct**

1   A.   Yes, through the IP resolution, as well as a phone

2   number associated with Mr. Miah.

3   Q.   The reference here to 18 U.S.C. 2261A, was that one

4   of the statutes that was listed in the search warrant

5   for his residence on October 9 of 2020?

6   A.   Yes, ma'am.

7   Q.   So is it fair to say from your assessment that he

8   is speaking directly to the FBI with this comment?

9   A.   Yes, ma'am, it is.

10  Q.   And the next account, itskhaledbruh, is that a

11  picture of Mr. Miah underneath the picture of Colin

12  Kaepernick?

13  A.   Yes, it is.

14  Q.   This account also was determined to be Mr. Miah's

15  account by both IP and phone number attribution?

16  A.   Yes, ma'am.

17  Q.   Have you reviewed the tweets from these two

18  accounts?

19  A.   Yes, I have.

20  Q.   For the Court's benefit, I would direct your

21  attention to Page 27 and 28 where only a handful of the

22  tweets directed to the FBI are listed, but if you could

23  just summarize for us, Special Agent Morgan, the types

24  of things that Mr. Miah is saying concerning the

25  specific special agents of the FBI who have interacted

**Special Agent Morgan - Direct**

1   with him and their families?

2   A.    Sure.  He is indicating that he knows who we are,

3   you can't unknow people.  I will know you forever.

4            He goes on to indicate where -- the supervisor

5   special agent who came into contact with Mr. Miah,

6   Mr. Miah goes on to identify where that supervisor

7   special agent currently resides, what his former

8   occupation was.

9            He makes reference to Special Agent A and

10  his -- the victim special agent's spouse engaging in an

11  orgy.  I never forget a face, nor a name, nor the clan,

12  this jurisdiction or another.  It's never over.

13  Q.    Does he refer to Special Agent A's sister by name

14  multiple times?

15  A.    He does, yes.

16  Q.    And brother?

17  A.    Yes, ma'am.

18  Q.    Does he indicate he has been researching them

19  during the course of these tweets?

20  A.    Yes, he does, as evidenced by knowing the previous

21  employment of the supervisor special agent where that

22  supervisor special agent resides, the occupation.  I

23  believe he also identifies the occupation of the special

24  agent's sister as well.

25  Q.    Yes.  Does he specifically indicate that -- he says

1  here on November 27, I will definitely let Ankara know

2  about Special Agent A's hometown.  What does that mean

3  to you?

4  A.   It's a threat.  So that's a reference to Turkey.

5  Mr. Miah seems to have an affinity for the Ottoman

6  Empire as well but it appears to be a threat, that his

7  identifying information will be passed along for some

8  action to follow thereafter.

9  Q.   Does he put Turkish flags on the face of -- on

10  December 2nd, he takes selfie of himself and puts Turkish

11  flags on his cheeks?

12  A.   Yes.

13  Q.   And uses Special Agent A's name in a bubble above

14  his head?

15  A.   Yes.

16  Q.   So these tweets continue through all of November

17  and December.  They were public facing tweets; correct?

18  A.   That is correct, yes.

19  Q.   And yet in November, Mr. Miah was not arrested; was

20  he?

21  A.   That's correct.

22  Q.   During the course of your investigation and review

23  of Mr. Miah's devices -- let me step back for a second.

24        Is he currently enrolled at Pitt as a student?

25  A.   He is not enrolled at Pitt, no.

**Special Agent Morgan - Direct**

1   Q.   Did you have occasion to review records from Pitt

2   concerning what his GPA was as of last semester?

3   A.   Yes.  His cumulative GPA was 1.9.

4   Q.   Does he have a job?

5   A.   No.

6   Q.   You said he had been fired from Uber; correct?

7   A.   Yes, ma'am.  I believe Lyft as well.

8   Q.   Did his seized devices provide other concerning

9   evidence to the FBI with regard to conduct on the

10  university campus or in Oakland with regard to women?

11  A.   Yes.  We located dozens of photographs, as well as

12  videos that were taken of unsuspecting women who were

13  both out in the public and seemingly in private

14  settings.

15         Mr. Miah also appeared to conduct searches

16  regarding hidden cameras, voyeurism, the secretion of

17  hidden cameras in innocuous household items, things of

18  that nature.

19  Q.   I'm showing you what has been marked as Government

20  Exhibit 20.  Tell us what this is?

21  A.   So these are recordings, covert or clandestine

22  recordings of women made by Mr. Miah.

23  Q.   And they were taken -- one was outside, that

24  appears to be Oakland; another is at gym, February 2018;

25  another is a female in an Uber ride; and then a

Special Agent Morgan - Direct

1    conversation with a female.

2           To your knowledge, do you know in Pennsylvania

3    is it legal to record without consent?

4    A.   It is illegal to record without consent as

5    Pennsylvania is a two-party consent state.

6    Q.   This was taken from Mr. Miah's iPhone 7?

7    A.   Yes, ma'am.

8           MS. SMOLAR:  I would ask that Government

9    Exhibit 20 be admitted.

10          MR. ROE:  I'm going to object on the basis of

11   relevance.

12          MS. SMOLAR:  Your Honor, this is a detention

13   hearing.  It goes to danger to the community.  Mr. Miah

14   not only has all of the other issues that we've

15   previously described but he has been secretly recording

16   women in his local neighborhood and community which goes

17   to danger.

18          THE COURT:  I do find it has some level of

19   relevance to the issues of detention.  So it will be

20   admitted.

21   Q.   I'm showing you Government Exhibit 21.  Again, if

22   you could just identify what this represents?

23   A.   Yes, ma'am.  These videos were located on both

24   Mr. Miah's iPad, as well as his LG phone.

25          The first video depicts a student sitting in

**Special Agent Morgan - Direct**

1   an area being filmed.

2          The second video, it's a film of a woman who

3   is somewhat exposed through a window, as is the third

4   video.

5   Q.   And the dates are seen on there.  Those were taken

6   from the iPad and the LG phone; correct?

7   A.   Yes, ma'am.  November 2015, August 2020, and August

8   2020 respectively.

9          MS. SMOLAR:  I ask Government Exhibit 21 be

10  admitted.

11         THE COURT:  Admitted.

12  Q.   Special Agent Morgan, can you just tell us what

13  this document is and who created this compilation?

14  A.   So the FBI compiled these photos as a sampling of

15  the numerous photos that were located, photos, video

16  recordings, that were located on Mr. Miah's devices.

17  These are images and photos that Mr. Miah captured of

18  unsuspecting women.  In fact, the photo sort of right in

19  the middle of the screen, it's the posterior of a female

20  and you can see Mr. Miah's head there in the bottom

21  right-hand corner.

22  Q.   All of these photos were taken directly from

23  Mr. Miah's devices, the iPhone 7, iPad, ICloud and LG

24  phone; correct?

25  A.   From those four devices, yes, ma'am.

**Special Agent Morgan - Direct**

1          MS. SMOLAR:   I ask Government Exhibit 22 be

2     admitted.

3          THE COURT:   It's admitted.

4     Q.   Special Agent Morgan, on Wednesday a search was

5     conducted of Mr. Miah's residence; correct?

6     A.   Yes, ma'am.

7     Q.   Were other concerning items found in a search of

8     his residence?

9     A.   Yes.  We may have said the search was conducted

10    yesterday.  The search was conducted on Wednesday,

11    January 6.

12    Q.   Correct.

13    A.   Yes.  There were other concerning items recovered

14    from Mr. Miah's residence.

15    Q.   I'm showing you Government Exhibit 23.  Can you

16    tell us what this is?

17    A.   This is the search warrant order signed by Judge

18    Lenihan.  The red circles that appear there, those were

19    made presumably by Mr. Miah.  Notably, he is circling

20    the name of the judge.

21          This item was located in Mr. Miah's bedroom.

22    He is the sole occupant of that bedroom and this -- the

23    actual document was located on Mr. Miah's computer desk

24    atop other materials, but this was promptly placed on

25    top of those documents and materials.

**Special Agent Morgan - Direct**

1  Q.   Special Agent, Exhibit 23, which is the search

2  warrant with the circles on it, was that also found with

3  this Exhibit 24, which was a multi-page document but

4  this is just the face sheet; correct?

5  A.   Yes, ma'am.  We located multiple documents that

6  detailed the results of searches regarding this judge

7  conducted by Mr. Miah.

8  Q.   This is the judge who signed the search warrant and

9  she is a judge in the Western District of Pennsylvania;

10  correct?

11  A.   Yes, ma'am.

12       MS. SMOLAR:  I ask Government Exhibits 23 and

13  24 be admitted.

14       MR. ROE:  No objection.

15       THE COURT:  No objection?

16       MR. ROE:  No objection, Your Honor.

17       THE COURT:  All right.  They are both

18  admitted.

19  Q.   During the search of Mr. Miah's residence and when

20  you found this information regarding the research

21  concerning Judge Lenihan, were you able to determine

22  what day that research had been printed out by Mr. Miah?

23  A.   November 6, which is the same day that Mr. Miah

24  surveilled the special agent's residence, as well as the

25  overnight trip to Washington, D.C., and back.

**Special Agent Morgan - Direct**

1  Q.   Special Agent, during the course of your search and

2  also in your investigation with regard to Mr. Miah, did

3  you obtain evidence concerning his interest in altering

4  or deleting evidence, specifically evidence to obstruct

5  the investigation being conducted by the FBI of him?

6  A.   Yes.  Also among Mr. Miah's papers a task list was

7  located and I believe that is what the document was

8  entitled by Mr. Miah.  It was a long list of tasks.

9  They were all handwritten.  Preceding each task, as I

10 recall, was a tick box and among those items were tasks

11 such as get burner phone, delete social media, and FBI

12 investigation.

13 Q.   During the course of the search on Wednesday of his

14 residence, did you find materials indicating the

15 purchase of SIM cards?

16 A.   Yes, we recovered packaging pertaining to two SIM

17 cards that were utilized by Mr. Miah.

18 Q.   Also, during the course of the investigation, let's

19 talk a little bit about deletion of tweets.  I'm going

20 to draw your attention to Paragraph 41 of the complaint

21 affidavit which is discussing the QassamSol account,

22 which is one of the original accounts that the FBI

23 wanted to discuss with Mr. Miah.

24        Is it your understanding that Mr. Miah deleted

25 a great number of tweets after being encountered by the

1   FBI in September of 2020?

2   A.   Yes.  Mr. Miah deleted I believe 15 accounts -- I'm

3   sorry.  Yes, he deleted accounts as well as specific

4   tweets.

5   Q.   And then ultimately is it correct that he deleted

6   the QassamSol account entirely?

7   A.   Yes, he did.

8   Q.   So, as we discussed, the FBI was aware that

9   Mr. Miah was posting about Special Agent A, Special

10  Agent A's wife, his family, his brother, his sister,

11  they were aware that he was visiting the Special Agent

12  A's residence, in the vicinity of his residence on

13  multiple occasions, as well as the FBI Building on

14  multiple occasions and that's in October and November of

15  2020; correct?

16  A.   Yes.

17  Q.   He hadn't yet been arrested, correct?

18  A.   That's correct.

19  Q.   It wasn't until Christmas week, this past Christmas

20  week that Mr. Miah escalated; correct?

21  A.   That's correct, yes.

22  Q.   Let's discuss specifically what happened.

23  A.   Mr. Miah, for a period of time he was not going to

24  a gun range but as time past from those initial

25  encounters in September and October, the execution of

**Special Agent Morgan - Direct**

1  the search warrant, Mr. Miah began returning to the gun

2  range, most recently the final two weeks of December.  I

3  believe he went once in the third week and again in the

4  fourth week.

5          On the first occasion of the third week when

6  he returned to -- again, it was the Keystone Shooting

7  Center -- I believe he waited in the parking lot, sort

8  of sat there in his vehicle.

9          The following week, the final week of

10 December, that's when Mr. Miah entered the Keystone

11 Shooting Center.

12         Additionally, the surveillance of the FBI

13 building, as well as ever concerning tweets directed at

14 the FBI by Mr. Miah.

15 Q.  Let's talk about those tweets.  Somewhere around

16 December 19th, Mr. Miah created a new account under the

17 name Federal Intelligence Service on Twitter; correct?

18 A.  Yes, ma'am.

19 Q.  And how do we know that that account is attributed

20 to Mr. Miah?

21 A.  That account -- the telephone number used to

22 register the account is a number known to be a telephone

23 number known to be utilized by Mr. Miah.

24 Q.  And that was also linked to him by an IP address;

25 correct?

**Special Agent Morgan - Direct**

1   A.   Yes.

2   Q.   I'm going to direct the Court's attention in

3   addition to what's on our screen to the complaint at

4   Paragraphs 8, 9, 10 through 16 for the specific tweets.

5   Let's go through a few of these.

6              On or about December 27, Mr. Miah tweeted what

7   is reflected in Government Exhibit 25.  Can you please

8   read it for the record, please.

9   A.   The first tweet from Federal Intelligence Service

10  is:  Currently eating pasta and watching videos of the

11  second plane hit the South Tower, which was soon after

12  followed by from the same handle.  Nick, Dave, Mike, the

13  whole bureau, the deed will be done at a time which is

14  the most opportunistic for me, chosen by myself.

15  Q.   Let's split that down a little bit.  What does the

16  reference to "the second plane hitting the South Tower"

17  mean to you as a special agent for 17 years with the

18  FBI?

19  A.   I would assess that to mean a reference to the

20  terrorist attacks of 9/11, the planes being flown into

21  the South Tower of the World Trade Center.

22  Q.   The references by name, there are three male names

23  underneath that.  Can you identify who those people are,

24  not by full name?

25  A.   Yes.  Those are individuals involved in this

1   investigation who came into direct contact with

2   Mr. Miah.   Those agents also provided Mr. Miah either

3   with their business cards and/or their names,

4   identifying names, and the bureau of course is the FBI

5   Bureau.

6   Q.   And this was a public facing Twitter account on or

7   about December 27 when this was posted?

8   A.   Yes, ma'am.

9   Q.   So is it fair to say that the FBI assessed this to

10  be a direct communication to the FBI?

11  A.   Yes, as evidenced by naming specific individuals

12  that Mr. Miah was in contact previously, as well as the

13  whole of the FBI, the whole bureau.

14          MS. SMOLAR:   I would ask Government Exhibit 25

15  be admitted.

16          MR. ROE:   No objection.

17          THE COURT:   It's admitted.

18  Q.   Then on December 28, another tweet was posted from

19  the Federal Intelligence Service Twitter belonging to

20  Mr. Miah.   What does it say?

21  A.   Zero hour is approaching.

22  Q.   What do you take that to mean as a special agent

23  with 17 years of experience?

24  A.   I would assess the "zero hour approaching" is a

25  reference to the attack is eminent, the time has come.

**Special Agent Morgan - Direct**

1   Q.   On December 29th at 7:14 p.m., this account being

2   run by Mr. Miah posted coordinates.  Can you tell us

3   where those coordinates resolved to?

4   A.   Those coordinates resolved to the J. Edgar Hoover

5   Building which is the headquarters of the FBI located in

6   Washington, D.C.

7          MS. SMOLAR:  Let me just go back to Exhibit

8   26.  I would offer that for admission.

9          THE COURT:  It's admitted.

10  Q.   All right.  Exhibit 27, you said those are the

11  coordinates for the FBI headquarters building in

12  Washington, D.C.; correct?

13  A.   Yes.  J. Edgar Hoover Building.

14  Q.   During the course of the surveillance of Mr. Miah

15  over the last couple months, did the FBI become aware

16  that Mr. Miah again traveled to Washington, D.C.?

17  A.   Yes.  Over the summer he went to Washington, D.C.

18  Q.   Did he stay there?  Do you know what he did while

19  he was there?

20  A.   Well, the most recent trip to D.C. was on November

21  6.  He did not stay there.  That was the same day where

22  he conducted the research with respect to the judge, was

23  in proximity to the special agent's residence, both

24  before and after upon his departure and upon his return,

25  so he went to D.C., drove back that night.

**Special Agent Morgan - Direct**

1          It's my understanding he did not spend the

2   night anywhere.  He drove around or was in his vehicle

3   the entirety of the trip.

4          MS. SMOLAR:  I ask Government Exhibit 27 be

5   admitted.

6          MR. ROE:  No objection.

7          THE COURT:  It's admitted.

8   Q.   Government Exhibit 28 also lists some names.  Can

9   you please read this?

10  A.   Again, this is from the Federal Intelligence

11  Service Twitter handle.  Rasheed, Dave, Nick, Mike,

12  how's your investigation going.  Things are looking

13  bright, and then "bright" is in quotation marks, in

14  2021.  Did you find the Saudi passports.

15  Q.   This, again, was tweeted from Mr. Miah's Federal

16  Intelligence Service public Twitter; correct?

17  A.   Yes, ma'am.

18  Q.   And those names listed there, who are they?

19  A.   Those are special agents or task force officers

20  assigned to the Pittsburgh FBI who had previous contact

21  with Mr. Miah.

22  Q.   With regard to the statement, things are looking

23  bright in quotes in 2021.  Based on your experience as

24  an FBI special agent for 17 years, can you tell us what

25  you assess that to mean?

**Special Agent Morgan - Direct**

1  A.   An explosion, detonation of an explosive devices

2  concerning.

3  Q.   "Did you find the Saudi passports," what meaning

4  does that have to you?

5  A.   That's assessed to be a reference to the 911

6  hijackers who were Saudi citizens.

7           MS. SMOLAR:   I would ask that Government

8  Exhibit 28 be admitted.

9           THE COURT:   It's admitted.

10  Q.   I'm now showing you Government Exhibit 29.  If you

11  could read that, please?

12  A.   Again this is from Mr. Miah's Federal Intelligence

13  Service which is forward facing accessible publicly.

14  2001 to 2021 is 20 years.  An entire generation, yet men

15  like me still exist and pop up into existence.  Next

16  time you come in cowboy with the crew, the hardwood will

17  collapse beneath your feet.

18  Q.   Can you tell us based on your experience what this

19  means to you?

20  A.   The time period 2001 through the present is

21  essentially the time period following the 9/11 terrorist

22  attacks and actions by the U.S. government and the

23  military in the Middle East.

24           "An entire generation of men like me" is a

25  reference to the 9/11 hijackers given the context.

**Special Agent Morgan - Direct**

1            "Cowboy" is a reference to -- assessed to be a

2    reference to the FBI agents and law enforcement

3    personnel.  I believe he referred to one of the task

4    force officers as a cowboy or suggested he was acting

5    with bravado during the execution of the search warrant

6    in October.

7            The "hardwood would collapse beneath your

8    feet" is in the interest of agent safety, was assessed

9    to pertain to a sabotage attack or some other attack the

10   next time the FBI should attempt to contact Mr. Miah or

11   execute further law enforcement duties.

12           MS. SMOLAR:  I ask Government Exhibit 29 be

13   admitted.

14           THE COURT:  It's admitted.

15   Q.   Special Agent Morgan, in addition to all that we've

16   already seen, were there tweets involving other

17   references directly by name to the agents or showing of

18   their credentials or other identifying information by

19   Mr. Miah?

20   A.   Yes.  Mr. Miah -- one of the business cards that

21   was provided to Mr. Miah, there are images of him

22   flushing it down a toilet.  There are indications that

23   Mr. Miah urinated on and flushed the business card of

24   another agent.

25           I believe on one of Mr. Miah's social media

**Special Agent Morgan - Direct**

1    accounts he changed the profile photo to the photo of

2    the supervisory special agent's dog.

3    Q.   I'm going to draw your attention to the complaint

4    at Paragraph 16 for the tweet on December 31, 2020. Can

5    you read to us what that says.

6    A.   Again, this is from the Federal Intelligence

7    Service handle publicly available. Remember, boys, the

8    more eyes on me, the less eyes on the others.

9    Regardless, yellow tapes will flow.

10   Q.   What does that mean to you as a special agent with

11   17 years of experience?

12   A.   With respect to yellow tape, that's assessed to be

13   a reference to caution type or crime scene tape

14   following a commission of a crime or some sort of

15   attack.

16   Q.   Subsequent to this post on December 31 -- oh, let

17   me make sure that Government Exhibit 29 has been

18   admitted.

19        THE COURT:   If I haven't done so already, it

20   is admitted.

21        MS. SMOLAR:   Thank you, Your Honor.

22   Q.   With regard to this post on December 31 of 2020,

23   that is set forth in Paragraph 16 of the affidavit,

24   after that point, did the FBI determine that Mr. Miah

25   needed to be taken into custody?

1    A.   Yes.  Based on the totality of the circumstances

2    and the apparent escalation of the threatening

3    information, communications and activity, that

4    assessment was made.

5    Q.   As you stated at the same time that these tweets

6    were being sent out, Mr. Miah did visit a shooting range

7    on December 27; correct?

8    A.   Yes.  In addition to the concerning communications

9    and threatening communications, Mr. Miah persisted in

10   engaging in those activities, the shooting range, the

11   surveillance, yes.

12   Q.   And he visited the FBI Building numerous times

13   during that time period, as well as recently as

14   Wednesday; correct?

15   A.   That's correct, yes.

16   Q.   In the middle of the night?

17   A.   That's correct.

18   Q.   In the course of your job as an FBI agent and as a

19   crisis negotiator, you had the opportunity to receive

20   briefings and trainings concerning the types of things

21   that make a person dangerous; correct?

22   A.   Yes.

23   Q.   Can you just very briefly tell us a little bit

24   about what you have learned?

25   A.   Yes.  Generally, individuals have a perceived

**Special Agent Morgan - Direct**

1   grievance.  Individuals who lack any sort of social

2   tether or familial association, development, individuals

3   who feel lost, individuals who are engaging in

4   increasing erratic and concerning behavior.

5   Q.   Was that type of behavior seen during the course of

6   the investigation by the FBI into Mr. Miah?

7   A.   Yes, ma'am.

8   Q.   And based on your experience and your training, is

9   criminal history dispositive as to what makes someone

10  dangerous?

11  A.   No, ma'am, it is not.

12  Q.   Do you have any understanding as to what percentage

13  of active shooters have a violent criminal history?

14  A.   Yes, ma'am.  So, through my consultation with the

15  Behavioral Analysis Unit as recently as this week, it's

16  my understanding that 94 percent of active shooters have

17  no violent criminal history.

18          MS. SMOLAR:  I'm going to try to leave the

19  screen.  At this time, that closes the government's

20  presentation, Your Honor.

21          THE COURT:  All right.

22          Attorney Roe, you may cross-examine.

23          MR. ROE:  Thank you, Your Honor.  Let me get

24  my bearings because the person -- I have your courtroom

25  deputy and I'm trying to look at the witness.  There you

**Special Agent Morgan - Cross**

1  are.  Okay.

2                        CROSS-EXAMINATION

3  BY MR. ROE:

4  Q.   Mr. Morgan?

5  A.   Yes, sir.

6  Q.   My name is Adrian Roe.  Nice to meet you.

7  A.   Nice to meet you.

8  Q.   I'm going to ask you some questions on behalf of

9  the defendant.  If at any point in time my questions are

10 not clear, kindly speak up and I'll try to clarify the

11 question.

12            This is somewhat challenging because we are on

13 Zoom but I'm going to do my best.

14            Are you familiar with a person name Limon

15 Miah?

16 A.   Limon?

17 Q.   Yes.

18 A.   Yes.

19 Q.   What do you know about Limon?

20 A.   I'm aware that Limon is Mr. Miah's brother.

21 Q.   When did you learn that?

22 A.   I've known that for some time.

23 Q.   How long have you known that?

24 A.   A period of months.  I learned that some time I

25 would say during the course of the summer.  Certainly,

1   during the course of the investigation.

2   Q.   And did you ever personally speak with Limon?

3   A.   No, sir.

4   Q.   Now, you have a role with the Behavioral Analysis

5   Unit; is that correct?

6   A.   No, sir.  I consulted with the Behavioral Analysis

7   Unit but I do not have a role with the Behavioral

8   Analysis Unit.

9   Q.   What is the Behavioral Analysis Unit?

10  A.   As I stated previously, it's a cadre of highly

11  specialized special agents who assist the field agents,

12  the field divisions in formulating investigative

13  strategies, assessing risks that individuals pose.

14  Q.   Have you had regular interaction with the

15  Behavioral Analysis Unit?

16  A.   Through the course of my career, yes.

17  Q.   In terms of working with that unit, have you

18  discussed with them what to do when you encounter an

19  individual who appears to be mentally unstable?

20  A.   In general terms over the course of my contacts,

21  yes, I have.

22  Q.   Have you ever had any discussion with whether it's

23  appropriate in certain instances when a person appears

24  to be mentally unstable, is it ever a strategy instead

25  of moving towards the criminal prosecution to refer that

**Special Agent Morgan - Cross**

1  person for mental health treatment?

2  A.   That's generally something that the FBI needs to do

3  with the assistance of a family member.

4  Q.   Right.   In this case, can you tell me about that

5  process?   Are there instances where the FBI will say, we

6  got somebody who is mentally unstable and they will

7  approach a family member and seek to intervene before

8  something bad happens?

9            MS. SMOLAR:   I'm going to object just to the

10  extent we are talking about other cases besides the one

11  at issue here today.

12            MR. ROE:   I think it's relevant, Your Honor.

13  It goes to the practices of the FBI and I think it's

14  appropriate, Your Honor.

15            THE COURT:   Overrule the objection.   I'll

16  allow it.   I understand the point.

17            MR. ROE:   Thank you.

18            THE COURT:   You may answer.

19  A.   So, in this instance, it came to our attention

20  Mr. Miah may have been medically committed on at least

21  two occasions, on two occasions that we're aware of.

22            There was a subsequent interview or contact

23  with a family member of Mr. Miah following the September

24  contact.   That family member indicated that Mr. Miah had

25  animosity toward law enforcement, perhaps had mental

1  health issues following the death of Mr. Miah's father.

2  Efforts were made by the family to get him mental health

3  treatment to no avail.

4          There was also an exchange between a special

5  agent and a family member as recent as the day of the

6  arrest where the family member apologizes for the

7  actions or Mr. Miah, states that he needs mental health

8  and essentially the family has tried that avenue to no

9  avail.

10  Q.   Is that something where the bureau has the guidance

11  under which there should be efforts, for example, to

12  have a person involuntarily committed in order to

13  address their mental health issues?

14  A.   That's generally -- my understanding that is

15  something that's generally done by a family member.  The

16  FBI cannot compel a family member to involuntarily

17  commit another family member.  That's at the discretion

18  of the family member.

19  Q.   But is there any strategy on the part of the FBI

20  when a mentally ill individual is identified to continue

21  with investigative activity until the person commits a

22  crime?

23  A.   No.  No.  In fact, as evidenced by this

24  investigation, multiple attempts were made in contacting

25  Mr. Miah, attempting to engage Mr. Miah into a dialogue

**Special Agent Morgan - Cross**

1    to resolve these issues absent negative action.

2    Nevertheless, Mr. Miah persisted.

3             Mr. Miah would not avail himself to the FBI

4    despite repeated requests.

5    Q.   I'm sorry.  I didn't hear that.

6    A.   Mr. Miah would not avail himself to the FBI despite

7    repeated requests.  As I stated earlier, it was made

8    clear to the FBI that he was largely estranged from his

9    family.

10   Q.   When you say he would not avail himself to the FBI,

11   what was he supposed to do to avail himself to the FBI?

12   A.   Well, participate in an interview either directly

13   or through counsel as he was asked to do to resolve the

14   underlying initial predicate of the investigation.

15   Q.   So, in your discussions, did you know that

16   Mr. Limon Miah had interacted and worked with the FBI

17   for a number of years?

18   A.   No, sir.

19            MS. SMOLAR:  I'm going to object to that.  I

20   don't see any relevance to that in this matter.

21            THE COURT:  Where are you going with that,

22   Attorney Roe?

23            MR. ROE:  Your Honor, I think it's relevant to

24   the notion that this person should be incarcerated as a

25   threat when I think the Court will hear there's a

**Special Agent Morgan - Cross**

1   history here that essentially this person has a mental

2   issue and given the FBI's relationship with the family,

3   this should not have been pursued in this manner and now

4   we have a situation where he is going to be incarcerated

5   and prosecuted as a criminal when really this was

6   something that involved mental health issues that could

7   have been broached with the family given the FBI's

8   interactions with the family.

9          THE COURT:  Let me say this.  I will hear

10  testimony on this but only to the extent it is relevant

11  to what you might suggest are conditions of release that

12  would reasonably assure the safety of the community and

13  individuals or assure the defendant's future

14  appearances.

15         To the extent that you're critical of the FBI

16  and that they did not pursue alternatives to

17  prosecution, I don't see any relevance.

18         So if --

19         MR. ROE:  Your Honor, if I may say, I'm

20  exactly going to where you just said in the first part

21  of your statement.

22         THE COURT:  All right.  If you stick to that,

23  then I will hear this but, again, I don't find the

24  underlying question to be relevant.

25         MR. ROE:  I appreciate that, Your Honor, and

**Special Agent Morgan - Cross**

1  that is exactly where I'm going.  So let me continue, if

2  I may.

3  BY MR. ROE:

4  Q.  Just to clarify on that point.  In terms of your

5  testimony would be, I think, and to cut it short in this

6  aspect, that you didn't have any discussions with anyone

7  at the FBI about speaking to Limon Miah about his

8  brother and really bringing Limon into the picture and

9  trying to get some help for his brother; correct?

10  A.  Again, efforts were made to contact family members

11  and they were uncooperative.  In fact, evidently, one

12  of --

13  Q.  I'm sorry.  Did you say uncooperative?

14  A.  Yes.  Yes.  In fact, one of Mr. Miah's underlying

15  grievances is the FBI was harassing his mother when she

16  was contacted.  The family was completely uncooperative

17  is my understanding.

18  Q.  You're saying that in relation specifically to

19  Limon Miah or you don't know?

20  A.  My understanding is the family felt as though they

21  had exhausted their ability and efforts to intercede on

22  Mr. Miah's behalf with respect to whatever mental health

23  issues he may have.  That's my understanding.

24  Q.  All right.  Thank you.  I'll move on.

25          In relation to Mr. Miah, at any point that the

**Special Agent Morgan - Cross**

1  FBI visited the home, were weapons found?

2  A.   My understanding is no weapons were found, that's

3  correct.

4  Q.   In any interaction with Mr. Miah -- so there were

5  numerous searches of his house and there no weapons

6  found; correct?

7  A.   There was -- yes, there were two searches of his

8  home and no firearms, weapons were found.

9  Q.   During those two searches, did Mr. Miah engage in

10 any physical violence?

11 A.   No.

12 Q.   We've spoken about his rental of firearms.  Are you

13 aware of any effort on his part to purchase any weapons?

14 A.   It's my understanding that he previously asked an

15 associate to purchase a weapon on his behalf despite not

16 being a prohibitive person.  My understanding is that

17 never transpired but evidently, Mr. Miah did make a

18 request to an associate to that effect.

19 Q.   So you're saying he asked somebody to buy a weapon

20 for him but that never transpired?

21 A.   That's correct.  The individual refused.

22 Q.   Did Mr. Miah -- are you aware of any effort of him

23 to go to any gun seller and purchase a weapon?

24 A.   I'm not aware of that.  In addition to going to the

25 Keystone Shooting Range, Mr. Miah also went to a

**Special Agent Morgan - Cross**

1   shooting range in Ohio.  I don't know that the complete

2   picture of what has transpired there has been determined

3   yet.  I'm sorry.  I may have said Ohio.  It was Iowa.

4           MR. ROE:  Bear with me for a moment, please.

5           (Pause in the proceedings.)

6   Q.  Does the bureau have guidelines for when a

7   person -- we talked a little bit about approaching the

8   family.  What guidelines does the bureau have for

9   dealing with mentally health unstable people in terms of

10  when it should be referred to a mental health treatment

11  and when it should be referred to a criminal

12  prosecution?

13          MS. SMOLAR:  Your Honor, I would object.  This

14  is not a discovery hearing.

15          THE COURT:  I'm going to sustain that.  That's

16  getting pretty far afield in the discovery.

17          You may continue, Attorney Roe.

18          MR. ROE:  Thank you.

19  Q.  In Exhibit 1 there was a reference to Mr. Miah

20  speaking of white supremacy, do you recall that

21  document?

22  A.  Yes, sir.

23  Q.  Did you have any concerns in this investigation

24  that the defendant might have -- to some extent, this

25  whole process could be the product of racial profiling

**Special Agent Morgan - Redirect**

1    in the grand scheme of things?

2              MS. SMOLAR:  Objection, Your Honor.

3              THE COURT:  That's sustained.

4              Please move on.

5              MR. ROE:  I have no further questions, Your

6    Honor.

7              MS. SMOLAR:  Your Honor, I just have a quick

8    follow-up, if I may.

9              THE COURT:  You may.

10                    REDIRECT EXAMINATION

11   BY MS. SMOLAR:

12   Q.   Special Agent Morgan, with regard to what you just

13   said previously about him asking an associate to buy a

14   weapon for him, can you specifically address whether he

15   told that associate that he wanted him to buy it for him

16   because he was being investigated by the FBI?

17   A.   I don't know if he made that qualification.

18   Q.   Are you aware that numerous contacts to his brother

19   Limon Miah went unanswered in recent weeks?

20   A.   Yes.  Additionally, it's my understanding that

21   Limon Miah has firearms and made a statement about his

22   concern with never -- ensuring that Mr. Miah, despite

23   not being a prohibitive person, Mr. Miah would never

24   access his firearms.

25             MS. SMOLAR:  No further questions.

```
1              THE COURT:  All right.  Agent Morgan, you are
2     excused as a witness.  You may remain on the Zoom
3     conference.
4              THE WITNESS:  Thank you, Your Honor.
5              THE COURT:  Thank you.
6              Attorney Smolar, any further evidence or
7     witnesses?
8              MS. SMOLAR:  No further evidence or witnesses.
9     Just argument, Your Honor.
10             THE COURT:  All right.
11             Attorney Roe, we have essentially consolidated
12    the hearings on the probable cause, the preliminary
13    hearing, as well as the detention hearing.
14             You may proceed with any evidence you wish to
15    offer.
16             MR. ROE:  Thank you, Your Honor.
17             I would call Limon Miah who I believe is on
18    the Zoom call.
19             THE COURT:  My courtroom deputy will
20    administer the oath.  If Mr. Miah could engage his
21    camera, please, if he has one.
22             MR. ROE:  You need to unmute your phone.
23             WITNESS LAMONE MIAH:  Hello.  Good afternoon.
24    How are you?
25             THE COURT:  My courtroom deputy will now
```

1    administer an oath.

2              THE DEPUTY CLERK:  Can you please stand and

3    raise your right hand.

4              LIMON MIAH, a witness herein, having been

5    first duly sworn, testified as follows:

6              THE DEPUTY CLERK:  Please state and spell your

7    name for the record.

8              THE WITNESS:  Limon, L-i-m-o-n, Miah, M-i-a-h.

9              THE DEPUTY CLERK:  Thank you.  You may be

10   seated.

11                    DIRECT EXAMINATION

12   BY MR. ROE:

13   Q.   Mr. Miah, for purposes of clarity, I may at times

14   refer to you as Limon.  I hope that will be okay.

15   A.   (No response.)

16   Q.   Limon, can you tell us a little bit about your

17   family, how did they come to the United States?  Can you

18   hear me?

19              THE COURT:  I'm afraid we may have a technical

20   problem.  Mr. Miah appears to be frozen.

21              MR. ROE:  Could we adjourn for just a

22   minute -- can you hear us now, Mr. Limon?

23   A.   In 2003 --

24   Q.   Limon, I'm going to start again with this question

25   just so we have a nice clean record, okay.

Limon Miah - Direct

1   A.   Can you hear me?

2   Q.   I can barely hear you.

3           MR. ROE:  Can the Court hear him?

4           THE COURT:  I can.  There is interruptions in

5   the transmission here.  I don't know if there is any

6   room -- if there is a room where you got your best data

7   connection, I suggest that you go there.

8           WITNESS LIMON MIAH:  Let me turn my heater

9   off, okay.

10  Q.   Limon, can you hear me now?

11          THE COURT:  Mr. Miah, can you hear me?  This

12  is the judge.  If Mr. Miah cannot re-establish his Zoom

13  connection, I'll allow him to -- if we can hear him,

14  I'll allow him to testify via telephone since he was

15  administered the oath while on camera, if he can connect

16  by phone and as long as all the participants can hear

17  him.

18          MR. ROE:  Your Honor, that would be fine.  I

19  have a phone number for him, I believe.  If you would

20  give me just a moment.

21          THE DEPUTY CLERK:  He may be trying to connect

22  with a different device.

23          WITNESS LIMON MIAH:  Hello.

24          THE COURT:  That's a better connection.

25          WITNESS LIMON MIAH:  I'm sorry.  My phone was

**Limon Miah - Direct**

1    out of charge.  Go ahead with your question.

2          THE COURT:  You may continue, Attorney Roe.

3          MR. ROE:  Thank you, Your Honor.

4    Q.   I'm going to call you Limon if that's okay.

5          Could you tell us about how your family came

6    to the United States.

7    A.   My family came to my father and we moved here in

8    March 28, 2003.  I went to high school here, North

9    Hills.  What else do you need to know?

10   Q.   Where did you come from?

11   A.   Bangladesh.

12   Q.   What do you consider to be your ethnicity?

13   A.   Bengali.

14   Q.   Within the Bengali ethnicity, would you consider

15   yourself to be Arab or an Indian?

16   A.   No.  No.  I am not an Arab.  We are basically

17   Indian.  It used to be part of India, Bangladesh.  We

18   speak Bengali.  That's why it's called Bangladesh.

19         I have been racially profiled many times.

20   People think we are Arabs instead of being Indian which

21   is Bangladesh.  Since I moved here, I have been facing a

22   lot of racial problems right and left.

23         MS. SMOLAR:  Objection, Your Honor, to this

24   testimony.  This is not relevant to detention.

25         THE COURT:  I have to agree.  The testimony

Limon Miah - Direct

1  has been proffered to indicate that there was racial

2  profiling of the defendant in this case.  It's not

3  relevant to this current proceeding either on the issue

4  of probable cause or the factors I would consider as to

5  whether bond is appropriate.  I would suggest you move

6  on, Attorney Roe.

7            MR. ROE:  Your Honor, if I could just be heard

8  for a moment on this and then I will move on.

9            THE COURT:  You may.

10           MR. ROE:  I think it's important.  I'm putting

11  it in for the purposes of the res gestae or the context

12  of what we are dealing with here and goes against -- to

13  the conditions of confinement that you were discussing

14  in terms of what is the family picture here and how are

15  we approaching this situation.  That's all I'm trying to

16  do is give you background.

17           THE COURT:  All right.  I'm very interested in

18  the family picture to the extent you are suggesting

19  someone as a custodian or explaining to me a residential

20  plan that you would propose as part of suggested bond

21  but you need to stick to that because that's what is

22  relevant.

23           MR. ROE:  Very good, Your Honor.  I'm going to

24  try to weave through this and keep it narrow.

25  Q.   In terms of your personal behavior in the United

**Limon Miah - Direct**

1   States, what do you do for a living now?

2   A.   Right now I don't have a job because of pandemic.

3   I was driving a truck.  Right now I'm not working.

4   Q.   Do you have a criminal record?

5   A.   No, sir, zero, nothing.

6   Q.   In fact, is it fair to say you have --

7            MR. ROE:  Your Honor, I would like to put a

8   piece of the record under seal due to the sensitivity of

9   some information I want to bring to the Court's

10  attention.

11           THE COURT:  Can you describe in general terms

12  without disclosing the confidential or sensitive

13  information you would like to be placed under seal?

14           MR. ROE:  It's law enforcement information.  I

15  would typically think this would be placed under seal in

16  a federal criminal case.

17           MS. SMOLAR:  Your Honor, this is not relevant

18  to detention of this particular defendant.  Anything

19  related to that is just absolutely inappropriate in this

20  proceeding.

21           MR. ROE:  I would like to make a proffer, Your

22  Honor.  I think it's relevant.

23           THE COURT:  Let me hear your proffer.

24           MR. ROE:  Your Honor, again, I would like this

25  to be a sealed proffer.

1          THE COURT:  All right.  I will order the

2    proffer sealed.  I may unseal it immediately after

3    hearing it.

4          MR. ROE:  That's fine, Your Honor.  I don't

5    want to let the cat out of the bag.

6          THE COURT:  I can't seal this because we have

7    other participants on this line that I could exclude.

8    There are more than court personnel on this call.  So to

9    the extent you wish to have me hear something on a

10   sealed basis, you would have to file a motion proffering

11   the information.

12          Otherwise, if you are not comfortable doing

13   that, to offer the evidence on the record, then I can't

14   hear it now because I'm not going to exclude every other

15   participant on this Zoom conference for this purpose.

16          MR. ROE:  Your Honor, I would have no

17   objection to Ms. Smolar participating in a sidebar

18   conference as we would normally have in any evidentiary

19   hearing.  I think this is appropriate.

20          THE COURT:  I'll ask my courtroom deputy if

21   she could place counsel and I in a breakout room to hear

22   this proffer.

23          MR. ROE:  Thank you, Your Honor.

24          (Sealed sidebar discussion was held.)

25          (Sealed sidebar discussion was concluded.)

Limon Miah - Direct

```
 1              THE COURT:  Attorney Roe, you may continue.

 2          I believe we have resolved the last line of

 3  questioning.  If you have more, please continue.

 4              MR. ROE:  Thank you, Your Honor.

 5  BY MR. ROE:

 6  Q.   Limon --

 7              THE DEPUTY CLERK:  Your Honor, is Attorney

 8  Smolar back?

 9              THE COURT:  Thank you.  I thought she was.

10              (Pause in the proceedings.)

11              THE COURT:  I believe everyone is back in the

12  main session of the Zoom now.

13              You may continue, Attorney Roe.

14              MR. ROE:  Thank you, Your Honor.

15  Q.   Limon, can you hear me?

16  A.   Yes, I can hear you.

17  Q.   Where do you live?

18  A.   I live in Etna.

19  Q.   Who lives with you?

20  A.   Three brothers and mom and a wife and kids.

21  Q.   Would it be possible for you to bring the defendant

22  into your home?

23  A.   What did you say?

24  Q.   Would it be possible for you to bring the defendant

25  into your home?
```

**Limon Miah - Direct**

1   A.   Who is defendant?

2   Q.   Your brother.

3   A.   Yes.

4            MR. ROE:   Now he is frozen, I'm afraid.

5            THE COURT:   Mr. Miah, can you hear us?

6            THE WITNESS:   Yes, I can hear you right now.

7   You were frozen for a second.

8            THE COURT:   Okay.  Let's continue, Attorney

9   Roe.

10  Q.   Would it be possible for you to bring the defendant

11  into your home if permitted by the Court?

12  A.   Yes, I'm willing to do that, no problem.

13  Q.   Would you be willing to report to the Court in the

14  event that your brother were to leave the home?

15  A.   Oh, absolutely, absolutely.  I would not let

16  anything happen under my watch.  That's the kind of

17  person I am.

18            Also, another thing I do want to mention.  The

19  agent, you guys mentioned I don't cooperate with you

20  guys.  Every time they came, I was talking to them.  I

21  have everybody's phone numbers, they were texting me and

22  I was texting them back.  That was a complete lie.

23            My mom doesn't speak English and she could not

24  talk at all.  So I show up in the house and talk to

25  them.  They were very friendly.  They give me their

Limon Miah - Cross

1  card, everyone give me their phone number, their card,

2  they were texting me can I contact you, talk to you, you

3  know, stuff like that.

4         I don't know why they told you that I was not

5  cooperative to them.  I even showed up on Wednesday when

6  they called me and they told me they arrested my brother

7  and they wanted to ask me questions.  I was talking to

8  them for almost 45 minutes.

9         I'm just disappointed why they would put a lie

10  out there like this.  I'm not that kind of person.

11  Q.   Would you be willing to have the FBI search your

12  home for weapons so that any weapons that are in the

13  home could be removed?

14  A.   Sure.  Yeah.  No problem.

15         MR. ROE:  Your Honor, I have nothing further

16  at this time.

17         THE COURT:  Ms. Smolar.

18         MS. SMOLAR:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20  BY MS. SMOLAR:

21  Q.   Good afternoon, Mr. Miah.

22         You said that you had a lot of contact with

23  the agents working this case, correct?  You texted with

24  them?

25  A.   Yes, ma'am.  The first day they came to my house, I

Limon Miah - Cross

1  was not there.  They knocked on the door.  My mom opened

2  the door and she did not know what to say.  She does not

3  speak English.

4          She called me and put me on her phone, home

5  phone, and I asked them who they are.  They told me they

6  are FBI agents and they are investigating my brother

7  Khaled.  I told them what you want to know about him.

8  They said, well, we would like to see you personally,

9  can you come.  I said, sure, I can come.  Give me 15, 20

10  minutes.

11          A few minutes later, they call my cell phone

12  because they took the number from my landline number

13  when they were talking to me and they got my cell phone

14  number.  They directly call me from their cell phone and

15  so forth and I told them give me five more minutes and I

16  would be there.

17          I was right around at Dante picking up a pizza

18  because I ordered a pizza there.  I show up and I was

19  talking to them for almost 45 minutes to an hour.  It

20  was Rasheed, I believe, and Mick and another guy, I

21  don't know his name.  I forgot his name.

22          They give me their business cards and phone

23  numbers.  We have the phone number.  They were very

24  happy with my statement and I gave them everything I

25  know to the best of my knowledge about my brother.  They

**Limon Miah - Cross**

1  appreciate that.

2          I also give them my other brother's name and

3  my sister's name and their phone numbers if they want to

4  talk to them.

5          How come they are telling you guys that I did

6  not talk to them, I was not cooperating?

7  Q.   Let me ask you another question.  So you had

8  numerous contacts with the FBI.  Did you at any time try

9  to get your brother to come live with you or to get some

10 help?

11 A.   We tried -- I know he was going to campus and that

12 there was no way that he is going to come back and live

13 with us.  That's why he moved there because he was

14 having difficulty going to college while staying home.

15 He wants to have peace of mind.  He don't want to hear

16 any family problems.  He just want to go straight to

17 school and study.  That's the main reason he moved.

18         We always ask him if you think you are

19 struggling with finance or you cannot pay rent, always

20 come back and live with us, no problem.  It's your

21 choice.

22 Q.   Were you aware that your brother is no longer

23 enrolled at Pitt because he could not afford to attend?

24 A.   I do not know that.  I thought he was still going

25 to Pitt.  From my experience, I know he was going to

Limon Miah - Cross

1   Pitt.  He was living there.  I did not know about that

2   part.

3          In the home he never caused a problem and he

4   never had any issue with anybody else, no fights.  He

5   just had -- I think he has anxiety problem.  As far as

6   from my experience, I'm not a doctor, but I know he

7   probably needs some consulting and he likes to run his

8   mouth sometimes.  That's the big problem.  Otherwise, he

9   doesn't have any other record at all.  None of us have

10  any record at all.

11  Q.   You, yourself, do have a number of guns; correct?

12  A.   Just one.  I had it from 2008 just for safety.  I

13  used to work at a gas station on the night shift in

14  Lawrenceville.  Back in the day Lawrenceville was really

15  bad.  It was just for work and that is about it.

16          Since then it's sitting in my locker.  I never

17  use it.  It's rusty now probably.

18  Q.   Have you seen the complaint affidavit in this case,

19  Mr. Miah?

20  A.   Yes, ma'am.

21  Q.   So there's a picture on Page 24, I don't know if

22  you have it in front of you, but there is a picture

23  taken from your brother's ICloud account that shows a

24  post with a lot of guns and it says getting ready for

25  tomorrow.  Hunting pheasants and rabbits with Jabadur

Limon Miah - Cross

1    Rahaman, Limon Miah.  Do you remember that picture?

2    A.   That picture, ha, ha, ha, that picture was taken

3    from my friend Mike Apressaman.  He is in U.S. military

4    and we went to hunt a deer one time and Mike is the one

5    who took the picture, posted it on Facebook and put the

6    names out there.  I bet that picture was taken by my

7    brother.  He put it there.  I believe so, one hundred

8    percent.  I remember going hunting with my friend Mike.

9    That was a while ago, 2008 or 2009.

10   Q.   Were those your guns in that picture?

11   A.   No.  All of them were my friend's guns.  He is in

12   U.S. military.  He was serving in Afghanistan.

13   Currently, he is back.  He has a mental issue.  We were

14   best friends.

15            While he was in military, he used to go to

16   drill once a month and we was working at the gas station

17   on the night shift, me and Mike.  He is the one who told

18   me about -- where I'm from, guns are not allowed.  We're

19   not even --

20            THE COURT:  Let me interrupt you.  The answer

21   to the question is those are not your guns?

22            THE WITNESS:  No, those are not my guns.

23   Those are my friend's guns.

24            THE COURT:  Thank you, sir.

25   Q.   Mr. Miah, you, I think, spoke to the probation

1   office this morning with regard to your brother and you

2   mentioned something about the fact that while he was at

3   Shaler High School, he was told to get help and you

4   tried to get him help then but it didn't work?

5   A.   Yeah.  It didn't work.  School told us he is acting

6   different, he is not normal.  After my father passed

7   away -- when my father passed away, I was not in the

8   hospital.  My mom and two of my younger brothers and my

9   aunt was there.  Khaled was standing right next to my

10  father on his last moment.

11          Everyone cried, grieved, talked.  Khaled was

12  the only one that was shocked.  He didn't say a word,

13  nothing.  He was froze and then he changed -- everything

14  changed.

15          He used to not eat on time, not go to school,

16  he doesn't want to do homework.  Everything changed with

17  him.  The school said he is going to need help, maybe

18  anxiety, take him to behavioral therapies or take him to

19  Western Psych and see if they can do something or if

20  there is anything wrong with him.

21          I took him to a PCP several times.  I took him

22  to Western Psych.  Things didn't work out.  I tried my

23  best --

24  Q.   What do you mean things didn't work out?

25  A.   Doctor said he was fine and we asked as a family

Limon Miah - Cross

1  because the doctor only saw him for ten, fifteen minutes

2  and just asked him some questions.  He probably outsmart

3  the doctor.

4        We live in the house.  We know he was going

5  through a problem but we didn't know exactly what it was

6  because he changed.  Everything was changed.  He would

7  not come home at all and he stayed home for years and

8  years.  He dropped out of school.  He took a few years

9  break and realized that is not how life goes and wanted

10 to finish his GED and go to community college to take

11 some credit and then transferred to Pitt.

12       I believe he was almost done this semester.

13 This was his last semester, I believe, and this thing

14 happened.

15 Q.  But you were not aware that he was no longer

16 enrolled at the University of Pittsburgh?

17 A.  No, I didn't know that.  Like I said, he doesn't

18 tell me things what he is doing.  I know he was going to

19 Pitt and that's about it.

20       As far as I thought he was going to medical

21 school, then he was in finance all of a sudden, and I

22 was like as long as he is doing something and putting

23 his life together, that's what we want.  Everybody wants

24 him to do that.  Nobody wants --

25 Q.  I'm sorry to interrupt you.  Do you recall speaking

**Limon Miah - Cross**

1  with the FBI agents and telling them he was estranged

2  from his family for a period of time?

3  A.   Yes, because what happened, he just don't like us

4  to put our nose in his business because if I personally,

5  me and my mom see anything wrong, we are on top of his

6  head all the time like, look, you aren't doing this, you

7  can't do this.  I guess he doesn't like it.

8           He is talking to me most likely because I'm

9  the one that would be at the top of his head if I see

10  anything wrong.  Like I said, I will put myself up on

11  the phone line.

12          I gave up citizenship over there and became

13  citizen here.  I have a wife and kids here.  This is

14  their future.  This is my future.  If I die, I'm going

15  to get buried here, not where I'm from.

16  Q.   I'm going to stop you because we don't want to get

17  too far afield here.

18          You said he doesn't like you to be in his

19  business.  Did you confront him about the fact that the

20  FBI was telling you about the things that he had been

21  doing with regard to them specifically?

22  A.   Yes.  I tried to call him a few times.  He did not

23  answer my phone.  I had my mom talk to him and basically

24  went through my mom and say, stop doing what you are

25  doing.  Don't be stupid.  Why are you doing all this.

**Limon Miah - Cross**

1  Do you need some mental health.  Do you need some
2  financial.  Are you going through any stress because of
3  finance and everything.  He says he is fine.
4          He might not be fine but he said he was fine
5  to my mom.  Like I said, I send him text messages and I
6  try to call him and he don't want to talk to me.
7          I would like -- I always like -- as the older
8  brother, you know.  I dropped out of college after my
9  father died to support our family.  I know how hard I
10 worked and I know --
11 Q.  Let me just ask you --
12         THE COURT:  We understand, Mr. Miah.  I think
13 you answered the question.
14         Attorney Smolar, you may continue.
15 Q.  Just one final question.  Did you send a text
16 message to one of the special agents this week
17 apologizing for your brother's behavior?
18 A.  Yes.  I tried -- after I talked to a few people,
19 they don't give me enough answer why he was arrested and
20 why he is being taken.  So I show up at the headquarters
21 and I ask and request to talk to a few guys and they say
22 everyone left.
23         While I was talking to them, two of the agents
24 walked -- drove in.  So I waved my hand and called them
25 by their name.  They turned around and talked to me

1   about what was going on.  I asked them, hey, what
2   happened about my brother.  He got arrested.  I just
3   need an update on what is going on.  They tell me what
4   it is.  I'm going to tell you this and this and I left
5   after that.
6          Later on because I made multiple calls to try
7   to find out what was going on with my brother, one of
8   the agent I called, he texted me back, hey, what is
9   going on.  Do you have contact with my colleagues and I
10  said, yes, I did see three of your colleagues and they
11  tell me what is going on.
12         He said he was not able to come to talk to me.
13  He was not part of this arrest because Khaled was
14  tracking him or his family members and stuff like this.
15  As soon as he said that, I apologized to him and
16  everything I sent him a text message accept my apology.
17         He is talking back and forth with me.  Like I
18  said, I'm very okay with those people that came and talk
19  to me.  Even the past few times, they were investigating
20  a few other people.  They came to talk to me and I went
21  to the courthouse a few times to testify for people.  To
22  the best of my knowledge what I knew, I told them.
23         I don't know how in the world they are saying
24  I did not talk to them and not cooperate.  Maybe they
25  are talking about my mom because she doesn't speak

Limon Miah - Cross

1    English.

2              THE COURT:  Mr. Miah, I've heard you and I

3    fully understand your testimony.

4              Attorney Smolar, anything else?

5    <u>BY MS. SMOLAR:</u>

6    Q.   Last question.  Did you tell the FBI that you don't

7    get along with your brother, that you guys don't get

8    along?

9    A.   Get along.  Like I just tell you, he doesn't like

10   me to get into his business too much.  That's what it

11   is.  It's not me.  He doesn't want me to know his stuff

12   because if I see he is doing -- and my opinion, maybe I

13   think it's wrong but he thinks it'S right.

14              I say no, you are not doing this.  This is

15   wrong.  I'm not going to let you do this.

16              I put myself on the line.  No, you are under

17   my watch, you are not doing this.  You have to not do

18   this.  That's the kind of things, that's how all my

19   family is with him.

20   Q.   Did you also tell them that he doesn't get along

21   with other members of your family?

22   A.   Yeah.  Basically I told them he doesn't get along,

23   he doesn't want to talk to them except my mom.  He talk

24   to my mom and sister and I believe that's it.

25              He doesn't want to share anything with us or

 1  talk to us because we always force him or try to put a

 2  force on him.  He doesn't like that, you know, like

 3  young kids, they don't like to give up control.  Things

 4  like --

 5          THE COURT:  Attorney Smolar, I think this line

 6  of questioning has been covered now.

 7          MS. SMOLAR:  Yes.  Thank you, Your Honor.

 8          I have no further questions.

 9          THE COURT:  Attorney Roe, any redirect?

10          MR. ROE:  Nothing further, Your Honor.  Thank

11  you.

12          THE COURT:  Do you have anything further on

13  behalf of the defendant at this time?

14          MR. ROE:  No, Your Honor, I don't.

15          THE COURT:  I don't believe I need argument on

16  either the probable cause issue or the issues relating

17  to detention but if counsel would like to highlight

18  something for me, I will listen.

19          So, Attorney Smolar, anything you would like

20  to add beyond the evidence that I have heard?

21          WITNESS LEMON MIAH:  Sorry to bother you guys.

22  Also my PCP said back in day -- sorry to bother you.  I

23  just want to bring this up.  They said take your brother

24  to a doctor.  He is going to have a problem.  As far as

25  he knows, he is concerned, here we go.  Stuff happening.

1          He just like to run his mouth.  He is going

2    through anxiety.  I don't know if he is going through

3    depression or not.  It seems like to me that is what is

4    going on.  He was not like this when he was home.

5          THE COURT:  Thank you.  Mr. Miah, I thank you

6    for your testimony.  It's been helpful to the Court.

7    You're excused as a witness but you, of course, may

8    remain on the Zoom call for the balance of this

9    proceeding.

10          Attorney Smolar, anything else you wish to add

11    by way of argument?

12          MS. SMOLAR:  I'll keep it brief, Your Honor,

13    because I understand the Court has said you do not

14    require argument and we have been going for several

15    hours.

16          With regard to the preliminary hearing, I

17    think probable cause is evident both from the complaint

18    and the testimony here today.

19          With regard to detention, I think what the

20    testimony today has revealed is the FBI was extremely

21    patient with Mr. Miah.  It has been months of trying to

22    cajole him into an interview with the United States

23    government to try to explain what he was doing.

24          Instead of responding appropriately, he

25    escalated and he went on the attack against federal

1    agents by name specifically and their families.

2              He began not just by words to threaten them

3    but also in his actions.

4              He surveilled Special Agent A's home on

5    multiple occasions.  He surveilled the FBI on multiple

6    occasions and that is just not acceptable behavior and

7    it's dangerous behavior that must be addressed at this

8    point.

9              His views that we have seen both in his own

10   words, so we have his threats that are out there in the

11   public on his Twitters but we also have what's going on

12   in his mind privately.  We have that from his ICloud and

13   from his phones and from his iPad and all of those are

14   extremely concerning when you get to the issue of

15   detention.

16             This is someone who is threatening law

17   enforcement, specific members of law enforcement.  He is

18   saying the deed will be done when he is prepared to do

19   it.  He says the zero hour is approaching.  He provides

20   coordinates and he is referencing the 9/11 attacks.

21   This isn't cute.  This isn't just somebody spouting off.

22   This is extremely dangerous behavior and it has to be

23   addressed by incarceration at this time to keep everyone

24   safe.

25             Most recently we see that after a search was

1  conducted in his house this week, we found research on

2  one of the federal judges who signed a search warrant.

3          I think the risk is just too great at this

4  time.  We've seen he is capable of getting into a car

5  and going to peoples' homes.  We have seen he is capable

6  of going to the FBI.  We have seen he is capable of

7  creating homemade destructive devices and has an

8  interest in guns.  He is conducting surveillance of

9  women on campus at the University of Pittsburgh.

10         He has no job.  He has no schooling right now.

11 He is a danger to the community, plain and simple.

12         As far as risk of flight, I think it's clear

13 he has a passport.  He has both a Bangladeshi and United

14 States passport.  He has traveled extensively

15 internationally and within the U.S.

16         Recently he made a tour of local terror sites.

17 He has a fascination with the Tsarnaev brothers from the

18 attack in Boston.  I think it is just far too much of a

19 danger of a risk of flight and danger to the community

20 that he be released at this time.

21         THE COURT:  Thank you, Attorney Smolar.

22         Attorney Roe.

23         MR. ROE:  Your Honor, the issue that I would

24 raise for the Court is whether for starters, if we could

25 have some type of mental health evaluation performed in

1   custody but I would suggest not in the custody of the

2   Allegheny County Jail but in the custody of something

3   akin to a federal medical center.

4        This is somebody who appears that things have

5   gotten out of control in his life.  It has to the point

6   where at some point in time, it spirals out of control

7   in terms of communication, use of the Internet and so

8   on.

9        Fortunately, we don't have somebody who has

10  actually physically acted out.  We have somebody who has

11  clear indicia including in the government's affidavit of

12  a recognition of a mental health condition.

13       We submit as an initial matter, he should be

14  subject to a formal mental health evaluation in a secure

15  setting and then over time, recommendations can be

16  received as to whether he could be placed in a home

17  subject to supervision by Limon if that's feasible or

18  not.

19       I'm not presenting the argument let him out on

20  the street, no confinement, everything is fine.  I'm not

21  making that argument.

22       I'm making an argument if we look at the

23  situation, it may be the case that this is not a -- that

24  this should be dealt with through a mental health

25  channel as opposed to eventually a criminal channel.

1   That, of course, is an issue for the merits and long

2   term what is going to happen with the charges, but in

3   the short term, there's at least enough here to raise

4   major question marks as to his mental health condition

5   that I would submit that the placement that should be

6   made is a placement into a mental health facility, a

7   federal medical center, something along those lines and

8   that there should be a report in a reasonable period of

9   time so that a further evaluation as to his appropriate

10  placement can be made.

11           THE COURT:   Thank you, Attorney Roe.

12           All right.   First as to the issue of probable

13  cause, I do find that there's probable cause to support

14  each of the elements of each of the three offenses

15  charged in the criminal complaint, specifically 18 U.S.

16  Code Section 115A1, 18 U.S. Code Section 1519, and also

17  18 U.S. Code 875C.

18           I do find the charges should move forward

19  under the criminal complaint.

20           Now, with respect to the issue of detention or

21  bond, I find by clear and convincing evidence that the

22  defendant does possess a significant and unacceptable

23  risk of danger to the public and to particular persons.

24           Further, that no condition or combination of

25  conditions of release will reasonably assure the safety

1    of the public or those individuals.

2              I base this finding first on the offense

3    charged and on the weight of the evidence.   In

4    particular, the nature and imminence of the threats made

5    against members of the FBI and other members of law

6    enforcement.

7              The evidence is strong that this defendant not

8    only made these Internet-based threats but then

9    personally surveilled and personally stalked agents and

10   members of their family and surveilled or cased the FBI

11   Building.

12             Coupling all of that with serious and not very

13   veiled threats of harm, I'm also troubled and concerned

14   and rely upon what I see as a pattern of activity that

15   appears to be in preparation for violence, for a violent

16   attack, including researching of weapons, of firearms

17   and bomb making, and the defendant's activities in terms

18   of developing proficiency with the use of firearms.

19             I'm further concerned that anyone who seems to

20   come within the defendant's orbit, including federal

21   judges who have issued warrants, then become the subject

22   of his surveillance and scrutiny.

23             This is all with the backdrop of an apparent

24   fascination with terrorism and terrorists that cannot be

25   reasonably explained by academic interest.

1           Now, I have considered the defendant's lack of

2    a criminal history here.  I have also taken into account

3    the very sincere testimony of his brother.  I applaud

4    his willingness to take his brother into his home and

5    desire to see him succeed going forward, but I also

6    applaud his entire family who as immigrants and

7    naturalized citizens are obviously making a way into

8    this country successfully which is not always an easy

9    thing to do these days.

10          But having said all of that, it is clear to me

11   that notwithstanding the good faith and sincerity of the

12   brother and the family, their efforts to date have been

13   largely in vein.

14          It's clear from the testimony that the

15   defendant has been resistant to family intervention and

16   any efforts to maintain control or at least to encourage

17   him to avoid conduct such as what is alleged in the

18   criminal complaint and, therefore, I must question the

19   efficacy of a custodial relationship here.

20          The bottom line is that I find that the

21   custodial relationship proffered will not reasonably

22   mitigate the risk to the community.  Therefore, I find

23   it inadequate.

24          In addition, I find by a preponderance of the

25   evidence that the defendant also poses a significant

1  risk of nonappearance and flight and that no condition

2  or combination of conditions of release will reasonably

3  assure his appearance in the future.

4          I base that finding also on the nature of the

5  offense here, also on the defendant's erratic behavior

6  while he was aware of the investigation and activities

7  of the FBI.

8          Then, finally, as to both of these

9  considerations, the risk of flight and a danger to the

10  community, I do agree with counsel that there appears to

11  be a serious history of mental health -- a history of

12  untreated mental health issues which hopefully will be

13  addressed, but I do not have the ability to -- and I

14  don't deem it appropriate to attempt to direct the

15  defendant to a mental health facility.  I don't have the

16  expertise to do that.

17          I trust that while detained, appropriate

18  evaluations will be made of the defendant but my order

19  is that this defendant will be detained pending further

20  proceedings in this action.

21          I there anything further, Attorney Smolar?

22          MS. SMOLAR:  Nothing further from the

23  government, Your Honor.

24          THE COURT:  Attorney Roe, is there anything

25  further?

1          MR. ROE:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  We're adjourned.

3          (Whereupon, the above hearing was concluded.)

4                        - - -

5

6          I hereby certify by my original signature

7    herein, that the foregoing is a correct transcript, to

8    the best of my ability, from the record of proceedings

9    in the above-entitled matter.

10

11

12          S/ Karen M. Earley

13            Karen M. Earley

14            Certified Realtime Reporter

15

16

17

18

19

20

21

22

23

24

25