IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,

       Plaintiff,

                             Criminal Action

   vs.

                             No. 21—110

KHALED MIAH,

       Defendant.
_____


    Transcript of SENTENCING HEARING proceedings recorded on
Tuesday, October 18, 2022, in the United States District
Court, 700 Grant Street, Pittsburgh, Pennsylvania, before
The Hon. W. Scott Hardy, United States District Judge


APPEARANCES:

For the Government:     Jessica Lieber Smolar, Esq.
                       Nicole A. Stockey, Esq.
                       United States Attorney's Office
                       700 Grant Street, Ste. 4000
                       Pittsburgh, PA  15219

                       Dmitriy Slavin, Esq.
                       United States Department of Justice
                       950 Pennsylvania Avenue, NW, Ste. 7600
                       Washington, D.C.

For the Defendant:     Charles Davidson Swift, Esq.
                       Catherine McDonald, Esq.
                       Constitutional Law Center for
                         Muslims in America
                       100 N. Central Expressway, Ste. 1010
                       Richardson, TX  75080

Court Reporter:        Deborah Rowe, RMR, CRR
                       700 Grant Street, Ste. 5300
                       Pittsburgh, PA  15219
                       (412) 471—2510


Proceedings recorded by mechanical stenography; transcript
produced by computer—aided transcription

1                    P R O C E E D I N G S

2                           -  -  -

3              (10:02 a.m.; in open court, Defendant present with

4    counsel:)

5              THE COURT:  Good morning, everybody.  Please be

6    seated.

7              As you all know, we're here this morning for the

8    sentencing hearing in the United States of America versus

9    Khaled Miah at Criminal No. 21-110.  Would counsel for the

10   Government please enter your appearance for the record?

11             MS. SMOLAR:  Good morning, Your Honor.  Jessica

12   Smolar on behalf of the United States.  I'm here with

13   co-counsel, Dmitriy Slavin, from the Department of Justice

14   and Nicole Stockey.

15             THE COURT:  Good morning to all of you.  Welcome to

16   all of you.  And for the defense?

17             MR. SWIFT:  Good morning, Your Honor.  Charles

18   Swift on behalf of the Defendant, Khaled Miah.  Also with me

19   is Catherine McDonald, who is also co-counsel, and we also

20   have a law clerk seated at counsel table.

21             THE COURT:  Welcome to you as well.  Welcome back

22   to Pittsburgh.  I note Mr. Miah is physically present in the

23   courtroom as well.  Welcome to you, too.  I also note that

24   Erin Stewart of our Probation Office is also present in the

25   courtroom as well.

1              Let me begin by just putting some background out

2   and on the record.  Back on March 16 of 2021, the Defendant

3   was charged in an eight-count indictment with the following:

4              Five counts of making interstate threats to FBI

5   agents, in violation of Title 18 of the United States Code

6   Section 875(c) for conduct occurring on or about December 27,

7   December 28, December 29, December 30 and December 31 of

8   2020.  That's Counts 1 through 5 respectively.

9              Two counts of influencing and/or retaliating

10  against FBI agents by threats, in violation of Title 18

11  United States Code Section 115(a)(1)(B) and 115(b)(4) for

12  conduct occurring on or about December 30 and December 31 of

13  2020, Counts 6 and 7 respectively.

14             And one count of altering and deleting records in a

15  federal investigation, in violation of Title 18 United States

16  Code Section 1519 for conduct occurring from on or about

17  October 5 of 2020 to and including January 1 of 2021, and

18  that's Count 8.

19             Following a jury trial, on December 17 of 2021 the

20  Defendant was found guilty of the charges in Counts 1, 2, 3,

21  4, 5, 6 and 8 of the indictment in the case.

22             The Probation Office conducted a presentence

23  investigation and completed a Presentence Investigation

24  Report dated February 28 of 2022 as well as an Addendum dated

25  April 13, 2022, and a second Addendum dated October 12 of

1    2022.

2              After reviewing the Presentence Investigation

3    Report, the positions and objections with respect to

4    sentencing factors filed by both the Government and the

5    Defendant and the Addendum, the Court issued its Tentative

6    Findings and Rulings on September 19 of 2022 and then

7    subsequently issued Supplemental Tentative Findings and

8    Rulings yesterday on October 17 of 2022.  Those are all of

9    record and incorporated here.

10             Mr. Miah, have you read the Presentence

11   Investigation Report?

12             THE DEFENDANT:  Yes, I have, Your Honor.

13             THE COURT:  And have you read the Addendum and the

14   second Addendum?

15             THE DEFENDANT:  Yes, I have.

16             THE COURT:  And have you read the Court's

17   September 19, 2022, tentative findings and rulings?

18             THE DEFENDANT:  I have.

19             THE COURT:  Have you read the Court's Supplemental

20   Tentative Findings and Rulings of yesterday, October 17?

21             THE DEFENDANT:  I have.

22             THE COURT:  And have you had an opportunity to

23   discuss those documents with your attorneys?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Did they explain those documents to

1   you?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Did you understand their explanations?

4            THE DEFENDANT:  I did.

5            THE COURT:  Do you have any questions for your

6   lawyers about those documents now?

7            THE DEFENDANT:  I do not.

8            THE COURT:  Do you have any questions for the Court

9   about those documents?

10           THE DEFENDANT:  I don't.

11           THE COURT:  So Mr. Miah, I need to advise you now

12  about the sentencing guidelines that will be used by the

13  Court and how they apply.

14           In light of the United States Supreme Court's

15  decisions in United States versus Booker, Gall versus United

16  States, and subsequent decisions issued by the United States

17  Court of Appeals for the Third Circuit, the sentencing

18  guidelines are now advisory.  They're no longer mandatory.

19           The Court's directed to sentence a criminal

20  Defendant in accordance with Title 18 of the United States

21  Code Section 3553(a), taking into consideration one of the

22  factors in that statute, the sentencing guideline range the

23  Defendant would face under the Sentencing Commission's

24  guidelines.  Those are spelled out in the Presentence Report

25  and also in my tentative findings.

1          Now, pursuant to Federal Criminal Rule 32(e)(3), I

2    find that it is not appropriate to disclose the sentence

3    recommendations of the Probation Office to the Defendant, the

4    Defendant's counsel or to the Government.  Understand, Mr.

5    Miah, that in determining your sentence, I will not consider

6    any matter that's not been previously disclosed to you and

7    your lawyers with the exception of that recommendation that

8    the Probation Office has given me.  Everything else that I'm

9    considering you've seen.

10          At this time the parties -- I should say this.

11    Other than the objections that have already been raised by

12    the parties and ruled upon by the Court, at this time do the

13    parties have any objections to the factual statements in the

14    Presentence Report from the Government?

15          MS. SMOLAR:  No objection, Your Honor.

16          MR. SWIFT:  No objections to the factual

17    statements.

18          THE COURT:  Thank you.  Noting that there are no

19    further objections to the factual statements in the

20    Presentence Report, the Court accepts the factual statements

21    in the Presentence Report, the Addendum and the second

22    Addendum as true and accurate except as otherwise set forth

23    in the Court's September 19, 2022 Tentative Findings and

24    Rulings and in the Court's October 17, 2022 Supplemental

25    Tentative Findings and Rulings.

1              With that, are there any other objections, whether

2     factual or otherwise, to the Presentence Investigation

3     Report, the Addendum, the second Addendum, the Court's

4     Tentative Findings and Rulings or Supplemental Findings and

5     Rulings that you would like to bring to the Court's attention

6     now from the Government?

7              MS. SMOLAR:  No objections from the Government.

8              MR. SWIFT:  The defense does object to the

9     tentative findings after all -- after having the benefit of

10    all the Court's reasonings and rulings with regards to the

11    intent to carry out threats on that part.  Ours is not a

12    factual objection, the idea that these things did not happen,

13    but we do continue to object that they do not amount to an

14    avert act, as required by the Third Circuit.

15             The best way that I can put this to Your Honor is

16    to think about it in this context.  I'm going to use an

17    analogy:  Buying a house.  I've thought about buying a house

18    lately.

19             So in buying a house, have I made an overt act if

20    I've gone online and looked at real estate parts, to look at

21    where a house location might be.  If I drove by a house and

22    looked at it, have I actually done the steps, or do I need to

23    do more if I haven't hired a real estate agent, if I haven't

24    actually secured financing, if I haven't taken steps to sell

25    the house that I currently have.

1              In other words, I've thought about buying a house,

2     but I have not taken significant steps to where one could say

3     that I'm going to buy a house.  Thinking about it, many

4     things may change.  Maybe I don't get the job.  Maybe I don't

5     move there.  Maybe those things don't happen.  We can't see a

6     clear fact on it.

7              As we argued in the part on that, we believe that

8     that's exactly what you see here in buying a house.  You do

9     have -- you know, looks at things, some parts on it, have

10    made statements, et cetera, that would be concerning, that

11    would give you the idea that you're thinking about it.

12             But have we moved beyond thinking about it to an

13    overt act that shows that we're going beyond mere thoughts?

14    And that's really what -- because any threats case, Your

15    Honor, there's always going to be thinking about it.  The

16    person stated that they were thinking about it.  That's the

17    very nature of the threats case.  And if we go simply to the

18    idea that they've made statements on these parts, then we're

19    not at the overt part of it.

20             And we argue that the Third Circuit overt acts can

21    be one of two parts.  They can be as they've set out -- they

22    can be the overt act for conspiracy, which is very, very

23    small, just one step forth.  And the overt act for an

24    attempt, which is very, very high, in other words, a

25    significant step toward that, absent, would naturally go to

1    its completion.

2           We think the overt act here falls somewhere in the

3    middle of that.  It's not necessary to have an attempt, and,

4    in fact, if an attempt had been charged, I don't think it

5    would have met the legal sufficiency on the part of it, but

6    we don't think that we're far enough along in the idea of --

7    when I used the analogy of if I'm buying a house -- to the

8    process.

9           What we have at most is what can be considered from

10   this, is that somebody's thinking about something, and not

11   that they've made those substantial steps that have been

12   found in other places to do an actual attack.  And that's our

13   legal argument on it.

14          THE COURT:  Thank you.  Anything from the

15   Government?

16          MS. SMOLAR:  Your Honor, I'll just harken back to

17   the Court's tentative findings and our response filed prior

18   to the -- it wasn't just that the Defendant was thinking

19   about it.  You had overt acts, researching the agents,

20   researching their families at the same exact time that he's

21   making the threats.

22          I think we had plenty of testimony from Special

23   Agent Strebold looking at that iPad, the second iPad, and

24   seeing that at the exact same time on the dates that he's

25   making the threats, he's researching blowing things up,

1    buying guns, et cetera.

2            He went to a shooting range on the same exact day

3    that he's making these threats.  He traveled to the agents'

4    homes and to their work.  All of these things taken together

5    are calculated.

6            They are not just thinking about it or buying a

7    house.  They are driving by the house.  They are looking at

8    the house.  They are researching ways to obtain the house.

9    So there are plenty of overt acts, as the Court has found in

10   this case, and I do think the enhancement does apply.

11           THE COURT:  Thank you.  Taking into consideration

12   each side's briefings as well as your arguments here today

13   and the consideration of the whole record, pursuant to

14   Guideline Section 2A6.1(b)(1), a six-level increase applies

15   if the offense involved any conduct evidencing an intent to

16   carry out such threat.  That comes straight from that

17   guideline.

18           The applicability of this enhancement does not

19   depend on the Defendant's actual intent, which would exist

20   regardless of whether any action was taken toward carrying it

21   out.  Rather, it depends on whether or not the Defendant

22   engaged in conduct from which the Court permissibly infers

23   such an intent.

24           In other words, Mr. Swift, to borrow your analogy,

25   somebody that is thinking about buying a house, then takes

1   actions that allows others, in this instance, the Court, to
2   permissibly infer that the person really is going to buy a
3   house.  And I'll note, too, that the Third Circuit has
4   required that the Defendant have engaged in an overt act to
5   warrant the application of the enhancement.

6          As the Court's previously found, evidence admitted
7   at trial establishes that the Defendant engaged in conduct
8   prior to and around the time of the threat offense of
9   conviction which demonstrates his intent to care out those
10  threats.

11         The Court first took note of the Defendant's
12  threats of conviction in considering the Defendant's conduct
13  under the facts of the case as a whole and found that he
14  engaged in a series of overt acts beginning in late September
15  of 2020 after the FBI attempted to interview him, and through
16  December of 2020, which were directed at the FBI agents and
17  connected to the threats he leveled between December 27 and
18  December 31 of 2020.

19         Now, these overt acts, as they're laid out in the
20  Court's tentative findings, include the following:

21         The Defendant researching the agents as well as
22  their families, where their family members for instance
23  worked, even their pets, traveled to the vicinity of one of
24  the agent's residences, traveled to the vicinity of the
25  agents' place of employment, the Pittsburgh Field Office of

1  the FBI at various times of the day and night, researching

2  weapons, explosives and violence, and then on one instance

3  going to a shooting range on the day he made an actual threat

4  or post.

5         The Defendant's overt acts were substantially and

6  directly connected to the threats of conviction, which

7  referenced the agents, mentioned the whole Bureau and

8  location of the FBI headquarters in D.C., alluded to a prior

9  horrific terroristic attack, stated that, quote, the deed

10  will be done at the time the Defendant chooses and promised

11  that the time is approaching, zero hours approaching when the

12  agents themselves will be harmed.

13         To quote, "Next time you come in cowboy with the

14  crew, the hardwood will collapse beneath your feet," end

15  quote, and again quoting, "Remember boys, the more eyes on

16  me, the less eyes on the others.  Regardless, yellow tapes

17  will flow," end quote.

18         In disputing the applicability of this enhancement,

19  the Defendant discusses in a sentencing memorandum and then

20  reiterates here in court today that each overt act just

21  mentioned addresses that and suggests that the conduct was

22  either innocuous or could be interpreted in some other

23  manner.

24         Even though, if each of these overt acts viewed in

25  isolation could somehow be explained away, whether

1  innocuously or had a different interpretation, the context of

2  those threats that were leveled viewed as a whole on the

3  record, the Court finds that the Defendant did engage in a

4  series of overt acts from which the Court is able to

5  permissibly infer intent to carry out the threats of

6  conviction.

7        Accordingly, the Court reaffirms its prior ruling

8  overruling the Defendant's objection to the application of

9  Guideline Section 2A6.1(b)(1).

10        With that then, are there any other objections to

11  the Court's Tentative Findings and Rulings, Mr. Swift?

12        MR. SWIFT:  Nothing further.  We also continue our

13  objection under the obstruction, but we'll stand on our

14  arguments and memo.

15        THE COURT:  Ms. Smolar, anything you would like to

16  say in response to that?

17        MS. SMOLAR:  No.  We've already briefed that fully,

18  Your Honor, and the Court has also fully addressed it in the

19  tentative findings.

20        THE COURT:  Mr. Swift, your objection is noted, and

21  the Court stands by its ruling and tentative findings in that

22  regard.

23        Accordingly, then the Court adopts the Tentative

24  Findings and Rulings and Supplemental Tentative Findings and

25  Rulings as its initial findings and rulings on the facts and

1   the guidelines.  As delineated in those Tentative Findings

2   and Rulings, the Defendant's offense level is 28, which along

3   with a criminal history category of 1 provides for an

4   advisory guideline range of 78 to 97 months imprisonment.

5        Now, before I take any testimony or hear any

6   argument, I note that the Court has reviewed the Government's

7   Sentencing Memorandum.  It appears at Docket No. 320,

8   advocating for a sentence at the high end of the advisory

9   guideline range.

10       The Court's also reviewed the Defendant's

11  Sentencing Memorandum, appearing at Docket No. 324 wherein

12  the Defendant moves for a downward departure pursuant to

13  guideline Section 5K2.13, as well as a downward variance

14  below the advisory guideline range and argues that a sentence

15  between 36 and 41 months imprisonment is sufficient but not

16  greater than necessary to meet the goals of sentencing.

17       The Court's also reviewed each parties' response to

18  the opposing parties' Sentencing Memorandum, and those appear

19  at Docket Nos. 325 and 326.

20       The Court also notes that I've received several

21  letters, which I read and considered, and I will also address

22  those letters shortly as well.  But at this time does either

23  the Defendant or the Government wish to present any witnesses

24  with respect to the Defendant's potential sentence?

25       MS. SMOLAR:  None from the Government, Your Honor.

1          MR. SWIFT:  We recall Dr. Xenakis, Your Honor.

2          THE COURT:  All right.  Ms. Sheets will swear you

3     in.

4          (The witness, DR. STEPHEN XENAKIS, was duly sworn.)

5                       DIRECT EXAMINATION

6     BY MR. SWIFT:

7     Q.   Good morning, Doctor.

8     A.   Good morning.

9     Q.   You've previously established your professional

10    qualifications as an expert, so I don't want to go back over

11    those.  I'm sure the Court's well aware of them.  But I would

12    like you to describe briefly your specific qualifications and

13    experience regarding threat assessments, particularly in the

14    context of religious extremism and terrorism.

15    A.   Well, I guess that goes back to a long career of just

16    as a military officer, first studying and being trained in

17    how to assess threats in a combat scenario and knowing who's

18    dangerous and how they're going to execute a plan if they

19    have a plan and what harm will come.  So there's a whole

20    history there.

21         I got, as you know from my record, commissioned in

22    1970.  I did basic training in infantry and artillery.  So

23    there's a whole —— and then I served on assignments with

24    combat units, the First Cav Division and then at Fort

25    Campbell, the 101st, and also worked with some special

                          S. XENAKIS – DIRECT

1  operations units.  So there's a whole model here or I guess

2  training and criteria that go to general threat assessments.

3        Since 2005, I've been involved in cases of threat

4  assessments of a number of individuals who've been labeled as

5  religious extremists and terrorists, and including many

6  probably cumulatively well over a year, close to a year and a

7  half of evaluating and working with a number of the

8  individuals, detainees in Guantanamo.

9        So I have had an opportunity both in my own direct

10  interaction with them as well as in working with the various

11  agencies, including the interrogators, to see probably some

12  of the most dangerous people on the planet.

13  Q.  Can you describe how you come up -- have you come up

14  with a dangerousness profile in evaluating --

15  A.  I have come up with a methodology.  So when I'm

16  evaluating somebody and thinking about how -- what might be

17  their potential for harm and their capability to put together

18  a plan and execute it, I go through a series of criteria that

19  I look at.

20        The first is what conduct?  Do we have anything

21  that we know about them from multiple, multiple sources that

22  says this person has acted in a way and, in fact, hurt

23  someone or has harmed them either directly or indirectly.

24        So and secondly, I ask and look at what is their

25  planning, capability for planning in order to do that?  And

S. XENAKIS - DIRECT

1    that varies extensively; and as I've said to you, I've really

2    seen some individuals of course that have committed some

3    heinous acts against our country.  And that varies.  Some

4    people may go through years and years of planning and

5    thinking about what they do.  Other individuals do not go

6    through that extensive.  But almost everyone who's going to

7    do something has gone through a series of steps of planning

8    what -- and preparing for what they're going to do in order

9    to hurt somebody.

10          The third criteria I look at is who are they

11   affiliated with?  Who are they associated with?  Is there --

12   are there other individuals that they somehow recruited?  And

13   a number of these people do recruit people.  Are they in a

14   group?

15          I mean like if they're our team, if they are

16   military, obviously they're working in combat units.  And in

17   order to effectively conduct an operation, you have to --

18   it's very rare, almost -- I mean there are snipers that we

19   put out there, but even they have got a support team, that

20   very rarely do these individuals act in complete isolation

21   without in one way or another having somebody who's working

22   with them in part of what might be a plan that they're

23   putting together.

24          Then the last thing that I look at as a criterion

25   is how much have they studied this?  What do they really

1    know?  What is the knowledge or the training or the

2    experience that they are calling on and using to do what they

3    are intending to do or that we think that they might do?

4            So all those factors are ones that I look at and

5    think about what is the threat here?  How serious is that

6    threat?  What's going to be the impact of the threat if the

7    individuals carry it out?  And, for that matter, what can we

8    do on our side to protect and defense ourselves?

9    Q.   Can you give me some examples where conduct is

10   extremely important in your evaluation -- on evaluations

11   you've done in the past, some concrete --

12   A.   Well, if these individuals have, in fact, already

13   either themselves directly or indirectly injured somebody.  I

14   mean if they've been in attacks or they've been part of an

15   operation or they've -- in fact, if they're in the combat

16   theater, that they've fired at our soldiers and injured them

17   that way, or they get into conflicts with individuals.

18           Lots of times you've got people that will get into

19   fights, and you'll see that both within their immediate

20   circle, in their family, as well as a circle in people that

21   they're working with.  So that there's an aggression with

22   what they're doing.  There's a forcefulness about it in terms

23   of how they personally come across.

24   Q.   How about planning?

25   A.   Planning?

S. XENAKIS - DIRECT

1    Q.   Yes.

2    A.   Well, planning is probably the most important.  I mean

3    that's the thing we learn about from the time we're young

4    officers, is what's the operation?  What's your target?

5    What's your target look like?

6         You do extensive surveillance.  I mean one of the

7    basic lessons that we have to learn ourselves when we train

8    is intelligence, and being able to -- very carefully be able

9    to look at all the -- look at your target, see where the weak

10   spots are, think about what might be access points, look at

11   the people, think about where they move, how you're going to

12   conduct that operation, and then what does it take to carry

13   that operation out?  I mean what -- if you study other

14   operations that are like that -- if I could get some water,

15   that would be great -- thank you.  Thank you.

16        So it's what we call in the Army doctrine in

17   training.  So you've got to study other operations that are

18   like that and see how they carried out and how they succeeded

19   and how they failed.

20        The planning of everything that you do here, yeah,

21   there's some skill sets that you need to have, it's a lot of

22   experience, but real detailed planning is probably the most

23   important element of why an operation succeeds or fails.

24        You've all seen or read of operations that failed

25   spectacularly, like Desert One when we tried to go into Iran

1    in 1980.  And if you don't study that and you don't do the

2    planning and have a backup, then things are going to --

3    you're just not going to succeed in what you're doing.

4        Q.    How about associations?

5        A.    Well, that's the team.  I mean who are you working

6    with?  The people you're working with, are they folks that

7    are -- it's most important because if we're looking at

8    carrying out a threat that's going to harm or hurt somebody,

9    are we looking at people that are doing this kind of

10   activity?

11           So it's not just ideology.  I mean there's a lot of

12   people that believe things firmly and are very, you know,

13   erudite; and, you know, you can respect them for how they

14   write and think about things, but the issue is in terms of

15   are we looking at an affiliation, an association with people

16   that do this kind of thing?

17           And therefore, in doing that and being with them,

18   are we -- can we see that the individual that we're concerned

19   about is learning the skill sets, the techniques, the tactics

20   to carry out what we're worried about in terms of the threat.

21       Q.    And finally, you said study and review?

22       A.    Well, the study and review is probably -- I put that a

23   bit separately because there's sometimes a conceptual way of

24   looking at that, but it's also the study and review that goes

25   into planning because, you know, people that carry out good

S. XENAKIS - DIRECT

1   operations, I mean look at -- everybody knows all the stories

2   of Patton and folks like that.  I mean these Generals really

3   knew war.  And they had studied it, and they saw what worked

4   and didn't work.

5       Q.   You've been using military analogies.  Are these also

6   present in the terrorist and extremist --

7       A.   Yeah.  I mean I can't disclose who the people are that

8   I've seen, but I will tell you that these people that carry

9   out attacks and carry them out effectively are like our men

10  and women in uniform.  I mean they're common principles.  So

11  I mean this is a military -- if you're going to go out and

12  hurt somebody, it is more or less a military operation.

13      Q.   Now, did you look at Khaled Miah's behavior in

14  conjunction with these factors?

15      A.   Absolutely.

16      Q.   Did you assess him as having a significant danger for

17  future dangerousness?

18      A.   No.  I did not.

19      Q.   Why not?

20      A.   Because he downplays everything that went with that.

21  I mean --

22      Q.   Well, doesn't the fact that he posed a threat -- that

23  he's posted threats, show that he posed a risk or that he's

24  dangerous, that he's made these generic terrorist threats?

25      A.   Only that it alerts you that he's posted threats.  I

S. XENAKIS - DIRECT

1    mean I think that those are indicators of can this person be

2    dangerous or not?  But that's just the first level.  I mean

3    that's just a verbalization.

4         And it means that I feel that our obligation is

5    when we get that kind of information, is to then dive into it

6    in more detail.  But in of itself, that statement is not --

7    and I know that we may be talking differently here if I

8    understood what your sense was of overt threat -- but for me,

9    that doesn't -- it's like a Lieutenant coming to me, sir, I'm

10   going to do this operation, and I'm going to get this guy.

11        Okay.  Tell me how you're going to do that.  If you

12   can't tell me how you're going to do that, you better go back

13   and do some homework, Lieutenant, because you're not going to

14   make Captain, by the way.

15        So I mean I don't want to be too offhand about it,

16   but, yeah, I mean I think the first step is the

17   verbalization.  But there's like so much more that's got to

18   go into it in terms of planning.

19   Q.   What about the fact that he's driven in the vicinity

20   of the FBI offices in Pittsburgh and Agent Edquist's

21   neighborhoods and all that?

22   A.   Well, I mean that's something you've got to look at.

23   I mean I think that's important.  What's he doing there?

24   What kind of information did he gather?  How did he process

25   that information?  What did he do with it?

S. XENAKIS - DIRECT

1           You know, that's all the steps that go into

2     planning that have to follow.  That he did that is -- then

3     that opens up the whole set of questions what are you doing?

4     Why are you doing that?

5     Q.    Would you consider surveillance -- you've talked about

6     information -- a significant indication of dangerousness?

7     A.    Yes.  Surveillance is key.

8     Q.    Did you see evidence of surveillance here?

9     A.    I didn't.  I mean just because he was driving in the

10    neighborhood doesn't rise to the level of surveillance.  I

11    mean surveillance is very detailed.  There's a whole set of

12    processes that military -- we learn in terms of gathering

13    intelligence, of information and access points and watching

14    people and looking at patterns of behavior and, you know,

15    what might be, you know, what we call vulnerabilities.  So I

16    didn't see driving in the area anywhere close to rising to

17    that level.

18    Q.    Khaled also visited gun ranges.  Does that indicate

19    dangerousness to you, gaining skills?

20    A.    It depends on what he did at the ranges, I mean how he

21    was firing.  And was he going -- was he at the shooting range

22    in a way that we train -- we all did our training to operate

23    in a combat environment?

24           From what I could tell, any of the information --

25    and I asked for more information -- I assumed there were

1    videos at these ranges.  Was it just he was going out to do

2    target shooting, or did it look like he was going to be

3    preparing to be in some kind of operation or gunfight?  And

4    there's nothing I was informed of that indicated he was doing

5    anything other than going to do plain old target shooting,

6    which I've taken my kids to do.

7        Q.   He also taped together soda cans to look like mock

8    IEDs and things like that.  Does that indicate dangerousness?

9        A.   Again, all right, so why are you doing that?  Or is

10   that just playing?  It almost –– when I looked at one of your

11   videos that I saw, about that list of him talking –– I mean

12   it looked like playing.  It didn't look like it was all the

13   ways that someone would learn about how to put these

14   particular weapons together and make sure that they could

15   unfortunately be harmful explosives.

16       Q.   Did you –– in all of the stuff that you reviewed, did

17   you see anything about him gaining capability to make an

18   explosive device?

19       A.   I didn't.  You know, I mean you would clearly –– as

20   I've looked at other cases, I mean these individuals that are

21   doing that are, you know, getting other items that they would

22   use in terms of being able to configure these devices and

23   also practicing making those devices and everything else that

24   would go into what you would need to do to act it out.

25       Q.   How about background planning?  Did you see anything

S. XENAKIS – DIRECT

1    that Khaled Miah was doing that would contact -- contacts

2    that he was actually planning an attack?

3    A.   I didn't.  I mean I didn't see anything.  And I asked

4    for it.  I wanted to know how he'd do it, what his ideas

5    were.  Did he think about, you know, even the -- I don't want

6    to demean it.  Even a low-level operation, I mean we've

7    trained people.  We do -- you look at different courses of

8    action.  If I do this, this could happen, you know, that kind

9    of thing.  I didn't see any of that.

10   Q.   And is that present in almost every terrorist attack?

11   A.   Yes.  I mean I haven't looked at an incident yet where

12   there hasn't been that kind of thinking.

13   Q.   Did he have any associations?

14   A.   I didn't see any.  I haven't heard of any.

15   Q.   The FBI described -- there was testimony that one of

16   the agents described what they refer to as leaking.  Are you

17   familiar with that term?

18   A.   Yeah.

19   Q.   What does leaking mean to you?

20   A.   Well, I mean that's what we use in intel, intelligence

21   gathering.  There are all these signs.  Everyone tries to

22   keep things close.  The fundamental loose lips sink ships,

23   that kind of thing.  So it's basic that if you're going to

24   carry out an operation, that you have a very tight security

25   net around it.

S. XENAKIS - DIRECT

1          But often, depending on how skilled the people are

2     and how sophisticated it is, information leaks out.  And

3     you'll see that, oh, this really is a -- a data that we can

4     use that, in fact, an attack is planned, or something is

5     going on here.

6          I would not characterize what I've looked at and

7     postings as leaking.  I mean leaking is -- the way we learn

8     about it in the military, leaking is information having to do

9     with a specific plan, with a specific activity.

10    Q.   And you didn't see any particular --

11    A.   I didn't see any.

12    Q.   Now, going back to associations, now, there are people

13    who have conducted lone wolf attacks as their called where

14    they don't have associations with anyone.  Particularly in

15    this process, could Khaled Miah fall into that group just

16    because he hasn't associated with anyone?

17    A.   No.  I saw him very different from the people that

18    I've studied who are lone wolf attackers.  Yeah.  He might

19    not directly associate with people, but you'll see other

20    correspondence, and you'll see other information that those

21    individuals have that, even though it's not a personal

22    relationship, there's a way that they are gathering

23    information and thinking about what they're going to do.

24    Q.   How about studying?  Was that present?

25    A.   I didn't see that.  I mean he -- does he have general

S. XENAKIS - DIRECT

1    information?  Is he intrigued about terrorism?  Does he

2    wonder how these things happen?  What is it all about?  Yes.

3    You know, but it never went beyond what it looked like very

4    general -- almost quasi-academic information, a real studying

5    about this was how this attack occurred.  This is what these

6    individuals did, the kind of studying that goes into

7    planning.  I didn't see any of that.

8       Q.   Are you surprised that they're not -- the factors of

9    dangerousness that you've described are not present in

10   Mr. Miah, given his overall seeming attraction to some

11   extremist --

12      A.   No.  As I put in my testimony and my reports, I

13   believe that these are all a product of serious mental

14   illness, and we see all sorts of -- I mean over my fifty-plus

15   years of practice, having seen any number of men and women

16   who have serious mental illness, I mean they'll get

17   fascinated by all sorts of things.  I mean microwaves and

18   Havana Syndrome and nuclear devices in the eighties during

19   the Cold War.  I mean they were all worried about some

20   Russian someplace with a nuclear device.

21      Q.   Would psychosis indicate that he's dangerous?

22      A.   Excuse me?

23      Q.   You've indicated -- wouldn't psychosis -- you've

24   indicated that you think --

25      A.   No.  I mean, in fact, not that he's dangerous.  That

S. XENAKIS - DIRECT

1    he needs treatment.  In fact, people who have serious mental

2    illness or psychosis are more the victims of harmful, hurtful

3    behavior than they are the perpetrators.

4    Q.   Does Khaled Miah have the capabilities when he's under

5    psychosis to conduct an attack or plan?

6    A.   No.  He's too disorganized.  He can't even focus in on

7    what he's going to do.  He can't even -- so he's not got --

8    the thinking is so fragmented in serious mental illness that

9    these people are really unable to carry out what might -- an

10   idea that just suddenly might get into their head.  It

11   usually passes anyway.

12   Q.   If he hadn't received treatment, what would you have

13   expected to happen while he was in prison?

14   A.   If he had not received treatment?

15   Q.   Yes.

16   A.   He would have gone on a downhill spiral.  I mean,

17   look, I mean as we have a lot of folks in our communities who

18   have serious mental illness, and the challenges we have for

19   getting them into treatment and being able to do what's most

20   helpful is -- you know, these people end up homeless.  And

21   their lives completely fall apart.  A number of them commit

22   suicide because their lives are just miserable.

23   Q.   In the year before his arrest, what objective factors

24   were showing that serious mental illness was affecting his

25   life?

S. XENAKIS - DIRECT

1    A.   He lost his jobs.  I think he was a driver for both

2    Uber and Lyft.  He lost those because of erratic behavior.  I

3    think he got about $8,000 under -- I forget what the COVID

4    funding was.  And he just went through that.  He didn't keep

5    any of that that was going on.

6              His behavior was just really chaotic, erratic.  He

7    was driving around and going to all these different places,

8    completely unfocused.  He wasn't really doing his studies.

9    He was not really close to his family.  Those are all the

10   signs that these illnesses and mental health problems are

11   just getting him down a bad cycle.

12   Q.   If the FBI hadn't gotten involved, if there had been

13   no FBI in this process, just looking at his objective

14   factors, would you have expected -- what would you have

15   expected his outcome to be if he didn't have treatment or an

16   intervention?

17   A.   Well, like I say, I mean I think he would probably

18   have ended up homeless.

19   Q.   Now, let's talk about what does he need to --

20   A.   He just needs good, decent treatment.  I mean we've

21   seen him respond to treatment early on when he was put on low

22   dose antipsychotics.  So that's really good.  He improved

23   with that.  That helped him with his shift mood instability,

24   helped him with his anxiety.

25             He's been in an environment where he can just have

S. XENAKIS - DIRECT

1   a good routine.  He's been able to now communicate with his

2   family.  So he needs counseling.  He's off of -- he was

3   really -- as a lot of people do with his kind of mental

4   illness, abuse drugs and alcohol.  He's been clean from that.

5   He probably would need some good counseling for the drugs and

6   alcohol --

7   Q.   Are you familiar with the federal drug and alcohol

8   treatment program?

9   A.   Yes.

10   Q.   Would you recommend that?

11   A.   Sure.  That would be good for him.  And then he --

12   then it's a matter of helping him build a life.  I mean he's

13   lost a lot of years here.  And so he's lost critical years

14   for learning how to work, finish your studies, be in a social

15   environment.

16        I mean you've got the confounding factors of his

17   illness and how it disrupted family relationships.  And then

18   put on top of that COVID that's part of everybody in kind of

19   a bubble, really kind of skewed relationships.  So we've got

20   to figure out how he's going to be in a situation where he'll

21   be able to have healthy relationships.

22   Q.   Should this -- one of the powers that this Court has

23   is to order as part of probation different factors, the

24   standard ones like you can't own a gun, you can't drink on

25   those parts, but should mental health treatment and

S. XENAKIS - DIRECT

1    evaluation be a standard part of this individual's probation?

2        A.    Yeah.   I mean he's an individual -- and I am a

3    proponent of community mental health, that is, treating

4    individuals in the setting that they're going to live,

5    because it's those day-to-day challenges that it's --

6    everything that people have got to learn to cope with.   And

7    you can't do that on a hospital inpatient ward or a jail.   I

8    mean because they're not real environments.   They're

9    completely artificial environments.

10           So that's why we have been -- in the field here

11   have been advocates of getting people out of the hospital as

12   soon as we can because we've got to be able to work with them

13   in the situation where they're going to live and really

14   understand how -- so they'll get the coping skills.   So he's

15   a candidate.   He's done so well in the hospital, he's a

16   candidate for community mental health.   That's the best thing

17   that can -- that we can do for him.

18           And by the way, I'll put my military hat on.   It's

19   the best thing we can do for ourselves.   I mean he's going to

20   eventually get out.   So what do we want?   We want everybody

21   living in this country to be able to work as well as they

22   can, to be good citizens, to be people who are effective and

23   that in our communities we feel safe about.   And how do we do

24   that?   We do that by working with them and helping them in

25   the communities that they're living.

                          S. XENAKIS - DIRECT

S. XENAKIS – CROSS

1           MR. SWIFT:  No further questions.

2           THE COURT:  Thank you.  Ms. Smolar?

3                    CROSS–EXAMINATION

4    BY MS. SMOLAR:

5     Q.    Good morning, Dr. Xenakis.

6     A.    Good morning.

7     Q.    Do you have a copy of your report with you?

8     A.    No.

9           MR. SWIFT:  We'll provide that.

10          MS. SMOLAR:  May I approach the witness?

11          THE COURT:  You may.

12          THE WITNESS:  Thank you.

13    Q.    I'm going to be referring to that a fair amount, so if

14    you could take a look at that.

15    A.    All right.

16    Q.    And just to clear up one point, you said he's been

17    doing very well while he's been in the hospital.  He has not

18    been in any kind of hospital?

19    A.    I misstated that.  He's been in jail, but he's been

20    treated.

21    Q.    And he's been treated with medication; correct?

22    A.    Yes.

23    Q.    Not therapy?

24    A.    He's not been getting therapy.

25    Q.    You submitted a report through defense counsel for the

S. XENAKIS – DIRECT

S. XENAKIS - CROSS

1    purposes of sentencing; correct?

2    A.    Yes.

3    Q.    And you have that in front of you now?

4    A.    Yes.

5    Q.    And this was your second report regarding Mr. Miah;

6    correct?

7    A.    Yes.

8    Q.    And the first one was done prior to his conviction in

9    this case; correct?

10   A.    Yes.

11   Q.    And you're aware that the jury convicted him of all

12   but one count in this case?

13   A.    Yes.

14   Q.    So they did not agree with you that he is not

15   dangerous?

16   A.    I guess --

17          MR. SWIFT:  Objection.  The question wasn't -- the

18   jury was not asked to determine whether he's dangerous.  They

19   were asked to determine whether these were threats.

20          THE COURT:  Why don't you rephrase the question.

21   BY MS. SMOLAR:

22   Q.    They did not agree with you that he did not make

23   threats; correct?

24   A.    I guess, yes.

25   Q.    He's not in the military to your knowledge?

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1    A.    No.

2    Q.    And at no point has he received military training like

3    you have?

4    A.    No, which is a good thing by the way.

5    Q.    Why is that?

6    A.    Because people then -- he doesn't -- people who have

7    military training have the skill sets to conduct operations.

8    He doesn't have the skill sets.

9    Q.    All right.  On page 2 of your report you indicate that

10   you based your review of court records and trial proceedings,

11   that the Court considers the following items for sentencing:

12        One, whether he intended to carry out his threats

13   in a violent terrorist attack; two, that the FBI thwarted a

14   terrorist attack against them; and three, that Miah wanted to

15   emulate the Boston bombers; and four, Miah may seem fit -- to

16   fit the prefile of mass shooters currently in the news,

17   angry, isolated young male, mental health issues.

18        What court records or trial proceedings inform that

19   statement?

20   A.    It may have been when I was drafting, what I surmised

21   in reading the records themselves and the way I read the

22   decision of the Court.  I mean this is what I surmised.

23   Q.    Okay.  At no time to your knowledge has Mr. Miah been

24   labeled as a religious extremist in this case; has he?

25   A.    I don't -- I can't answer that.  I don't know if that

S. XENAKIS - DIRECT

S. XENAKIS – CROSS

1  term was in any of the records or anything that I looked at.

2  I don't know.

3     Q.   You interviewed the Defendant after the conviction;

4  correct?

5     A.   Yes.

6     Q.   For several hours?

7     A.   Yes.

8     Q.   At different times?  Right?

9     A.   Yes.

10     Q.   And your conclusion from those interviews is that he

11  continued to deny any thinking to conduct harmful or

12  dangerous activities with regard to the FBI agents?

13     A.   Yes.

14     Q.   And you say that on page 5 of your report.  I'm going

15  to ask you to take a look.  You say, "Khaled consistently

16  denied any thinking or planning to conduct harmful or

17  dangerous activities"?

18     A.   Yes.

19     Q.   And he continued to maintain to you that he just

20  wanted to tease the FBI and engage them in banter; correct?

21     A.   Yes.

22     Q.   And he told you even after the conviction, that his

23  intent was to tease the agents?

24     A.   Yes.

25     Q.   To joke?

S. XENAKIS – DIRECT

S. XENAKIS - CROSS

1    A.    Pardon me?

2    Q.    To joke?

3    A.    To joke?  I think he used that word.  Did I put it in

4    the report here?  I don't see that --

5    Q.    Yeah.  Let's take a look at page 6.  In the middle of

6    the page, "Khaled wanted the FBI agents to feel intimidated,

7    as he has experienced.  He wanted to tease them and engage

8    them in banter."  Do you see that?

9    A.    Yeah.  I didn't use the word joke.  You said I used

10   the word joke.  I don't remember that I used that.  Yeah.  I

11   think that's kind of what he was doing.

12   Q.    In the first full paragraph of page 9, you write,

13   "Khaled denied any intent to harm or endanger the FBI agents

14   or anyone else.  Nonetheless, his driving around the

15   neighborhood near the residence of the FBI agents and videos

16   of the ROTC student at the college raised concerns and

17   suspicions that require review and analysis.

18          "As bizarre as the activities appear, there's no

19   clear statement of intent to harm the FBI agents or their

20   families.  Intent goes beyond casual conversation, loose talk

21   or postings on social media. In fact, such loose or casual

22   conversation can be found on any Friday night gathering at a

23   local college or bar."  Correct?

24   A.    Yeah.

25   Q.    So you believe that the threats that he was convicted

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1    of in this case are merely loose talk or casual conversation?

2    A.    I mean it's -- as Mr. Swift said and argued, these

3    were just verbalizations.  I mean the jury decided what it

4    decided, but I believe it was just verbalizations, and that's

5    what I've been trying to explain.

6    Q.    So you thing the jury was wrong?

7    A.    Do I think the jury was wrong?

8    Q.    Yes.

9    A.    Yeah.

10   Q.    And you believe that other college students on the

11   Pitt campus would be doing exactly what Mr. Miah is doing?

12   A.    Sometimes worse.  I mean there's -- I mean, you know,

13   lots of loose talk out there, lots of loose talk,

14   particularly after January 6.

15   Q.    And you think that he wanted the FBI agents to feel

16   intimidated by him, just like any other college student would

17   want to intimidate the FBI?

18   A.    If they were threatened.  I mean that happens all the

19   time.  These are young people.  And if you get in their face,

20   and that's what they do, is they kind of get back in your

21   face and make you feel as bad as they've been made to feel or

22   embarrassed or demeaned.  And this is what happens with

23   people from 18 to 22.

24   Q.    You say on page 7 that he discloses that "he learned

25   the distinctions between expressing statements and making

S. XENAKIS - DIRECT

S. XENAKIS – CROSS

1   threats in a counter terrorism course he took in 2018 and
2   that he conformed his conduct to the definitions as he
3   understood them."
4   A.   That's what -- I had repeated conversations about
5   that.  He took that course.  He said he understood what the
6   differences were.  And he made sure that he followed whatever
7   the guidelines were.  So he told me that repeatedly.
8   Q.   So he was calculated enough to conform his conduct to
9   what he had learned in a class in 2018; correct?
10   A.   I would not call it calculated.  It was not
11   calculated.  It was -- this fellow had no intent ever of
12   harming anybody, and there is no evidence in any part that he
13   had in any interaction, anything that was hurtful or harmful.
14   He can't do it.
15   Q.   You say on page 11 that "Despite the worrisome nature
16   of his verbalization activities and behavior, he does not
17   present a serious threat to national security or safety";
18   correct?
19   A.   Yes.
20   Q.   Now, you also indicate on page 2 that you reviewed the
21   detention hearing exhibit and excerpts conducted on January 8
22   of 2021; correct?
23   A.   We're back on page 2?
24   Q.   Yep.
25   A.   I guess.  I mean I've reviewed everything I have.

S. XENAKIS – DIRECT

S. XENAKIS – CROSS

1    Q.    Okay.  And you say on No. 4 at the top of page 2 that

2    you reviewed excerpts of the detention hearing exhibits at

3    United States versus Khaled Miah, Magistrate No. 21-10?

4    A.    Okay.

5    Q.    So if you said it there, is that correct?

6    A.    Yes.  I have it somewhere in my computer.

7    Q.    So if you reviewed those exhibits, are you also aware

8    that the Defendant actually had numerous images and videos of

9    actual human beheadings by ISIS on his devices?

10   A.    Yes.

11   Q.    Did you see those videos?

12   A.    I did not.

13   Q.    Did you ask to see them?

14   A.    Yes.

15   Q.    Don't you think that actual videos and images of human

16   beheadings is more than academic research?

17   A.    No.  I don't, because there are too many people that

18   I've encountered over the years, particularly young people,

19   as we hear more about this, that are just wondering what

20   that's all about, how does that happen.

21         I mean young folks particularly, both men and women

22   get fascinated by things, and they can have all sorts of

23   thoughts and be intrigued by them.  I think you've got to

24   explore it and understand and ask a whole lot more questions

25   about what that kind of activity means.

S. XENAKIS – DIRECT

S. XENAKIS - CROSS

1    Q.   All right.  I'm going to ask that we bring up Slide

2    No. 3.  This was one of the detention hearing exhibits that

3    I'm going to assume that you reviewed.  It was Government's

4    Exhibit 15.  Do you recall seeing this?

5    A.   Yes.  I've seen it many times.

6    Q.   What is it?

7    A.   It's a man who was eventually killed by a drone,

8    Jihadi John Britton.  Gosh, I dropped the name of who the

9    victim is here.

10   Q.   This is before this man was beheaded; correct?

11   A.   Correct.

12   Q.   And you are also aware that there were numerous other

13   beheading videos, actually seeing the beheading, on the

14   Defendant's devices?

15   A.   Yes.

16   Q.   You didn't look at those though?

17   A.   Pardon me?  I didn't look at them with this.  I mean

18   I've seen them at other times.

19   Q.   You say it's important to explore that.

20   A.   Yes.

21   Q.   Why didn't you explore that here?

22   A.   I mean I've explored it in asking him about it.  The

23   beheading videos I've watched.  I mean I don't personally

24   need to see the beheadings.  You know, I've seen this kind of

25   stuff --

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1    Q.    So you've talked with him about the beheading videos?

2    A.    Yes.

3    Q.    You don't include that in your report.

4    A.    I didn't think that he had -- I knew that he had

5    surveyed and studied all that.  I knew that he was -- part of

6    what he was thinking, I mean part of what was part of either

7    during the course of everything that was going on, I didn't

8    see -- he didn't tell me anything that was significant that

9    led me to believe that, because he was looking at these

10   videos, that he was going to do anything dangerous or harmful

11   or that he learned how to do those.  There was nothing in

12   terms of that that he thought about how he would himself

13   conduct a beheading or how he would conduct a knife attack.

14   Q.    You think it's perfectly normal for a student to have

15   umpteen beheading videos on their devices --

16   A.    There are a lot of these young folks I've -- over the

17   years that I've been doing this, there are a lot of these

18   young folks that have this information.

19   Q.    You are also aware that Mr. Miah photographed numerous

20   women surreptitiously and saved images of those women on his

21   electronic devices; correct?

22   A.    Yes.

23   Q.    And you saw those images in the detention hearing

24   exhibits; correct?

25   A.    I saw some of them, yes.

S. XENAKIS - DIRECT

S. XENAKIS – CROSS

1    Q.   All right.  Let's take a look at Slide 4.  Was this

2    one of the slides that you recall seeing from the detention

3    hearing exhibits?

4    A.   Yes.

5    Q.   Slide 5?

6    A.   Yes.

7    Q.   You saw that one as well?

8    A.   Yes.

9    Q.   And Slide 6?

10   A.   Yes.

11   Q.   That's a compilation of all the -- not all of them,

12   but many of the images of women on the Pitt campus that

13   Mr. Miah photographed surreptitiously; correct?

14   A.   Yes.

15   Q.   And did you discuss those surreptitious photographs

16   with him?

17   A.   Yes.

18   Q.   It's not in your report.

19   A.   I didn't think there was anything particularly

20   significant when it came to his potential dangerousness or

21   harm.

22   Q.   You don't think that is potentially dangerous, to be

23   photographing women without their consent and saving those

24   images on your phone?

25   A.   No.  There are too many young men and women that do

S. XENAKIS – DIRECT

S. XENAKIS – CROSS

1   that.  And this is an age where people are wrestling with

2   their sexuality and comfort level with how they're going to

3   have intimate relationships, and I knew that he was wrestling

4   with that, and I didn't see this as an element of

5   dangerousness or harmfulness.  I mean I saw that as you see

6   it in a lot of young people trying to figure out how they're

7   going to go about their lives and have an intimate

8   relationship.

9   Q.   Okay.  On page 5 of your report, you state that you

10  reviewed independently the documents provided by the FBI and

11  the U.S. governmental agencies provided in discovery and

12  discussed them with the Defendant to determine if he was a

13  serious threat to the safety of any person.  Correct?

14  A.   Yes.

15  Q.   So I assume you reviewed the Defendant's Facebook

16  posts and discussed them with him?

17  A.   Yes.

18  Q.   All right.  Let's take a look at Slide 11, please.

19  Are you aware of Mr. Miah's violent views towards women?

20  A.   I don't -- that's your characterization.  What do you

21  see --

22  Q.   You don't think rape is a violent view toward women,

23  his view that women should be raped?

24  A.   No.  That's a different circumstance of how rape

25  occurs, who gets raped, how sexual assaults occur, what he

S. XENAKIS - CROSS

1   thinks about it, what he understands about it.  I mean that's

2   a whole conversation.

3   Q.   Okay.  I mean --

4   A.   I mean there's nothing -- I asked him about it.  And

5   there was nothing that he said or indicated in any way that

6   he would condone or enact rape.

7   Q.   Okay.  So you do not believe that he believes that

8   women should be raped based on your conversations with him?

9   A.   I do not think he thinks women should get raped.

10  Q.   Okay.  Let's go to the next slide, Slide 12.  This is

11  only a handful.  "Anyone that gets an abortion except for

12  medical complications should be raped."  Do you discuss that

13  with him?

14  A.   Look.  Yeah.  I mean I said in what would you say

15  something like that, and it seemed to me like it was in one

16  of his more -- this is a product of his mental illness.  I do

17  not believe he really believes that.

18  Q.   Okay.  And then let's go to the next slide, Slide 13,

19  please.  I'll ask you to read that to yourself because of the

20  language.  Did you discuss that with him and his views toward

21  women?

22  A.   Yes.  Again, I said this is all his confusion,

23  discomfort, wrestling with his sexuality, which I think he

24  has a lot to do and think about.  I don't think that it's --

25  I think that we have to understand that this is what's behind

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1   that.

2    Q.   Okay.  Let's go to Slide 14, please.  "Rape is

3   something that occurs in nature a hundred percent of the

4   time.  There is no consent in the animal kingdom."  Again,

5   did you discuss this with him?

6    A.   Yes.

7    Q.   You don't think that's at all dangerous?

8    A.   I think it's -- no.  I don't think it's dangerous

9   because there was nothing he was doing.  He didn't approach

10  any -- I mean this is conversation.  These are

11  verbalizations.

12   Q.   Okay.

13   A.   This is -- what did he do?  Was he dating?  No.  Did

14  he assault anyone?  No.  Did he --

15   Q.   He was taking surreptitious of women on the Pitt

16  campus --

17   A.   I'm sorry?  Did he date anybody?  No.  Was there any

18  interaction or any episode with any woman --

19   Q.   We'll get to that.

20   A.   No.

21   Q.   Let's go to Slide 16, please.  "Rape the girl in pink.

22  Rape is AOK."

23   A.   He said all sorts of things because of his mental

24  illness.  There's no doubt about that.  Are they bizarre?

25  Are they wrong?  Would most of us not want to hear that?

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1  Absolutely.  I'm not disagreeing with that.

2  Q.    Slide 17.  "Your wife should be raped by our brothers.

3  Then sold."  Did you discuss that with him?

4  A.    Yeah.  Sure.

5  Q.    18:  "It's okay to rape kafirs.  It's halal."  Do you

6  know what a kafir is?

7  A.    Yes.  It's a non-Muslim.

8  Q.    Slide 19, please.  "That girl should be raped just in

9  case"?

10  A.    There's no doubt that he said all these things.

11  Q.    Not dangerous at all?

12  A.    No, until we see what happens.

13  Q.    Let's go to 21, Slide 21.  Also from his Facebook,

14  "Killing is a human instinct.  A lot of people commit murder

15  with their eyes every single day.  Physically killing is a

16  manifestation of an inner desire."  Not dangerous?  Just

17  words?

18  A.    Not necessarily, no.

19  Q.    Okay.  How about 22?  "I hate Jews, and we need more

20  Jewish exterminators in this world.  The synagogues of

21  Satan."

22  A.    Okay.

23  Q.    Did you talk to him about that?

24  A.    Sure.

25  Q.    And where's that in your report?

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1    A.   Why would I want to talk about that?

2    Q.   Because you're --

3    A.   Because I'm asking specifically is he dangerous?  I've

4  established that he has a serious mental illness and, in

5  fact, he as I recall dated a woman who was Jewish.

6    Q.   Okay.  Let's go to the next slide.  "Jewish problem

7  needs an Islamic solution.  Mark the date and location for

8  the next APAC meeting."

9    A.   Okay.

10    Q.   Did you discuss that with him?

11    A.   As I said, I've discussed this whole thing about --

12  because, you know, it's very political, the whole thing

13  between the Muslims and the Jews and the Palestinians.  This

14  is a big part of what has informed a lot of the fighting in

15  the Middle East.  So this is -- and what people do with it

16  and what they think about it politically is a major element

17  of what's going on.

18    Q.   Let's go to Slide 25, please.  "Anyone who doesn't

19  support violence doesn't support change.  Bullets bring

20  change faster than ballots"?

21    A.   Right.

22    Q.   Again, you're not worried at all that he's dangerous?

23    A.   It depends on what he does.  I mean, look, this debate

24  goes back to the sixties and all the debate -- I mean I

25  remember listening to lectures from Stokely Carmichael and

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1   Martin Luther King and Muhammad Ali.  This was an old

2   political debate of how you cause social change.

3     Q.   All right.  Let's go to Slide 26.  "Violence is good.

4   Peace is unnatural.  Let there be violence and gore."

5     A.   Like I said, this is an old political debate, probably

6   since the history of civilization.

7     Q.   Slide 27, "It's called a long range sniper.  It solves

8   all problems."  Again, a long range sniper is not dangerous?

9     A.   It depends on if he was practicing to be a sniper.

10    Q.   Were you aware that Mr. Miah in March of 2019 was

11  cyber stalking a woman on the Pitt campus?

12    A.   I remember there was activities.  I remember it was

13  called cyber stalking.  I don't --

14    Q.   Did you discuss it with him?

15    A.   I don't remember the details of exactly what that

16  activity was.

17    Q.   All right.  Let's go to Slide 28, please.  This is him

18  saying, "Hey, so I was going through my phone notes and found

19  this.  Don't freak out, but this was from literally 1 hour of

20  data mining I did a while ago."

21         Then he lists pretty much every personal detail

22  about this girl on the Pitt campus.  Do you recall discussing

23  that with him?

24    A.   Yeah.  I mean I'm still interested in what was going

25  on with him and what his intimate life was like.  It was all

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1   part of like, you know, what's your personal life?  I don't

2   know if I would have called this cyber stalking.  So he had

3   information.

4   Q.   He did research.  You talk about planning.  He did

5   research on the agents in this case, on their families, on

6   their pets, and he did it right here to an actual young woman

7   on the Pitt campus.

8   A.   Well, this is information.  It doesn't rise to the

9   level of research in terms of where it's going to go in terms

10  of planning an operation or conducting an operation.  He had

11  information.

12       So, yes, is this an alert?  Yes.  Should we explore

13  it?  Yes.  But does it -- stalking implies that there was an

14  offensive and intentional act to hurt somebody.  I don't see

15  where the harm is in this.  There's no harm in anything that

16  he put up on the slide.

17  Q.   Everything that you base in your report regarding the

18  Defendant, that he was joking or not intending to harm

19  anyone, is based upon what he told you when you met with him?

20  A.   And the review of the information.  I mean you have to

21  get ancillary information.  You can't just take what the

22  individual tells you.  You have to have other sources as well

23  to corroborate or validate what you've been told.

24  Q.   Isn't it possible that he was actually serious about

25  his threats and decided it was in his best interests because

S. XENAKIS - DIRECT

S. XENAKIS - CROSS

1   this is a court proceeding and because you are paid by his

2   lawyers to lie to you?

3       A.   He may have.  Everybody lies --

4       Q.   What does that mean for your opinion that he's a low

5   risk of danger --

6       A.   Everybody lies and organizes their information for

7   their own purposes.  That's the basis of the adversarial

8   court processes.

9       Q.   You're correct.  So, for example, you mentioned

10  January 6.  A lot of those fellows are saying they were

11  tourists; correct?

12      A.   Yes.

13      Q.   What does it mean for your analysis that he's a low

14  risk of danger if he's lying to you?

15      A.   If you -- if he's an effective liar, which by the way,

16  many of these people who are really dangerous are, because a

17  key to planning an operation is deception.  So one of the

18  criteria we need to look at very carefully when it comes to

19  assessing harm or threat is how much planning and preparation

20  people put into deception.

21           So just the fact that people will, quote, lie, or

22  speak in their best interests or not show what is

23  embarrassing or harmful doesn't rise to the level of

24  deception that people that are planning an attack and

25  conducting an attack do.  Deception is really key to good

S. XENAKIS - DIRECT

S. XENAKIS – CROSS

1    operations, military operations.

2    Q.    So in reaching your conclusions in your report, you

3    did no forensic testing; correct?

4    A.    What do you mean, I did no forensic testing?  The

5    whole thing is a forensic evaluation.

6    Q.    It's an evaluation.  It's not testing?

7    A.    Testing, I'm not a psychologist.  I don't do paper-

8    pencil tests.

9    Q.    It's based on your clinical judgment and your clinical

10   experience; correct?

11   A.    Yes.

12   Q.    You did not use any risk assessment tools; did you?

13   A.    I didn't use any tools, no.

14   Q.    You spoke to Mr. Miah, and you relied on what he told

15   you?

16   A.    And on what you gave as the Government and what

17   Mr. Swift gave as the Government and any other sources of

18   information I could get.

19   Q.    As a psychiatrist, would you agree that it's important

20   to keep current with relevant professional and scientific

21   literatures?

22   A.    Yes.

23   Q.    And are you aware of the research literature

24   indicating that unstructured clinical judgments about

25   somebody's risk for violence that are based on a mental

S. XENAKIS – DIRECT

S. XENAKIS - CROSS

1    health professional's experience and clinical judgment are

2    the least reliable and least valid approaches to assessing

3    someone's risk for violence?

4    A.    I've read those articles.

5    Q.    Are you aware of any tool that's been developed to

6    structure assessments or someone's risks for committing

7    terrorist acts?

8    A.    Yes.

9    Q.    Are you aware of the Terrorist Radicalization

10   Assessment Protocol 18, TRAP 18?

11   A.    I am.

12   Q.    You didn't use it here; did you?

13   A.    Like I said, I don't -- a psychologist I often work

14   with uses it.  I didn't use it.

15   Q.    So you work with a psychologist who often uses that

16   test on some of the people --

17   A.    Sometimes.  You now, there's a lot of questions about

18   the validity and utility of those tools and any of the other

19   tools that are out there.  I mean this is a whole field that

20   is open, and there's a lot of developments and research going

21   into that.

22   Q.    Are you aware that the TRAP 18 has been reviewed

23   positively by at least two --

24   A.    It's been also as I recall reviewed negatively.

25   There's a lot of questions about these tools.  I sit on the

S. XENAKIS - DIRECT

S. XENAKIS – CROSS

1    editorial board of the American Academy of Psychiatry and the

2    Law, and so we review a lot of articles.  There's lot of

3    questions about what tools are good or not good, a lot of

4    questions about how you go about doing these kinds of threat

5    assessments.

6              So it's a wide open field.  There are many --

7    that's why the experts debated with each other and why there

8    are differences of opinion, as there should be.

9    Q.   And you didn't use any of those tools though in this

10   situation?

11   A.   I didn't use those tools in this case.

12   Q.   You wrote in your report that some people that have

13   mental illness like what you believe the Defendant has are so

14   impaired by their symptoms, they cannot carry out their plans

15   to harm others; correct?

16   A.   Yes.

17   Q.   If that's true, what does that mean for the fact that

18   now Defendant's, according to you, treated and all better,

19   what does that mean for his ability to plan when he gets out?

20   A.   Hopefully his planning is better because he's got to

21   get a job.  He's got to find a place to live.  He's got to be

22   able to have a reasonable life.  I hope his planning is

23   better because one of the hallmarks of serious mental illness

24   is that these people can't do the basic things that most of

25   us can to have a productive life.  So I hope his planning is

S. XENAKIS – DIRECT

S. XENAKIS – CROSS

1    improved.

2              Now, the question is, as his planning has improved

3    is there -- are there indications that he wants to or would

4    carry out something that would be hurtful or harmful to

5    individuals or somebody else if he's in the community?  But

6    you hope that -- a goal of treatment is to improve their

7    ability to plan and conduct their normal lives.

8    Q.   The Defendant is not currently participating in any

9    mental health counseling or therapy; correct?

10   A.   As I've looked at the records, yeah.

11   Q.   But his condition, according to you, has improved

12   because he's medicated?

13   A.   Probably, yes.

14   Q.   And he's also motivated to get out of jail; correct?

15   A.   Hopefully.

16   Q.   He told you that he will agree to comply with

17   medications and therapies as available; correct?

18   A.   Yes.

19   Q.   Let's discuss the availability of medications and

20   therapies when he's no longer in prison.  Will you be

21   treating the Defendant once he's been released?

22   A.   No.

23   Q.   Have you prepared a treatment care plan for the

24   Defendant for when he is released from prison?

25   A.   I've given out the basics of a comprehensive treatment

S. XENAKIS – DIRECT

S. XENAKIS – CROSS

1   plan in a document that you have put in front of me.

2      Q.   Your report?

3      A.   Yeah, my report.

4      Q.   You haven't actually proposed any other plan beyond

5   your report?

6      A.   I had, and it didn't seem like -- I was told it

7   probably wouldn't be pertinent to -- I had a detailed

8   statement of what I thought would go into treatment, and then

9   I was advised that the Court wouldn't necessarily want to see

10  or hear it.  So I didn't publish it.

11     Q.   So how will you ensure that Mr. Miah is being treated

12  and progressing positively?

13     A.   I can't be sure of that.  I thought the conversation

14  here was about the probation.  I mean I'm not the Court.  I

15  don't have a Pennsylvania license.  He's not my patient.  I

16  mean I don't have personally the mechanism to do that.  That

17  rests with the Court.

18     Q.   Once he gets out of prison -- and to be clear, the

19  most supervised release he can get in this case I think you

20  probably know is three years.  Correct?

21     A.   I don't know the law.

22     Q.   Okay.  Once he gets out, he will not be a college

23  graduate; correct?

24     A.   He will not be a college graduate?

25     Q.   Right.

S. XENAKIS – DIRECT

S. XENAKIS - CROSS

1   A.    No.

2   Q.    He will not have employment waiting for him?

3   A.    Probably.

4   Q.    How will he spend his free time?

5   A.    He's starting -- he's currently studying.  He is

6   studying on his own.  He's got a program of independent

7   study, and I would hope that we would be able to support him

8   and find ways that he can continue his course of study and,

9   with good support from parole or probation, be able to find

10  employment.

11         I mean I think that we -- we don't do right by not

12  helping these individuals get into situations where they can

13  work productively and feel fulfilled by what they do.  I mean

14  that doesn't make sense to me as a community for us not to do

15  that.

16  Q.    How will he pay for his treatment and medications?

17  A.    I don't -- I mean I would assume that the state would

18  be paying for it because he doesn't have income.  Hopefully

19  that we have -- I don't know what Pennsylvania has.  I don't

20  know how good the Medicaid public health programs are.  I

21  don't know what other resources are here.

22         I mean I think that's one of the things that has to

23  be looked at very carefully.  It's a major challenge for us

24  in our communities, and I think part of what we need to be

25  thinking about is how we develop and promote better public

S. XENAKIS - DIRECT

S. XENAKIS – CROSS

1  mental health.

2    Q.   What if he gets out and decides, because he's an

3  adult, that he doesn't want treatment or medication, and he's

4  no longer on supervision?  What then?

5    A.   Well, I mean hopefully in the course of the probation

6  here, that he would be engaged in treatment that he would

7  acknowledge that this is something he needs and could do for

8  the rest of his -- he should probably be thinking about for

9  the rest of his life.

10          A component of the program that I drafted was that

11  the family would be involved.  So they understood how they

12  can help and support him, because that attachment to the

13  family then at the times that he says I don't need treatment

14  would be very important for him to be able to think through

15  when and if he needs treatment, to get back into treatment.

16          The fact is that most patients at one time or

17  another say I'm okay.  I don't need to go into treatment.

18  And that can be for a while.  And then they realize, well,

19  that's not the case.  And hopefully with the right support

20  systems, they'll get back into treatment.

21          So this is what is an element and very important to

22  good, comprehensive public mental health.

23    Q.   I assume that you are aware though that prior to the

24  conviction in this case the Defendant's family was unable to

25  get him under control; correct?

S. XENAKIS – DIRECT

S. XENAKIS – CROSS

1    A.   The whole record from the time that his father died, I

2    mean that was part of his spiraling down.  And that's a very

3    common thing with serious mental illness, that families are

4    trying to get help, and they may or may not know how to do

5    that, and unfortunately things get worse before they get

6    better.

7    Q.   On page 9 of your report you indicate that he was

8    socially isolated leading up to his arrest, and he consumed

9    high doses of Red Bull and beer and alcohol and that his

10   alcohol use impacted his classes and his interaction with his

11   family; correct?

12   A.   Yes.  That's part of what I was explaining, was the

13   spiral downward that he was experiencing.

14   Q.   What happens if he starts drinking alcohol again when

15   he's no longer —

16   A.   Well, that would be an indicator that hopefully

17   somebody, the family or anybody else monitoring him, if he's

18   in treatment, that things aren't going right, and we better

19   bring him back in and maybe put him into more intensive

20   alcohol and drug abuse treatment.

21   Q.   You agree that at the time he was arrested by the FBI,

22   he was on a downward spiral; correct?

23   A.   Yes.

24   Q.   And you say he would have ended up homeless; correct?

25   A.   Yes.

S. XENAKIS – DIRECT

1    Q.   He was not in school at the time?

2    A.   Right.

3    Q.   He was estranged from his family?

4    A.   Right.

5    Q.   What happens to women who he's around if he's no

6    longer getting treatment or locked up in prison?

7    A.   What happens to women?

8    Q.   Yeah.  You saw his views about women.

9    A.   Well, I mean he never -- I mean he's offered -- part

10   of the treatment would be counseling around healthy

11   relationships with women.  I mean that's a fundamental

12   element of what would be -- I clearly would approach in the

13   counseling.

14   Q.   Would you agree with me that the FBI stopped him in

15   this case before he could hurt anyone?

16   A.   Before he could hurt anyone?

17   Q.   Uh-huh.

18   A.   No.  I think what they stopped him from was before he

19   was homeless.  He hadn't hurt anybody; none, no one.  Not

20   even the girlfriend he broke up with.

21        MS. SMOLAR:  I think the jury would disagree with

22   you, but no further questions.

23        THE WITNESS:  That's fine.

24        THE COURT:  Mr. Swift, any --

25        MR. SWIFT:  Just a couple redirect.

S. XENAKIS - DIRECT

1                          REDIRECT EXAMINATION

2    BY MR. SWIFT:

3      Q.   On those slides about women, do you know what dates

4    those were?  2017?

5      A.   I didn't look at that.  I'm sorry.

6      Q.   Would it surprise you that those statements,

7    et cetera, occurred in 2017?

8      A.   It's important.  Yeah.

9      Q.   Did you find anything in the records that he had ever

10   sexually assaulted a woman?

11     A.   No.

12     Q.   Was there anything in the records that he ever -- on

13   the woman that he looked up online in 2019, was there

14   anything in the records that he continued to try and contact

15   her or harm her after she cut him off?

16     A.   No.

17     Q.   In stalking type of behaviors, does just simply

18   telling somebody to go away make them go away?

19     A.   No.

20          MR. SWIFT:  No further questions.

21          THE COURT:  Thank you.  Dr. Xenakis, you can stand

22   down.  Thank you, sir.

23          THE WITNESS:  Thank you.

24          THE COURT:  Does the Government have any

25   documentary evidence or exhibits that they would like to

                        S. XENAKIS - DIRECT

1    present at this time?

2              MS. SMOLAR:  No, Your Honor.

3              THE COURT:  Defense?

4              MR. SWIFT:  No, Your Honor, other than what were

5    attached with our reports, letters, et cetera.  We would

6    admit -- ask that those that we previously attached as

7    exhibits be admitted for consideration in this hearing, and I

8    believe the Court indicated that's what it was going to do.

9              THE COURT:  That's correct.  All of your

10   submissions are part of the record, and I've reviewed them,

11   and I'm going to make some findings and talk about them now.

12   So hearing that there are no additional documentary exhibits

13   being presented to the Court today, I'm going to make some

14   findings of fact regarding the evidence that has been

15   submitted, which consists of the following:

16             First, the Court's received several letters from

17   the Defendant's family, from his mother, Noor Khanom; the

18   Defendant's brothers, Limon Miah and Soud Miah; and the

19   Defendant's sister, Sumn Miah.

20             The letters from the Defendant's family members

21   explained that they moved to the United States when the

22   Defendant was ten years old.  Although the move was difficult

23   for the entire family, the letters indicate that it was

24   especially hard for the Defendant, who faced bullying at

25   school when he was young.

1          Despite those difficult circumstances, the

2     Defendant is characterized as having been bright, self-

3     motivated, helped others, volunteered in his community.

4          Sadly, the Defendant's father passed away in 2010.

5     The Defendant was significantly impacted by his dad's death.

6     His family observed that he became more isolated and

7     antisocial at that time; and although the Defendant's family

8     tried to get him mental health treatment, he refused.

9          Eventually the Defendant started college.  His

10    family noticed improvement in his demeanor.  According to the

11    Defendant's family, things trended downward for him in the

12    time after he started college in the midst of the COVID

13    impacts and then having been approached by the FBI.

14          His brother Limon observed that the Defendant's,

15    quote, panic, fear, anxiety and depression got worse as the

16    situation escalated between him and the FBI issues.

17          The Defendant's brother Limon and his sister Sumn

18    had observed that his mental health has improved now that

19    he's been receiving treatment by taking medication while

20    incarcerated.  The Defendant's mother states that he is ready

21    to learn a lesson from his mistakes and move forward with his

22    life his mother apologizes for the Defendant's behavior and

23    submits that she will support him and work with him upon his

24    release from incarceration.

25          Each of the Defendant's family members asked for

S. XENAKIS - DIRECT

1    leniency for him, given his psychological struggles.  The
2    letters from the Defendant's family also make clear that they
3    deeply care for him and strongly support him.

4           Next, the Defendant supplied a report by
5    Dr. Stephen N. Xenakis dated September 19 of 2022.  We've had
6    testimony about that letter here.

7           And I'll note for the record that Dr. Xenakis is
8    Board certified by the American Board of Psychiatry and
9    Neurology and general psychiatry and in child -- in
10   adolescent psychiatry.  He's retired from the United States
11   Army at the rank of Brigadier General and serves in multiple
12   positions as a clinician and as a commander.  He's been
13   qualified as a psychiatrist and mental expert in numerous
14   cases of detainees at Guantanamo naval base and accused
15   terrorists.

16          Dr. Xenakis states that medical records and
17   clinical examinations document, through those reviewed, that
18   the Defendant suffered from serious mental illness since his
19   father's death.  His mental health deteriorated in the years
20   leading up to his arrest.

21          Social isolation caused by the COVID pandemic
22   lockdowns aggravated his mental state, and he coped with
23   those circumstances and its effect on his mood by consuming
24   high doses of caffeine and then calming himself at night with
25   alcohol.

S. XENAKIS - DIRECT

1            Dr. Xenakis reports that the Defendant's

2    presentation at the first clinical interviews he conducted in

3    March of 2021 uncovered signs of serious mental illness in

4    the form of thought disorder and, as referenced here today in

5    his testimony, of psychosis.

6            Dr. Xenakis now reports that the Defendant's mental

7    state has improved, as he's been receiving medication while

8    incarcerated.  And it's helped him in his thinking, mood and

9    behavior.  He demonstrates more appropriate behavior in

10   interpersonal relationships and has at least at this juncture

11   no documented conflicts or other problems with staff and

12   inmates while he's been detained.

13           It's Dr. Xenakis' opinion that the Defendant's

14   thought disorder and psychosis affected his ability to

15   perceive that his statements constituted threats as

16   interpreted by observers and readers.  According to

17   Dr. Xenakis, "Despite the worrisome nature of his

18   verbalization," -- this is a quote -- "activities and

19   behavior, the Defendant does not present a serious threat to

20   national security or safety."

21           And finally, Dr. Xenakis recommends that the

22   Defendant receive appropriate treatment and therapy in

23   accordance with standards of care for psychosis and past

24   abuse of alcohol.

25           And again, Dr. Xenakis states that the Defendant

S. XENAKIS - DIRECT

1    agrees to continue to comply with medication and treatment.

2    With those findings of fact in mind, does either party have

3    any objections?

4              MS. SMOLAR:  No objections, Your Honor.

5              MR. SWIFT:  No objections, Your Honor.

6              THE COURT:  At this juncture, I'm going to ask

7    counsel and the Defendant to approach at sidebar.  And we do

8    this because this is our convention and standard operating

9    procedures in our District.

10             MR. SWIFT:  I understand, Your Honor.

11                            - - -

12             (Sidebar conference held.)

13             (Sidebar conference concluded.)

14                            - - -

15             (In open court:)

16             THE COURT:  Thank you for that.  As the attorneys

17   are aware, the Court is required to separately analyze

18   motions for downward departures and motions for variances.

19             The Court's first going to hear argument with

20   respect to the Defendant's motion for departure and make a

21   ruling on the motion for departure, and then we'll hear

22   argument for a motion on a variance, and I'll rule on that

23   motion.  We'll proceed in that way.

24             Mr. Swift, in your Sentencing Memorandum and

25   filing, you indicated that you desire to move for a downward

                     S. XENAKIS - DIRECT

1    departure.  I'll give you an opportunity at this point to

2    make any argument you would like.

3             MR. SWIFT:  I would note that departure under the

4    rules —— and I've been harping on the rules —— in a threats

5    case is not appropriate.  The rules —— I agree on that part,

6    but I would ask for its consideration in dealing with the

7    obstruction because they are supposed to be done separately,

8    and in this part because they're a different conduct on that.

9             We would argue that serious mental health issues

10   impacted the Defendant's decisions, particularly the

11   Defendant's decisions with deleting things shortly before the

12   time period.

13            We would argue that alcohol doesn't play into that

14   realm.  It would be part of it.  The Defendant —— if we note

15   the conduct, the Defendant drank a great deal in the evenings

16   and made these statements generally in the evenings.

17            Then there were deletions, which the Court focused

18   on, the next morning; i.e., the effects are less.  But

19   alcohol is not playing in the idea of the obstruction.

20   Instead, the serious mental illness and all the parts that

21   led to this conduct are all playing into it, and I would

22   argue for a variance on the obstruction part or a

23   departure —— a downward departure on that basis.

24            I recognize that in the threats part there's no

25   downward departure for the mental illness or particularly

S. XENAKIS - DIRECT

```
 1    under two grounds, his mental illness, and it would be
 2    disingenuous to argue to the Court after arguing to the jury
 3    that there was a significant amount of drinking right before
 4    this to then say, well, that mitigates it.  It doesn't.
 5    That's what the rules say.  I can disagree with the rule, but
 6    I know the Court -- we're arguing the rules right now.
 7             THE COURT:  I understand.  Thank you, Mr. Swift.
 8    Ms. Smolar, any argument in response?
 9             MS. SMOLAR:  Your Honor, I'm looking for the
10    section, but Dr. Xenakis' report clearly explains that when
11    the Defendant was drinking alcohol, he was also up late at
12    night, and that's when he would post and then delete.  So
13    it's actually directly related to the obstruction count in
14    this case.  And if we could find that section, that would be
15    great.
16             The diminished capacity departure is totally
17    inapplicable here.  He fully appreciated his conduct and how
18    others would perceive his conduct.  That's why he deleted all
19    of these tweets right after posting them, because he didn't
20    want to get caught.
21             Dr. Otto fully testified in this case that Mr. Miah
22    was fully capable of forming the intent to threaten the
23    agents.  After meeting with him in person, Dr. Otto testified
24    that his social media posts did not reflect impaired thinking
25    via mental disorder, and his thinking was logical, and he
```

1    appreciated the seriousness and gravity of his conduct.

2             Whether it's posting and deleting or deleting

3    portions of posts, it's very calculated.  He deleted the

4    things that were troublesome in the morning after he,

5    according to Dr. Xenakis, was no longer impaired by alcohol.

6             The law is clear that this downward departure does

7    not imply —— does not apply to a reduced mental capacity if

8    it was caused by the voluntary use of drugs or other

9    intoxicants.

10            Dr. Xenakis said that he had "a pattern of wacky

11   activity and verbalizations in the evening, often when using

12   and abusing alcohol and other substances, and then

13   recognizing the bizarre and inappropriate nature of his

14   conduct and behavior in the morning and trying to undo his

15   acts."

16            That directly relates to his use of alcohol.  So I

17   would argue that departure is not applicable here.

18            THE COURT:  Thank you.  Upon consideration of the

19   parties' arguments and the facts of record, I'm going to deny

20   the Defendant's motion for a downward departure based upon

21   Guideline Section 5K2.13 in relation to diminished capacity.

22   I'm going to provide some explanation for that.

23            As counsel know, Guideline Section 5K2.13 provides

24   that a downward departure may be warranted if the Defendant

25   committed the offense while suffering from a significantly

S. XENAKIS — DIRECT

1    reduced mental capacity, and the significantly reduced mental

2    capacity contributed substantially to the commission of the

3    offense.

4            The commentary to Section 5K2.13 explains that

5    significantly reduced mental capacity means the Defendant has

6    a significantly impaired ability to understand the

7    wrongfulness of the behavior comprising the offense or to

8    exercise the power of reason or to control the behavior that

9    the Defendant knows is wrongful.

10           The guideline additionally specifies that the Court

11   may not depart below the applicable guideline range if, among

12   other things, the significantly reduced mental capacity was

13   caused by the voluntary use of drugs or other intoxicants, or

14   if the facts and circumstances of the Defendant's offense

15   indicate a need to protect the public because the offense

16   involved actual violence or a serious threat of violence.

17           Initially, the Court notes that "The requirements

18   of Section 5K2.13 are not easily met, and the District Courts

19   retain discretion to deny a downward departure even when a

20   Defendant does satisfy that burden."  That's the McBroom

21   case.

22           In this case, the Court finds that the Defendant

23   did not sustain his burden to establish that the downward

24   departure is warranted for diminished capacity for several

25   reasons.

S. XENAKIS - DIRECT

1          First, I note that Dr. Xenakis –– he did not

2    specifically opine that the Defendant had a significantly

3    reduced mental capacity, again, as defined by the commentary

4    in the rule.  Rather, he more generally stated in his report

5    that the Defendant's thought disorder and psychosis affected

6    his ability to perceive that his statements constituted

7    threats as interpreted by observers and readers.

8          I further note that the Government points out in

9    its sentencing submissions, and in particular Dr. Otto

10   testified at trial that the Defendant was not experiencing

11   symptoms of mental disorder, including things like impaired

12   thinking, that would compromise his ability to understand the

13   meaning of what he was saying and posting and how it was

14   received by others.

15         Dr. Otto further testified that the Defendant's

16   social media posts did not reflect thinking impaired by

17   mental disorder, that his thinking was logical based upon a

18   psychological analysis of the Defendant.

19         Additionally, even if the Defendant could establish

20   that he had significantly reduced mental capacity, a downward

21   departure under this guideline section doesn't apply if it

22   was caused by a voluntary use of drugs or other intoxicants.

23   Here, Dr. Xenakis states in particular in his report that the

24   Defendant was calming himself at night with beer and alcohol

25   the night prior to his arrest.

                        S. XENAKIS – DIRECT

1          And I'll further note that it also had an impact on

2    his deletion of those posts as well in reviewing the record

3    in its totality and its content.

4          Also, I'm mindful of Dr. Otto's testimony at trial

5    of the history that the Defendant gave him, his use of

6    alcohol, and that alcohol supported a diagnosis of alcohol

7    use disorder, and that was certainly in the period leading up

8    to his arrest when he was both tweeting these threats as well

9    as deleting.

10         Now, even assuming that the Defendant had a

11   significantly reduced mental capacity, a downward departure

12   for Guideline Section 5K2.13 doesn't apply in such cases

13   where the facts and circumstances of the Defendant's offenses

14   indicate a need to protect the public because the offense

15   involves serious threats of violence.

16         Here –– and it bears repeating –– the Defendant's

17   threats referenced by the –– they reference the FBI agents.

18   They mentioned the whole FBI as an institution, the location

19   of the headquarters in Washington, D.C., have alluded to a

20   prior terroristic attack, it made various specific threats,

21   such as the deed will be done at the time of the Defendant's

22   choosing and promised that the time is approaching by use of

23   the phrase "zero hours approaching," indicated that the

24   agents themselves would be harmed the next time they came in

25   with the crew, "the hardwood would collapse beneath their

                    S. XENAKIS – DIRECT

1   feet," and the admonition that the more eyes on the

2   Defendant, the less on others and "regardless, yellow tapes

3   will flow."

4         In summary, after carefully considering all of the

5   parties' arguments and particularly the evidence of record,

6   the Defendant's motion for a downward departure under

7   Guideline Section 5K2.13 for diminished capacity as it

8   relates to each of the counts, including the obstruction

9   count, is denied.

10         In so ruling, while I do note that the Defendant's

11   arguments concerning mental health conditions are properly

12   considered in the context of whether a variance is

13   appropriate, we'll address it in that context as well.

14         So with that ruling in mind, I will turn next,

15   Mr. Swift, to your motion for a variance.

16         MR. SWIFT:  Yes.  Your Honor, in the motion for a

17   variance, this really relates to the 3553(a) factors --

18         THE COURT:  And I should say -- I'm sorry to

19   interrupt you, but in addition to whatever argument you want

20   to present in relation to motion for variance, feel free to

21   address all the 3553(a) factors.

22         MR. SWIFT:  Right, because in the post-Booker

23   world, they merge at this point.

24         THE COURT:  Right.

25         MR. SWIFT:  So at this point, you know, Your Honor,

S. XENAKIS - DIRECT

1  one of my favorite sayings is just because we can do

2  something doesn't mean we should.  We can.  And that's really

3  when one looks at the idea of a variance or beyond the

4  guidelines.  The guidelines grant fairly -- protect

5  discretion.  But they also ask a question at the end of this,

6  should we?

7         And when we look at this, the one thing that we do

8  see objectively, objectively walk back on the part, is that

9  this Defendant's life was falling apart.  If we took the FBI

10  out of the equation, the Defendant's life was falling apart.

11         The Defendant had -- as Dr. Xenakis put here today,

12  had lost his job.  He had also dropped out of school.  Now,

13  the FBI had absolutely nothing to do with those things.  They

14  didn't cause him to drop out of school.  He was pretending he

15  was still in school, but he wasn't.  He wasn't attending it

16  at all.

17         He was -- sometimes people quit school at the end

18  of it.  You know, they got a job or a different vision.

19  That's not the case with this Defendant.  He's pretending

20  he's still in school.  He's in complete denial.

21         He's locked down.  He's driving all over the place.

22  He had $8,000 with which to start something or do something.

23  It all disappears in a cross-country trip driving everywhere

24  randomly in the part on this.

25         And the Defendant at the time of his arrest is

S. XENAKIS - DIRECT

1    completely dependent upon his family sitting back there for

2    any level of support.  And when that runs out, because

3    frustration and caring eventually run out, Dr. Xenakis is

4    absolutely right.  He's going to be homeless.

5            What we didn't see in the part -- in this in the

6    variance is with all of those assets, with that $8,000, that

7    he went and bought a rifle, went and bought explosive

8    devices, went and obtained the things to conduct an attack.

9    And sometimes when people drop out of school, it means

10   something.  They've got a new plan.  But as Dr. Xenakis has

11   hit here today, there is no plan per se.

12           So we have somebody with serious mental illness in

13   this part dropping out, and that kind of a person can be very

14   scary if you're sitting at this desk (indicating), because

15   they are not behaving the way we expect them to.  They're

16   not.

17           One would expect when the FBI comes, that, gee, we

18   want to talk to you and change your behavior.  You would

19   think, gee, I might be in trouble.  I should probably be

20   careful.  I should probably, even if you're planning

21   something, get a low profile right now.

22           But somebody with serious mental illness does not

23   behave that way.  Someone in those parts behaves erratically.

24   They behave extremely erratically.

25           Now, you can still know what you're doing when

                        S. XENAKIS - DIRECT

1    you're behaving erratically.  I'm not going to reargue the

2    case here.  A jury found that even erratically, he knew what

3    he was doing, and he crossed the line.  But we look at it and

4    say how do we bring this society with something sufficient or

5    not greater than in this process?

6            And here's where we have to think about the mental

7    illness particularly.  The prosecution raises good points.

8    Well, what happens after the three years?  What happens if

9    there's no family?  What happens if those things?

10           Now, I'm going to ask you a question.  Is it more

11   likely that those bad things will happen eight years from now

12   or six years from now or three years from now or two years

13   from now?

14           How long does the family hang in there?  One of the

15   things we know is time distant.  The faster we continue

16   treatment, how long does the Defendant sit in jail and decide

17   that, gee, I don't really need this?  The longer we wait, the

18   less likely the resources will be there.

19           We want to get it at that moment of contrition at

20   that point of it.  And the Court has powers.  If we exhaust

21   all of the sentences, et cetera, on these parts on it, we

22   lose some of that power of probation.  What happens in

23   probation is, hey, look, for three years I've got you.  Three

24   years you don't have to commit an offense.  You have to not

25   go to treatment, not go to a meeting, not go to this, and

1    I'll see you again, Mr. Miah.  You'll be in front of me, and
2    I'll try to help you.  I really will.

3            And part of helping you is making sure you do
4    exactly what the treatment plan recommended by Probation is.
5    You have evaluations.  The Court can dictate that.  It can
6    dictate that he goes to the treatment.  You have that power.

7            But if we wait five years, does it still have the
8    same emphasis?  Does it come back with that part?  And my
9    argument is, no, it doesn't.  And looking at what's
10   sufficient or greater than, the things that we know is that
11   he's going to get out.

12           We want be to interrupt the cycle.  The cycle isn't
13   particularly surprising.  In the process we had real problems
14   in youth, and then around 25 we have another significant set
15   of problems.  That's where it's at.

16           He focused on terrorism, which is why we care about
17   him at all.  If he had been focusing on something else, we
18   wouldn't have cared about him.  He would have just slid down.

19           I've told Mr. Miah multiple times that we can look
20   at the last week in December in one of two ways.  Gees, this
21   is terrible.  Or, oh, thank God, because where do you end up
22   without the last week in December?

23           And I submit to you that it doesn't end up in a
24   terrorist attack, but it does end up in somebody who is
25   completely and irretrievably broken, and eventually those

S. XENAKIS - DIRECT

1   people end up in front of somebody for something.  That's

2   just the way it goes.

3          We have a chance to break it, the first one.  But

4   overpunishing it doesn't break it.  Long terms of confinement

5   doesn't say that he will come out -- this is a lifetime

6   disorder.  It's not going to go away.  How fast do we get to

7   treatment, one of the things for the variance we ask the

8   Court to think about.

9          The other part in the variance is how have we done

10  this in another cases?  And when we look out in the vast

11  majority of the cases, we look -- at the sentence on the

12  guidelines would be way above the norm in this instance.

13         We set out two parts.  The Government gave you two

14  where it was around that.  I went and looked those cases up.

15  I confess I hadn't put them in because I hadn't thought of

16  them as relevant.  Both of them were threats cases under

17  unique circumstances.  The individual had been convicted and

18  then from jail threatened the bench.

19         And that's a different part.  That shows no

20  rehabilitation whatsoever, no desire to be rehabilitated.

21  The idea that I'll give you a chance, well, the Judge has

22  just given him a chance, and obviously they have not acted on

23  that chance.  They have then determined to threaten the

24  people that have given him the chance.

25         This is Mr. Miah's first time.  It's not after

S. XENAKIS - DIRECT

1  significant offenses, and it's not threatening under those

2  circumstances.  Those are very different cases, and this case

3  falling into looking at the heart line of the part is --

4  that's also important.

5          I look at it -- when I talk to the client, it's the

6  perception of justice.  I think Mr. Miah knows a couple of

7  things.  And he wants to talk to the Court, and he will in

8  just a bit.  But before he does so, I want you to look at a

9  couple things.

10         I think that in some ways Mr. Miah has learned a

11  lot about the justice system that dispelled some things.

12  One, he's been zealously represented.  Somebody's listening

13  to him.  He's been zealously represented.

14         Your Honor, the Court's rulings have not always

15  gone his way, but the Court has re-emphasized that this is a

16  careful balance trying to come out on the part, and we aren't

17  considering you for one reason or another, and we're not

18  putting a thumb on the scale.  We're making the rulings in a

19  difficult series of times, and sometimes we've won.

20  Sometimes we've lost.  We haven't lost every time, and we're

21  appreciative of that.

22         So in this process Mr. Miah's gotten to see that

23  his perception of justice, which drove an awful lot of that,

24  was wrong.  And we can build on that.  We can build on that.

25         Mr. Miah wanted to plead guilty to really this

S. XENAKIS - DIRECT

1    whole thing against him.  But we were too far down the road

2    in the trial part on it, you know, and I don't blame the

3    Government in those sort of things.  They had offered at the

4    onset a very fair resolution of this.

5          But, you know, I wish Mr. Miah had had medication

6    earlier.  It takes a while to kick in.  I wish he had.  But

7    we find ourselves here in this place, and I think a variance

8    makes sense from -- I understand the Court's rulings.  I've

9    argued strictly against them.  I understand it's a judgment

10   call in the end, and you've made a judgment.

11         But I also think that because it's a close one, and

12   I believe it is a close one, that we can look at the overall

13   circumstances and say we've interrupted this cycle.  We've

14   interrupted it.  Now let's make sure that treatment takes

15   hold, and we don't have to worry about this person, because

16   that's the best outcome.  That's the best outcome, is that we

17   get this person, that this is the first and last brush with

18   the law.

19         Society doesn't benefit any more on this.  I was

20   struck with me on the Agent saying that, hey, look, we really

21   don't have the time and the money to do all of this.  And I

22   think that the best way to ensure when somebody comes out is

23   to look at it and balance it and think about, okay, at what

24   point in incarceration are we not getting a benefit?

25         We certainly aren't sending a message that, oh,

S. XENAKIS - DIRECT

1    gosh, I'm diminishing this when we look at the average

2    sentence all the way over.  If we come up with a sentence in

3    a 40-month range, we're not sending a diminished message on

4    threats.  We aren't.  We're sending a pretty strong message

5    on threats.

6          We also are, given the time, et cetera, and the

7    strong recommendation that alcohol treatment needs to be part

8    of this on the part, giving sufficient time for some things

9    to happen while incarcerated.  He needs to do that.  I'm not

10   arguing against it.  There's sufficient time for that to

11   occur.

12         That's a year-long program.  It's not -- from

13   counsel's view, it's probably the federal -- in some things

14   the feds don't do well.  One thing they really do well is

15   drug and alcohol.  They have good programming, and they have

16   attention.  They have the ability.

17         And of course, they also have one of the best

18   follow-up programs because it's backed up with probation and

19   a standard edict that there will be no drinking, no drug use,

20   and there will be testing.  Those are all good things to look

21   at the part that the Court can take and then add the other

22   parts to the probation.

23         We can put all of this -- you can restrict online

24   behavior.  You know what?  I'm not going to say you can never

25   use the Internet, but I can restrict your online behavior.

S. XENAKIS - DIRECT

1   It's one thing to say I need the Internet to apply for a job.

2   There's another thing that says I don't think you need social

3   media in this part.  That's not good for you.  And for the

4   period of probation, let's not go back to that habit; shall

5   we?  We're going to lock that out.

6        We're also going to lock out your ability -- we're

7   going to order Probation to take a look.  Are you of

8   researching people?  Are you falling back into bad habits?

9   Those are powers you have.  And those powers with the maximum

10  probation give this Court a period of time.

11       There's the ability to reimpose a sentence if it's

12  not complied with and an ability for that individual to work

13  through, and I think a variance in that works to the

14  advantage of the Court to craft a sentence that's sufficient

15  but not greater than necessary in this particular case.

16       And I would encourage the Court to listen to

17  Mr. Miah.  And he crafted this statement himself.  And he

18  does want to speak to the Court.

19       THE COURT:  Thank you, Mr. Swift.  Ms. Smolar?

20       MS. SMOLAR:  The Defendant, Khaled Miah, is not a

21  jokester.  He is not a prankster.  He's not a knucklehead, as

22  Dr. Xenakis refers to him.  He's a convicted felon, and he is

23  dangerous.

24       He was convicted of seven serious federal felonies

25  after a nine-day jury trial with ten witnesses and

S. XENAKIS - DIRECT

1    approximately 150 exhibits.  And the jury found him guilty of

2    all but one count.

3            This Court presided over that jury trial and is

4    intimately familiar with the facts and the legal issues in

5    this case.  I think we're at something like 350 filings at

6    this point in this case.  So I will not repeat much of what

7    is already in there.  But there are a few things that bear

8    repeating, especially when you consider the 3553(a) factors.

9            And the Government is seeking a guideline sentence

10   and a sentence at the high end of the advisory guideline

11   range because of the nature and circumstances of this

12   Defendant and his conduct and the danger.

13           When he was approached by the FBI in September of

14   2020 to discuss his menacing online threats and social media

15   accounts, he became furious.  And he was furious that law

16   enforcement would dare question him about his online posts.

17   And he directed that grievance directly at the FBI agents who

18   were investigating him and then began intense planning.

19           Dr. Xenakis talked about planning.  We saw plenty

20   of that during the course of this trial.  We saw the

21   Defendant researching the agents, their families, their pets,

22   their locations.  We saw him weaponizing his social media and

23   going on Twitter and talking specifically by name about these

24   particular agents and one of their wives.

25           He endeavored to interfere with the FBI's work and

                        S. XENAKIS - DIRECT

1   investigation by altering and deleting his social media

2   accounts that he knew they were investigating.  And when you

3   looked at his electronic devices that were shown at trial,

4   they revealed a chilling interest in weapons, his fascination

5   with violence, terrorists, and his pronounced animosity

6   toward law enforcement officers, just like the federal agents

7   who he was threatening.

8          His targeting of the FBI agents was calculated and

9   controlled.  It was not haphazard or random.  It was not

10  crazy.  His obsession with them kept him online searching for

11  them and their families into the wee hours of the night for

12  months.

13         In December of 2020 his outrage at the FBI resulted

14  in the threats for which he's been convicted, invoking the

15  terrible September 11 terrorist attack that killed almost

16  3,000 people.

17         He's a danger to the community and to law

18  enforcement based on his online threats.  But what makes him

19  even more dangerous is that his conduct was not confined

20  merely to the Internet.  He traveled to the vicinity of

21  Special Agent Edquist's residence on several occasions

22  subsequent to September 2020 and to the FBI Field Office in

23  the middle of the night, nonwork hours, and on multiple

24  occasions between November 1, 2020 and January 6, 2021.

25         At the same time he was threatening the agents, his

S. XENAKIS - DIRECT

1    seized electronic devices revealed that he was also

2    researching them, their families, explosives, weapons,

3    violence, another Judge in this courthouse, this exact

4    building that we're standing in today.  He traveled to a

5    shooting range on the very same day that he made the

6    threatening posts.

7            Dr. Otto did testify at trial, and he's a forensic

8    psychologist who interviewed the Defendant and also conducted

9    forensic testing on him.  He said that Mr. Miah was fully

10   capable of forming the intent to threaten the agents.

11           After testing him and meeting with him in person,

12   Dr. Otto testified that his social media posts did not

13   reflect thinking impaired by a mental disorder and that his

14   thinking was logical based upon his psychological analysis of

15   Miah.  He opined that Miah appreciated the seriousness and

16   gravity of the situation he found himself in with the FBI.

17           It appears that the jury believed Dr. Otto and not

18   Dr. Xenakis in this case.  When the Defendant gets out of

19   prison, he will have no job, no schooling, a family who may

20   very well be interested in helping him, but could not help

21   him when the FBI sought their help leading up to the arrest

22   in this case.

23           And he will only be on supervised release for three

24   years.  That is the most this Court can order under the

25   guidelines.  And that's extremely troubling.  Three years is

S. XENAKIS - DIRECT

1    not a long time in a case like this for someone who,

2    according to his own expert, needs the type of treatment and

3    care that he needs.

4            If he gets out and decides he doesn't want that

5    treatment or that medication after three years, no one can

6    force him to do it.  And that's very dangerous.

7            So it makes him a danger to the community, to law

8    enforcement; and the only way to protect against that danger

9    at this point in time is keeping him in prison as long as we

10   are legally able to do that.  We're not asking for an upward

11   variance in this case, but we are asking for a guideline

12   sentence, given the breadth of the exhibits in this case and

13   the testimony and the conduct in this case.

14           In addition, his conduct demonstrates sustained

15   disrespect for the law.  He directly targeted and threatened

16   federal law enforcement officers merely trying to do their

17   jobs.  That's not what a normal college student on the Pitt

18   campus is doing in their spare time.  That's not what normal

19   people are doing online.

20           Other evidence on his electronic devices revealed

21   his plain contempt for law enforcement and his fascination

22   with weapons, explosives and violence.

23           Importantly, at no time has Mr. Miah expressed a

24   scintilla of responsibility -- acceptance of responsibility

25   or remorse for his conduct.  There is no reason to believe

                          S. XENAKIS - DIRECT

1  that he will conform his behavior when he is released from

2  prison or that he will not seek revenge for his prosecution,

3  just as he did for his investigation.

4           He does not have a desire to be rehabilitated.  His

5  lawyers do, and they're trying their best.  And his expert

6  does.

7           One of the purposes of the sentence is to protect

8  the public.  And that is what is so important in this case,

9  because this is a case involving real victims.

10          As we explained in the sentencing memo, the FBI

11  victims in this case are deemed to be official victims under

12  the sentencing guidelines.  But they are also human beings

13  with families who were all impacted by this Defendant.

14          FBI Special Agents Edquist, David Foster, Rashid

15  Hassanpoor, and Federal Task Force Officer Mike Matta, who

16  are all here in the courtroom today, were acting in

17  performance of their official duties to investigate the

18  criminal conduct and protect the public that they were

19  charged with protecting.  They were targeted by Mr. Miah

20  because they were doing their job.

21          The Court heard the testimony from Special Agents

22  Edquist, Hassanpoor and Foster at trial, and they explained

23  to you and to the jury how his conduct affected them

24  personally and professionally.  Their lives were disrupted

25  for months by this Defendant.

S. XENAKIS - DIRECT

1            Another impacted person is Special Agent Edquist's

2    wife, who is a civilian.  And we understand the ruling that

3    the Court issued yesterday with regard to the Crime Victims

4    Act.  And we understand that she's technically not a crime

5    victim in this case.  But the Court has expressed that it can

6    consider under 3661 and under the cases that the Court cited

7    other evidence relating to the Defendant's characteristics

8    and conduct.

9            And Special Agent Edquist's wife did submit a

10   victim impact statement in this case that is extremely

11   telling about how it affected both she and her husband during

12   this time, and I would just like to read a section from that.

13           She says, "In the more than four years that my

14   husband has worked as an FBI Special Agent, I have rarely

15   felt that my personal privacy or safety were violated or

16   threatened.  Khaled Miah changed that for me.

17           "It is difficult to describe how disturbing it felt

18   when I saw the social media profile he had altered, using my

19   photo and personal details, including information about my

20   profession and workplace, to post inflammatory content and to

21   express his personal grievances.  I never imagined that a man

22   whom I had never met would use me as a way of retaliating

23   against my husband because of some apparent vendetta.

24           "What was even more disconcerting than this initial

25   violation of my privacy was finding out that Mr. Miah had

S. XENAKIS - DIRECT

1   extensively researched our family and sat outside near our

2   home."

3          She continues, "While all of this was occurring in

4   late 2020, we were coping with a serious health emergency

5   involving a close family member living far away.  That added

6   heartbreak and anxiety of this situation further compounded

7   the stresses of trying to predict the intentions of a

8   potentially dangerous man who was actively threatening and

9   harassing my husband, his family members and me and

10  physically monitoring our residence.

11         "It goes without saying, but no partner, spouse or

12  family member of an FBI agent or any law enforcement officer

13  simply doing their job should ever be subjected to the

14  harassing and disturbing behavior that Mr. Miah

15  demonstrated."

16         Unfortunately, Khaled Miah's threats against these

17  law enforcement officers are not isolated incidents.  And we

18  provided the Court in our sentencing memo some examples of

19  the current threats against law enforcement and the FBI that

20  are very real and daily occurrences in our work.  I'm sure

21  the Court has seen them, and they are online constantly.

22  They are unacceptable, and they're extremely dangerous.

23         And these agents are dedicated public servants who

24  put their lives on the line to protect the public.  Neither

25  they nor their families should be threatened by the likes of

1    Khaled Miah or anyone else.  The jury in this case agreed.

2            A sentence at the high end of the advisory

3    guideline range will address the danger of this Defendant and

4    deter future Defendants from this type of serious criminal

5    conduct.

6            THE COURT:  Thank you.

7            MR. SWIFT:  Your Honor, we need a short break.  The

8    Defendant needs to use the facilities.

9            THE COURT:  Sure.  Let's take a short recess.  Ten

10   minutes.

11           MS. SHEETS:  All rise.  We will reconvene here at

12   12:15.

13           (A recess was taken at 12:06 p.m.)

14           (12:20 p.m; in open court:)

15           THE COURT:  Are we ready to proceed?

16           MR. SWIFT:  We are, Your Honor.

17           THE COURT:  So at this point before we give

18   Mr. Miah an opportunity to speak, do either counsel have any

19   motions or other comments that you'd like to make at this

20   juncture?

21           MS. SMOLAR:  Nothing further, Your Honor.

22           MR. SWIFT:  Nothing further from the defense.

23           THE COURT:  Mr. Miah, if you wish to make a

24   statement on your own behalf or present any additional

25   information in mitigation of your sentence, now is your

S. XENAKIS - DIRECT

 1    opportunity to do so.  I'd be pleased to hear from you if
 2    you'd like.  You're not required to, but you may.
 3              THE DEFENDANT:  I will.
 4              MR. SWIFT:  Mr. Miah would like to deliver it from
 5    the podium.
 6              THE COURT:  That's fine if it's okay with those
 7    guys.
 8              THE DEFENDANT:  Your Honor, I was arrested on
 9    January 6, 2021.  Simultaneously on that very same day,
10    hundreds of thousands of people tweeted the now infamous
11    phrase, "Hang Mike Pence."  I was upset and frustrated that
12    no one was charged for this conduct while I was prosecuted.
13              But I realize that today it is about me and not
14    them.  It is about what I did.  In late 2010, while I was a
15    teenager, my father suddenly and unexpectedly died from lung
16    cancer.  I felt brutalized by the harsh realities of the
17    world.  This was a life-changing event for me.  I realized
18    that my childhood had come to an early end.
19              Our Muslim community helped my family at this time,
20    and I remember them being there to help us get through those
21    tough, hard times.  As the months progressed, the people
22    around me went on about their daily lives.  However, I
23    remained in a state of shock.  I couldn't bring myself to
24    come to terms with the reality of my situation.  I felt
25    isolated and forgotten by everybody.  I was saddened at the

                        S. XENAKIS - DIRECT

1   unfair world I inherited.

2          Just a few months after my father died, while we

3   were in mourning, the FBI came to our family home.  They

4   interrogated my brother about a member of our community.  I

5   felt afraid and worried for my brother, and I felt

6   disrespected by the way the FBI treated us.  That event left

7   an impression on me and presented to me a negative and

8   intimidating image of the FBI.

9          I was frustrated with the Muslim community in

10  Pittsburgh due to how they reacted.  Instead of being

11  protective of one of our own, the members of my community

12  sympathized with the investigating agents.  The very same

13  community of people that came to my aid in the days after my

14  father's passing was now the very same people I despised.

15         I started to vent my frustration towards members of

16  my community.  I became vengeful of the FBI's tactics and

17  purpose and my community's inaction against it.  I started

18  sharing violent images and making comments, daring members of

19  my community to turn me in, just like how they had done

20  before.

21         I would send dumb pictures of plastic bottles taped

22  together to look like mock IEDs and pictures of me dressed up

23  in military attire all to my Muslim friends, daring them to

24  turn me in.  I've realized the uncomfortable position that I

25  put the members of my community in.  I've realized that I've

S. XENAKIS - DIRECT

1    done nothing but betray the very same people who came to my

2    aid in my darkest hour.  I want to apologize to the Muslim

3    community here in Pittsburgh for my actions towards them.

4            When the FBI started investigating me in 2019, I

5    imagined myself in a large FBI sting and shifted all my focus

6    and energy on the agents.  I gave the FBI a reason to

7    investigate me.  I reacted very badly to the FBI

8    investigation concerning me.  I directed my frustration and

9    angst towards the agents.  I took my frustration and built-up

10   tension out on the agents and their families.  I wanted them

11   to feel the same disrespect and the feeling of being under a

12   microscope that they made me feel.

13           Before I was arrested, I thought the FBI was

14   anti-Muslim and racist.  I now know that the FBI was

15   investigating me for how I was behaving.  During trial, I

16   heard testimony from the investigating agents and their

17   reaction to my behavior.  After being delusional for a long

18   time, I was brought back to reality.

19           It was troubling for me to hear how Agent Edquist

20   and his wife feared the unpredictability of the situation I

21   put them in.  It was troubling to know how my behavior caused

22   the agents to change the way they lived their lives.  I only

23   wanted them to feel insulted and under scrutiny.

24           I heard testimony from Agent Hassanpoor on how he

25   would look out his window every night to see if I was there

S. XENAKIS - DIRECT

1   outside waiting for him.  I heard testimony from Agent Foster

2   and how fearful he was for himself and his family because of

3   the way I was behaving.  All of these agents had to take

4   additional steps in order to ensure for themselves and their

5   families a curtain of security.

6         Although I understand your rationale and

7   precaution, I never had the intention to cause you any harm

8   or violence.  The thoughts thereof never crossed my mind.  I

9   never took any steps, whether large or small, nor devised any

10  plan or idea to cause you any harm.  Having now understood

11  the severity and seriousness of my actions and the

12  repercussions to the agents' lives that it caused, I am

13  sorry.

14        I apologize to Agents Edquist, Hassanpoor, Foster

15  and Matta for how I made you feel.  I never had the intention

16  to cause you any physical harm.  I wanted to make you feel

17  the same disrespect and discomfort that I felt when you were

18  investigating me and my community.  I feel terrible knowing

19  now how you guys interpreted my words and actions.  And for

20  that, I am sorry.

21        Lastly, I want to apologize to my family for

22  putting them through this ordeal.  Although I have been

23  neglectful towards you, you have always been on my side.  You

24  are my greatest supporters.  You had hopes for me graduating

25  from college, and I let you down.

S. XENAKIS - DIRECT

1        Your Honor, I respect your authority and judgment.
2   I understand why you have come to the conclusion that you
3   have.  However, I want you to hear me out.
4        It's taken me a long time to come to terms with the
5   fact that I need help.  I have struggled with mental health
6   since I was a teenager.  I ignored my high school teachers,
7   counselors, my family, my community, and even the FBI who
8   have all told me that I need mental help.
9        I've always thought of myself as being special.
10  During my childhood, I would look at myself differently than
11  others.  In my journey of life, I have always chased purpose.
12  I have always seeked a reason for why I was special.
13       I now realize there is nothing special about me.
14  There is nothing extraordinary that can set me apart from the
15  rest.  I've realized that the inner me is truly the enemy.
16       I find myself on the verge of being thirty, and I
17  have nothing to my name except a trail of regrets and
18  disappointment.  I have struggled with mental health
19  throughout my life and tried to remedy it with alcoholism.
20       It was during my alcoholic episodes that I started
21  tweeting about the agents.  It was during my alcoholic
22  episodes that I called my mother and ranted against her.  It
23  was during my alcoholic episodes that I neglected my school
24  work.  And it was during my alcoholic episodes that I was
25  abusive towards so many others.

1          Your Honor, when we were all kids, the world around

2     us molded and sculpted us into the people we have become

3     today.  I don't see why this circumstance couldn't be used to

4     mold and sculpt me into the person I am to become.

5          Before being incarcerated, I was completely

6     estranged from my family.  However, since then I've had the

7     opportunity to reconnect with my mother and brother, whom

8     I've telephoned nearly every day since being locked up.  I've

9     had the opportunity to rekindle a relationship with my family

10    that was nonexistent before.  I pledge to continue to further

11    and strengthen this bond in the days to come.

12         I pledge to my mother that I will be a better son,

13    to my brothers a better sibling.  I promise to finish my

14    undergraduate studies and graduate from college to be more

15    supportive of the family when I'm released.

16         I feel that since I have been incarcerated, I've

17    gotten the much-needed medications necessary to remedy my

18    mental health issues.  I have witnessed gradually my paranoia

19    and impulsiveness slowly going away.

20         Before taking medications, I was on a path of

21    self-destruction.  I can now think in a more self-critical

22    and clear way.  My ability to read the room and make

23    intelligent decisions have improved.  I have a strong desire

24    and a plan to further continue treatment in order to be more

25    in control of my life.

                          S. XENAKIS - DIRECT

1          Since I have been in jail, I have met so many, each

2    imparting their wisdom and experience on me.  I am determined

3    to correct and perfect myself.  That mission has already

4    started.  In the two years since my arrest I have been

5    nothing but obedient and law abiding, as the records from

6    jail will prove.

7          Having gone through this ordeal for the past two

8    years has been the biggest wake-up call in my life.  It is my

9    mission going forward to live a purposeful and meaningful

10   life.  I don't view this to be the end of my story.  Rather,

11   it is only the beginning of a new chapter, a new era.  Thank

12   you, Your Honor.

13         THE COURT:  Thank you, Mr. Miah.  I appreciate

14   that.

15         Mr. Swift, any additional items that you wish to

16   convey to me at this point?

17         MR. SWIFT:  I've made my argument, and without -- I

18   don't think that -- I believe everything in my argument was

19   also -- well, I knew what he was going to say.

20         THE COURT:  Well, along the way you've made a

21   number of recommendations for the Court for the Bureau of

22   Prisons.  I give you this opportunity.  Is there anything

23   else that you would like me to note at this point?

24         MR. SWIFT:  Under the standard conditions, and I

25   believe this is the standard conditions, that you should also

1  order -- and I'll set them out.  Order that the Probation

2  conduct a mental health survey and determine the appropriate

3  treatment for the Defendant upon release.  During the Bureau

4  of Prisons -- recommend to the Bureau of Prisons, but inside

5  the Bureau of Prisons they make their decisions.  And they'll

6  conduct their own evaluation, et cetera.

7         I would ask that the Court also recommend to the

8  Bureau of Prisons that Mr. Miah be incarcerated as close to

9  his family as possible.  Again, that's a recommendation.  But

10  I think in this case anything that would be added to it,

11  because contact with family, as we've all discussed, even the

12  prosecution argues that contact with family is very, very

13  important for his treatment, and I am too.  Placing him near

14  his family helps that continue.

15         But then what the Court can control is that

16  Probation absolutely conduct an evaluation and recommend

17  outside treatment or outside -- make a recommendation as to

18  what outside treatment plan is necessary, community health

19  treatment plan in this process.

20         I would ask that -- in these type of cases I know

21  that there's a halfway house at some point.  That's normal,

22  and he's been extraordinarily good on it.  But I ask the

23  Court to recommend to Probation that at the time that he's

24  released to any halfway house, that that part start.

25         The prosecution recommended that he only have three

S. XENAKIS - DIRECT

1   years.  I would say he actually should have three years and

2   six months.  Let's not waste a day; shall we?

3            So in that part at any time that he's not in

4   custody, treatment, in other words, in a halfway house, that

5   Probation begin that review and start -- a residential

6   treatment program would be the recommendation there.

7            I can submit to the Court afterwards Dr. Xenakis'

8   detailed recommendations.  I didn't find that to be

9   appropriate at this time, but I could submit it in part and

10  ask for the Court to consider any modifications as to it.

11  That being said, I think at the end it comes down to

12  Probation because they're going to supervise him in this

13  process.

14           The monitoring of social media I think is an

15  appropriate step inside Probation.  This is a unique defense

16  in that this is -- all of this occurred on social media.  So

17  I don't think that it's an undue restriction to restrict the

18  Defendant's use of social media, and given the concerns that

19  the Government's had to have the Defendant's computer open

20  for searches by Probation at any time and at any place in

21  case we're going back into concerning behaviors in this

22  process.

23           I think those are all very good steps because they

24  build habits.  And habits are important to build.

25           During the period of confinement, as Dr. Xenakis

S. XENAKIS - DIRECT

1   has said in that part, it's kind of an artificial time.  He

2   has done well, and that should be discounted, but it's also

3   artificial in that it's very structured and rigid.  You don't

4   have a lot of choices.  He's made good choices there, but you

5   don't have a lot.

6           And making sure that we take those steps in the

7   community to make sure we're not back here are I think very,

8   very important, and that's actually something that Mr. Miah

9   wants because he doesn't want to come back.  He doesn't want

10  to be here again.  And I think it would help.

11          So those steps, and the alcohol treatment, those

12  are while in custody.  The rest are the standard probations.

13  But the three deviations would be social media, monitoring,

14  community treatment plan and adherence to that plan and

15  the -- those are the additionals.

16          THE COURT:  Okay.  Thank you, Mr. Swift.

17          Ms. Smolar, anything additional you would like to

18  add?

19          MS. SMOLAR:  No.  And no objection to those.

20          THE COURT:  Bear with me one second.

21          (Brief pause.)

22          THE COURT:  After careful consideration of the

23  parties' arguments, the facts of record, including the

24  Presentence Investigation Report and the additional facts

25  that I've made findings on today, and after considering all

S. XENAKIS - DIRECT

1    of the Section 3553(a) factors, the Court will grant the

2    Defendant's motion for a variance, though not nearly to the

3    degree requested.

4         I'll detail those reasons regarding all the 3553(a)

5    factors in a few minutes, but I want to first address the

6    parties' various arguments.

7         The Defendant argues that a variance below the

8    advisory guideline range to a sentence between 36 and 41

9    months imprisonment is warranted here.  That's the argument.

10   And that argument is based principally on history and

11   characteristics of the Defendant, particularly his mental

12   health issues and his difficult upbringing as well as

13   secondarily -- I should say not secondarily, but secondly,

14   arguing that a variance is needed to avoid disparities with

15   sentences imposed in similar cases.

16        The Court recognizes that each of these areas are

17   appropriately considered in the context of evaluating 3553(a)

18   factors, though I must weigh the severity of the offenses

19   here against the personal history and characteristics of the

20   Defendant, which I'll do.

21        As it relates to the role in the offense and prior

22   criminal history, I note that the seriousness of the instant

23   offenses cannot be understated.  It's very serious.

24        The Defendant used social media accounts to

25   threaten FBI agents, who were just doing their jobs by

S. XENAKIS - DIRECT

1    investigating him.  The Defendant further endeavored to

2    interfere with the agents' work by altering and deleting

3    social media accounts and postings that he was aware of that

4    they were investigating.

5           The Defendant submits in his sentencing memorandum

6    that his conduct was fueled by paranoia and mistrust of the

7    FBI, and he was offended and thought that the FBI had crossed

8    the line by questioning him about comments he made online.

9    The Defendant supposedly decided he would cleverly get even

10   with the Agents by using the Internet to troll them.

11          The jury's verdict, however, indicates that they

12   weren't persuaded by that argument and that position.  And

13   I'm going to speak to the nature of the offense and the need

14   for a sentence in more detail in a few minutes, but I want to

15   focus mostly on the mental and emotional conditions presented

16   here.

17          The record reflects that the Defendant was

18   significantly affected by his father's death in 2010.  He

19   subsequently began exhibiting mental health symptoms.  His

20   family made attempts to obtain mental health treatment for

21   him, but the Defendant refused treatment at that time.

22          I note that Dr. Xenakis opined that the Defendant

23   suffered from serious mental illness since his father's

24   death, as I've mentioned, and to that end exhibited signs and

25   symptoms of psychosis and delusional thinking and perceptual

S. XENAKIS - DIRECT

1  disturbances, suicidal ideation and self-injurious behaviors

2  as an adolescent.

3          According to both Dr. Xenakis as well as the

4  Defendant's family members, the Defendant's mental health

5  deteriorated in the years leading up to his arrest, which was

6  exacerbated by his social isolation during the COVID

7  pandemic, during which time he began abusing alcohol.

8          I also note that the Allegheny County Jail records

9  from the Defendant's pretrial incarceration reflect that he

10  has been treated with various medications for symptoms of

11  anxiety, depression and psychosis.

12          Since that time, I note that the Defendant's

13  reported that the medications are helping, and he's open to

14  receiving mental health counseling and therapeutic treatment

15  moving forward.

16          According to Dr. Xenakis again, the Defendant's

17  mental state's improved, as he's been receiving these

18  medications.  And Dr. Xenakis recommends that the Defendant

19  continue to receive treatment and therapy for psychosis and

20  past alcohol abuse and that the Defendant has expressed an

21  intent to engage in counseling and therapy.

22          It's the Defendant's mental health situation that,

23  based upon all the information that I have available to me

24  and considering all of it, that I find that a variance is

25  warranted, based on the Defendant's mental and emotional

S. XENAKIS - DIRECT

1    condition.

2          In relation to the Defendant's second argument --

3    and let me just say in addition to that, maybe it's a

4    corollary to that, I also have considered the Defendant's

5    disadvantaged upbringing, particularly with the loss of his

6    father at a young age that either caused or contributed to

7    the mental illness that brings the Defendant's affliction to

8    today.

9          As it relates to the second argument posed for a

10   variance, avoiding unwarranted sentencing disparities, again,

11   after having considered all of the arguments made and the

12   facts of record as it relates to this particular argument,

13   the Court does not believe that the need to avoid unwarranted

14   disparities among Defendants with similar records who have

15   been found guilty of similar conduct warrants a variance

16   here.

17         In arguing for a sentence below the advisory

18   guideline range, the Defendant cites several cases involving

19   what is classified as decidedly more egregious matters

20   involving threats, and cites an array of cases where the

21   sentences imposed range anywhere from probation to 70 months

22   imprisonment.

23         I will note that in studying all of those other

24   cases, I recognize that many cases have lots of uniquenesses,

25   and this one in particular poses significant uniquenesses,

S. XENAKIS - DIRECT

1   and lots of factors go into sentencing, as you all know:  The

2   nature of the offense, the personal characteristics and

3   history of the Defendant, the charges that were asserted,

4   whether there was a guilty plea, whether there was

5   cooperation, many, many things that go into it.

6          And I don't believe that the sentence that I'm

7   going to impose today poses an unwarranted disparity with

8   other cases involving threats.  And for those reasons -- the

9   reason for avoidance of unwarranted sentencing disparities

10  does not pose a basis for a variance here.

11         I've also taken into consideration as part of the

12  variance process as well as all the 3553(a) factors

13  Mr. Miah's statement to the Court today and his recognition

14  that his behavior directed towards these FBI agents and their

15  families was wrong, and it showed disrespect for lawful

16  authority, and I take note of that.

17         I recognize Mr. Miah's apology in that regard,

18  corroborated by the letter written by his mother.

19         So after considering all of the 3553(a) factors and

20  for the reasons I've already expressed and for other reasons

21  that I am going to outline in a few moments, as I mentioned,

22  the Court grants the Defendant's motion for a variance, but,

23  again, not to the degree requested.

24         Turning to the Defendant's sentence, before I go

25  there, Counsel, any reason why sentence should not be imposed

1    at this time?

2              MS. SMOLAR:  No, Your Honor.

3              MR. SWIFT:  No, Your Honor.

4              THE COURT:  Ms. Stewart, any reason I shouldn't

5    impose sentence at this time?

6              MS. STEWART:  No, Your Honor.  Thank you.

7              THE COURT:  Mr. Miah, pursuant to the Sentencing

8    Reform Act of 1984, it is the judgment of the Court that the

9    Defendant, Khaled Miah, is hereby committed to the custody of

10   the Bureau of Prisons to be imprisoned for a total term of 72

11   months, which consists of 60 months at each of Counts 1, 2,

12   3, 4 and 5 and 72 months at each of Counts 6 and 8 of the

13   indictment at Criminal No. 21-110, said terms to be served

14   concurrently.

15             In addition, the Court makes the following

16   recommendations to the Bureau of Prisons on the Defendant's

17   behalf:

18             That he be granted credit for time served in

19   presentence custody to the extent he's eligible for same;

20   that he be incarcerated at a facility as near to Pittsburgh,

21   Pennsylvania, for which he qualifies; that he be provided

22   with a mental health evaluation as well as mental health

23   treatment while in the custody of the Bureau of Prisons to

24   the extent he is eligible for same; four, that he be provided

25   with any necessary counseling and/or treatment for substance

1    abuse while in the custody of the Bureau of Prisons for which

2    he is eligible, and that he be considered for placement in

3    the Residential Drug Abuse Program; five, that he be able to

4    receive any available education or vocational training for

5    which he qualifies; and six, that he be given a job in

6    prison.

7         Upon release from imprisonment, Mr. Miah, you shall

8    be placed on supervised release for a total term of three

9    years at each of Counts 1, 2, 3, 4, 5, 6 and 8 of the

10   indictment at Criminal No. 21-110, said terms to run

11   concurrently.

12        Within 72 hours of release from the custody of the

13   Bureau of Prisons, you shall report in person to the

14   Probation Office in the District to which you're released.

15        Now, while on supervised release, you shall not

16   commit another federal, state or local crime.

17        You shall comply with the standard conditions of

18   supervised release recommended by the Sentencing Commission

19   and adopted by this District Court.  You shall comply with

20   the following additional conditions.  I'm going to read

21   through them.  There are a number of them.

22        Number one, you shall not illegally possess a

23   controlled substance.

24        Two, you shall not possess a firearm, ammunition,

25   destructive device or any other dangerous weapon.

S. XENAKIS - DIRECT

1              Three, you shall participate in a mental health

2     assessment and/or treatment program approved by the Probation

3     Officer until such time as you're released from the program

4     by the Court.  Based upon your ability to pay, you shall be

5     required to contribute to the costs of service in an amount

6     determined by the Probation Office.  These costs shall not

7     exceed the actual cost of service.  The Probation Office is

8     authorized to release your presentence report to the

9     treatment provider if so requested.

10             Four, you shall participate in a program of testing

11    and, if necessary, treatment for substance abuse, said

12    program to be approved by the Probation Officer until such

13    time as you're released from the program by the Court.  Based

14    upon your ability to pay, you shall be required to contribute

15    to the costs of services for any treatment in an amount

16    determined by the Probation Officer, but not to exceed actual

17    costs.

18             You shall submit to one drug urinalysis within 15

19    days after being placed on supervision and at least two

20    periodic tests thereafter.  It is further ordered that you

21    shall not intentionally purchase, possess and/or use any

22    substances designed to simulate or alter in any way your own

23    urine specimen.  In addition, you shall not purchase, possess

24    and/or use any devices designed to be used for the submission

25    of a third-party urine specimen.

1           Six, you shall participate in an alcohol aftercare

2   treatment program approved by the Probation Officer, which

3   may include urine testing, until you are released from the

4   program by the Court.  You shall not use or possess alcohol.

5   Based on your ability to pay, you shall be required to

6   contribute to the costs of service in an amount determined by

7   the Probation Office.  These costs shall not exceed the

8   actual cost of service.

9           Seven, you shall participate in the United States

10  Probation Office's Work Force Development Program, as

11  directed by the Probation Officer.

12          Eight, you're permitted to possess or use a

13  computer and are allowed access to the Internet.  You shall

14  consent to the installation of any hardware or software to

15  monitor any computer or other electronic communication or

16  data storage devices used by you to confirm compliance with

17  this condition.  Based on your ability to pay, you shall pay

18  the monitoring cost as directed by the Probation or Pretrial

19  Services Officer.

20          Furthermore, you shall consent to periodic,

21  unannounced examinations by the Probation or Pretrial

22  Services Officer of any computers, cell phones or other

23  electronic communication or data storage devices that you

24  have access to to confirm compliance with this condition.

25          Additionally, you shall consent to the seizure and

S. XENAKIS - DIRECT

1    removal of hardware and data storage media for further

2    analysis by the Probation or Pretrial Services Officer based

3    upon reasonable suspicion of a violation of the conditions

4    imposed in this case or based upon reasonable suspicion of

5    unlawful conduct by you.  Failure to submit to the monitoring

6    or search of computers and other electronic communication or

7    data storage devices used by you may be grounds for

8    revocation.

9         Nine, if your employment requires the use of a

10   computer, you may use a computer in connection with your

11   employment, approved by the Probation or Pretrial Services

12   Officer, provided you notify the employer of the nature of

13   your convictions.  The Probation or Pretrial Services Officer

14   shall confirm compliance with this notification requirement.

15        Ten, you shall provide the U.S. Probation Office

16   with accurate information about your entire computer system,

17   hardware or software, and other electronic communication or

18   data storage devices or media, to include all passwords used

19   and the name of the Internet service providers.

20        You also shall abide by the provisions of the

21   Computer Restrictions and Monitoring Program approved by the

22   Court.

23        Eleven, you shall submit your person, property,

24   house, residence, vehicle, papers, business or place of

25   employment to a search conducted by the United States

S. XENAKIS – DIRECT

1   Probation or Pretrial Services Officer at a reasonable time

2   and in a reasonable manner based upon a reasonable suspicion

3   of contraband or evidence of a violation of a condition of

4   supervision.  Failure to submit to a search may be grounds

5   for a revocation.  You shall inform any other residents that

6   the premises may be subject to searches pursuant to this

7   condition.

8           And twelve, you shall cooperate in the collection

9   of DNA as directed by the Probation Officer, pursuant to

10  Title 28 Code of Federal Regulation Section 28.12, the DNA

11  Fingerprint Act of 2005 and the Adam Walsh Child Protection

12  and Safety Act of 2006.

13          The Court also orders you to pay to the United

14  States a special assessment of $100 at each count of

15  conviction for a total special assessment of $700, which will

16  be paid to the United States District Court Clerk forthwith.

17          The Court finds that you do not have the ability to

18  pay a fine, and, thus, the Court will waive a fine in this

19  case.

20          The Court believes that this sentence adequately

21  addresses the nature and circumstances of the offenses as

22  well as the history and background of the Defendant.  The

23  Court also finds that this sentence is sufficient, but not

24  greater than necessary to meet the goals of sentencing in

25  this case.

S. XENAKIS - DIRECT

1        The Court further holds that it would adhere to

2  this sentence even if the advisory guideline range is

3  incorrectly computed.

4        Now, you may sit if you'd like.  In making findings

5  relevant to your sentence, Mr. Miah, the Court examined the

6  factors set forth under Title 18 of the United States Code

7  Section 3553(a), and I've considered every one of those

8  factors.  And on the basis of the Court's factual findings,

9  the reasons for the imposition of the sentence in your case

10  are as follows.  I'm going to go through them with you.

11        First, I gave significant consideration to the

12  nature of the offenses, the circumstances of the offenses and

13  the history and characteristics of you.

14        And as I've discussed already, these offenses are

15  very serious.  You used social media accounts to target and

16  ultimately threaten FBI agents who were investigating your

17  other conduct.  You interfered with the FBI's investigation

18  by altering and deleting social media accounts that you were

19  aware the FBI was investigating.

20        You engaged in conduct which would allow one to

21  permissibly infer that you had the intent to carry out the

22  threats contained in the tweets charged in the indictment.

23  You researched the agents and their families and their pets

24  online, traveled to the vicinity of one of the agents'

25  residences and to the vicinity of the FBI Field Office where

1   these agents worked at various times of the day and night on
2   multiple occasions.

3         You performed online research about weapons
4   explosives and violence, and you visited a shooting range on
5   the day that one of the threatening posts were made.

6         Although arguments have been made contending
7   throughout this case that these were jokes or trolling or
8   clever provocations, expressing resentments, that the words
9   were mere hyperbole, these threats charged and that you were
10  ultimately convicted of, considering the context of the
11  conduct described throughout the record here and viewed as a
12  whole, painted a much different picture.

13        As the jury found, these words contained in these
14  tweets were true threats, and those true threats were
15  directed at FBI agents who were simply doing their jobs
16  performing an investigation to keep everybody safe.

17        Now, as to your history and your personal
18  characteristics, Mr. Miah, as I've mentioned, I take
19  significant note of your childhood, the impact that the loss
20  of your father had on you and the consequential mental
21  illnesses that you've been afflicted with.

22        I take note that you immigrated to the United
23  States with your family in 2003, came here related to your
24  father's employment.  You described your home life as typical
25  and reported that your parents provided for all of your basic

1    needs.  And I note, too, that even up through today they seem

2    to be very supportive of you.  And they do everything that

3    they can to support you.  And that's good.  That's helpful,

4    and I want to talk about that a little bit more in a bit.

5            You indicated having a good relationship with your

6    mother and your siblings.  And they indicate that they

7    support you, and they love, and they care for you, and the

8    Court takes note of that.

9            I note that you're in good physical condition, but

10   that you've suffered from mental health issues as we've

11   previously discussed and talked about at length.  And as

12   detailed in the presentence report, it indicates that the

13   medications that you've been receiving while being detained

14   are helping in your symptoms and helping you generally in

15   very impactful ways.

16           The Court's hopeful that you'll continue to

17   maintain the commitment of taking those medications and

18   really focusing hard on treatment and counseling to help you

19   through these mental health ailments that you're afflicted

20   with.  And the Court encourages you to take full advantage of

21   all available resources and treatment while in BOP custody

22   and afterwards while on supervision to address these mental

23   health needs.

24           The Court also takes note of the Defendant's

25   history of drug and alcohol use, a history of using marijuana

S. XENAKIS – DIRECT

1    beginning at age 17, and drinking alcohol began in 2017,

2    abusively at times.

3           The Court also takes note of the Defendant's

4    perseverance of getting a GED after having struggled in high

5    school and then pursuing a college degree and getting very

6    close to that until all these things happened.  Again, the

7    Court encourages you, Mr. Miah, to explore and take advantage

8    of all vocational training and educational opportunities that

9    you're going to be provided.  That will take you in good

10   stead and help you become a contributing member of our

11   society and your community.

12          I've considered all of the types of sentences

13   available, everything from incarceration to probation to home

14   confinement to supervised release and everything of that

15   nature.  I've also considered and take note that restitution

16   is mandatory in this case, that none of the victims have

17   requested or applied for restitution; therefore, none will be

18   ordered.

19          I've considered the various pertinent policy

20   statements in this case, and I'll note them for the record.

21   Guideline 5H1.1, the Defendant's age; 5H1.3, mental and

22   emotional conditions; 5H1.4, physical condition, including

23   drug or alcohol abuse; 5H1.12, disadvantaged upbringing; and

24   5K2.13, diminished capacity.

25          I've also considered, to the extent the record

S. XENAKIS - DIRECT

1    reflects, any post-offense rehabilitation as well as a

2    showing of remorse, and I've considered all of those items

3    here.  I've considered the guidelines in this case in both

4    the sentencing here and in my tentative findings and rulings.

5         Last but not least, the need for a sentence.  You

6    know, again, the crimes, Mr. Miah, for which you've been

7    found guilty are very serious crimes.  You engaged in conduct

8    that threatened the very people that sacrifice their own

9    lives and their own comfort at times frankly to keep

10   everybody safe, to keep you safe, to keep your family safe,

11   to keep everybody in our community safe, and they're public

12   servants.  They're doing their job.

13        They don't have to be doing that job.  They do that

14   job because they feel a calling to protect all of us,

15   everybody, including you.

16        And it appears clear to the Court that -- and I

17   think Mr. Swift said it earlier, that in that fateful

18   December, your interactions with the FBI agents may very well

19   have saved your life.  And they were just doing their jobs.

20        Now, I recognize that public servants aren't

21   perfect.  Our institutions of Government aren't perfect.  And

22   people are certainly free to express opinions and criticisms

23   of our institutions.  That's what makes America great.  We

24   have the right to do those things.

25        But what we don't have the right to do though is to

1   threaten people with harm.  And I know and appreciate now

2   that you've come to know that your conduct crossed that line,

3   and that you've put these agents in harm's way and created

4   fear in them, impacted them professionally, impacted them

5   personally, impacted their families, impacted spouses by your

6   threats and by your surrounding conduct.

7           And to be sure, the need for a sentence here serves

8   the need to ensure that there's respect for the law, which I

9   think you've now come to realize.  There needs to be a

10  protection of the public.

11          And I'm concerned that these behaviors require more

12  treatment, and you're going to get the treatment you need and

13  continue to get the treatment you need where you are

14  presently, so that when you do exit incarceration and come

15  into the community with the help of supervision from the

16  Probation Office, that you'll be on a good track to again

17  contribute to society, to be a good, contributing, valuable

18  member of society.

19          Something you said to me, Mr. Miah, struck a chord

20  with me when you talked about a person of self-worth.  Every

21  human being has self-worth.  You have self-worth.  There's a

22  lot of people in this room today who are here because they

23  want to see you go down a different path than you've been

24  going down.  They want to see you succeed.

25          Every person in this room wants to see you succeed

S. XENAKIS - DIRECT

1    in your treatment, wants to see you get better, wants to see
2    you recognize that our society, our communities and our
3    institutions are here to support everybody.
4            And Mr. Swift made some comments about that earlier
5    today, and that's true.  This whole process, you know, all of
6    the structures that you've been experiencing are to protect
7    your rights and to protect all of our citizens.  And the
8    conduct that you were convicted of undermines our society's
9    ability to protect each other.
10           And, you know, I hope that that's a lesson that
11   you'll have learned now, and I think you have based upon your
12   comments to me today; and I hope that the time that you're
13   going to finish spending your sentence to reflect on those
14   things and, again, to focus on getting better, mentally
15   better, and orienting yourself towards doing good for your
16   community, doing good for our society, I have faith in you to
17   do that, as long as you're willing to put in the work on your
18   end.
19           Your family seems to be as well.  And, you know,
20   it's to your credit that they're here for you and that they
21   support you, and they love you.  And they want to see you be
22   healthy again, too.
23           And so the next time that they call, heed their
24   admonitions.  Heed their concerns.  Heed their warnings.
25   They tried to help you before, and you weren't in the head

S. XENAKIS - DIRECT

1    space to listen to them.  It's my hope that you will be going

2    forward.

3              I also have to address deterrence.  And certainly

4    deterrence is a critically important factor in my

5    considerations today.  There are certainly specific

6    deterrents in the sense that your period of incarceration is

7    intended to deter you from continuing to engage in the

8    behaviors and harms that you had engaged in that led to your

9    conviction.

10             And it's the hope that through that incarceration

11   as well as the treatment that you're going to receive, that

12   you will be deterred from engaging in any of these types of

13   behaviors again.

14             But I also have to be mindful of what I'll call

15   third-party or general deterrents.  We live in a time, in an

16   age where people seem less able to control impulses and less

17   able to recognize the difference between things that are said

18   and done, that are said and done kind of off the cuff or

19   maybe jokingly or meaningful and serious.

20             And while the actual offense conduct that you were

21   convicted of was done on social media, it doesn't make it any

22   less impactful.  When somebody types out a tweet and sends it

23   to somebody else or sends it to the universe at large, it has

24   an impact on people.  It has an impact on in this case the

25   FBI agents and their families who were doing their jobs as

1   public servants.

2           It's concerning that people can sit in anonymity

3   and press a button and send a message that's not just words,

4   it's not just verbalization, but it imposes threats, and it

5   really impacts people in very harmful ways.  And it's

6   important that as part of the purposes behind sentencing

7   today, that that general deterrence to others who may

8   consider conveying threats to people and thinking, oh, it's

9   not that important because -- it's not that impactful or it's

10  not that meaningful because I'm just doing it on my phone or

11  I'm doing it on my computer.  I'm not in somebody's face

12  making these threats.  It's still a threat, and it's still

13  harmful.

14          And the community needs to understand that those

15  who engage in those types of threats even by the use of

16  social media are doing great harm to our society, doing great

17  harm to our culture, and we're hurting our neighbors.  And

18  that can't be.  And the law will impose very strict

19  consequences to those engaged in that type of behavior.

20          All that being said, the Court believes that this

21  sentence that's been imposed today will address the goals of

22  punishment, rehabilitation and deterrence in your case,

23  Mr. Miah.

24          The Court also believes that this sentence is

25  sufficient but not greater than necessary to meet the goals

S. XENAKIS - DIRECT

1    of sentencing as set forth in Section 3553(a); and I'll note,

2    too, as both sides presented me with very divergent points of

3    views of what you're asking for from me; and when I look at

4    the proposed sentence that the defense proposed to me, I look

5    at a sentence that is not sufficient to meet the goals of

6    sentencing.  And when I consider the Government's proposed

7    sentence, I look at a sentence that is greater than necessary

8    to meet the goals of sentencing in this particular case,

9    particularly given your mental health struggles, Mr. Miah.

10          But I'm also very concerned about protecting the

11   public as well.  And so I have to balance all of those

12   things.  And in that regard, I've arrived at the sentence

13   that I've arrived at today.

14          And with that being said, Counsel, any reason why

15   sentence should not be imposed as stated?

16          MS. SMOLAR:  No, Your Honor.

17          MR. SWIFT:  No, Your Honor.

18          THE COURT:  Ms. Stewart, any need to clarify

19   anything in the Court's oral statement of sentence?

20          MS. STEWART:  No.  Thank you, Your Honor.

21          THE COURT:  The Court hereby orders the sentence

22   imposed as stated.

23          Mr. Miah, I now need to review with you your appeal

24   rights.  You may appeal your conviction if you believe that

25   it was somehow unlawful or inappropriate or improper.

S. XENAKIS - DIRECT

1            You have the right to apply for leave to appeal in

2   forma pauperis, which means that you're without funds, and

3   the Court disregards filing fees and costs.  And the Clerk of

4   Court will prepare and file a notice of appeal upon your

5   request pursuant to Federal Rule of Criminal Procedure 32J.

6            Further, the Court advises that with few

7   exceptions, any notice of appeal must be filed within 14 days

8   of the entry of judgment, pursuant to Federal Rule of

9   Appellate Procedure 4B.

10            With that, any other motions that either party

11   would like to raise?

12            MR. SWIFT:  Just to let you know that we'll be

13   counsel for Mr. Miah for appeal, and he does intend to

14   appeal, and we'll file that forthwith.  We will intend --

15   although we represented him as private counsel during this,

16   we have done so pro bono, and he is in forma pauperis, and we

17   will file a motion.

18            THE COURT:  Ms. Smolar, any motions?

19            MS. SMOLAR:  No, Your Honor.

20            THE COURT:  Any items under seal that need to be

21   unsealed?  I don't believe so.

22            MS. SMOLAR:  I don't think so.

23            MR. SWIFT:  No, Your Honor.

24            THE COURT:  Mr. Miah, I just want to say to you

25   before we part company that I wish you all the luck.  And I

S. XENAKIS - DIRECT

1    hope that you do work hard at helping yourself through

2    therapy and continuing to take the medication that's been

3    prescribed for you.

4            You know, stay in close contact with your family

5    members.  I'm heartened to hear that you've become closer to

6    them in the time that you've been detained.  You're going to

7    need their help.  And they need you.  And they need you to be

8    healthier, and they need you to be back with them.

9            And it's my hope that you use the time that's

10   remaining on your sentence well, work hard at it; and I hope

11   that, as Mr. Swift pointed out, that you've come to realize

12   that the whole system here was mobilized for you in many

13   respects, for the agents as well who were victimized by your

14   crimes.  We're here for everybody, including you.

15           And it's my hope that the supports that you're

16   going to get over the next several years will put you on the

17   right pathway that you can return to your family, you can

18   return to your community, you can return to our society and

19   contribute.

20           You have a lot to offer.  You're a bright guy.  You

21   have lots of intelligence; and if you can channel it in the

22   right ways, I think you could do great things.  You have a

23   lot of worth as a human being, and I want you to understand

24   that that's the truth.  And I believe that as a human being

25   myself.  And as the Court, you should understand that in this

1    country we stick together, and that includes you.  You've

2    just got to do your part.

3            And then for those in law enforcement that are here

4    in the courtroom today, let me just say that the Court is

5    grateful for all of the sacrifices and the work that you all

6    do because you're just doing your jobs, and you're public

7    servants, and the Court is grateful for that.  And sometimes

8    it's not easy.  And the Court extends its thanks to you for

9    doing your job.

10           With that, Mr. Miah, you're hereby remanded to the

11   custody of the United States Marshal.  And I ask everybody to

12   please remain seated while the Defendant is exited from the

13   courtroom.  This hearing is adjourned.  Again, Mr. Miah, good

14   luck to you, sir.

15           (Proceedings were concluded at 1:13 p.m.)

16                              -  -  -

17

18                   C E R T I F I C A T E

19

20           I, Deborah Rowe, certify that the foregoing is

21   a correct transcript from the record of proceedings in the

22   above-titled matter.

23

24   S/Deborah Rowe    _____

25   Certified Realtime Reporter

                        S. XENAKIS - DIRECT